**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 12-cv-3012-WJM-BNB

KISSING CAMELS SURGERY CENTER, LLC,
CHERRY CREEK SURGERY CENTER, LLC,
ARAPAHOE SURGERY CENTER, LLC, and
HAMPDEN SURGERY CENTER, LLC,

      Plaintiffs,

v.

CENTURA HEALTH CORPORATION,
COLORADO AMBULATORY SURGERY CENTER ASSOCIATION, INC.,
ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE, INC., d/b/a ANTHEM BLUE
CROSS AND BLUE SHIELD OF COLORADO,
UNITEDHEALTHCARE OF COLORADO, INC.,
AUDUBON AMBULATORY SURGERY CENTER, LLC, and
AETNA, INC.,

      Defendants.

---

### ORDER ON DEFENDANTS' MOTIONS TO DISMISS

---

Plaintiffs Kissing Camels Surgery Center, LLC ("Kissing Camels"), Cherry Creek Surgery Center, LLC ("Cherry Creek"), Arapahoe Surgery Center, LLC ("Arapahoe"), and Hampden Surgery Center, LLC ("Hampden") (collectively "Plaintiffs") bring this antitrust action under the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, and the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-101 *et seq.* (First Am. Compl. ("FAC") (ECF No. 70) at 28-38.) Before the Court are eight Motions to Dismiss (collectively "Motions"). (ECF Nos. 88, 91, 93, 94, 112, 113, 114, 128.) For the reasons set forth below, the Motions filed by Kaiser Foundation Health Plan of Colorado, HCA, Inc., and HCA-HealthONE LLC are denied as moot, Centura Health Corporation's Motion is granted in part and denied in part, and the remaining Motions are granted.

## I.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  In evaluating such a motion, a court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II.  BACKGROUND

The relevant facts, as pled in the FAC, are as follows.

Plaintiffs are four ambulatory surgery centers performing outpatient surgical procedures and treatments in a non-hospital environment.  (FAC ¶ 17.)  Plaintiff Kissing Camels provides services in the area of Colorado Springs, Colorado, and the other three Plaintiffs provide services in the Denver, Colorado metropolitan area ("Metro Denver").  (*Id.* ¶¶ 27, 40.)

Defendant HCA, Inc. owns Defendant HCA-HealthONE LLC (together, "HCA"), which operates a system of hospitals and surgery centers in Metro Denver that compete with Plaintiffs Cherry Creek, Arapahoe, and Hampden to provide ambulatory surgery services.  (FAC ¶¶ 6, 27.)  Centura Health Corporation ("Centura") owns a system of hospitals and surgery centers in both Metro Denver and Colorado Springs, which compete with Plaintiff Kissing Camels to provide ambulatory surgery services. (*Id.* ¶¶ 7, 40.)  Defendant Audubon Ambulatory Surgery Center, LLC ("Audubon") is a joint venture between Centura and several local physicians, and is controlled by Centura.  (*Id.* ¶¶ 13, 44.)  Defendant Colorado Ambulatory Surgery Center Association, Inc. ("CASCA") is a trade association representing the interests of ambulatory surgery centers.  (*Id.* ¶ 45.)  At least two HCA employees sit on CASCA's Board of Directors, and Audubon's Executive Director serves as an officer of CASCA.  (*Id.* ¶¶ 65-66.) Defendants Rocky Mountain Hospital and Medical Service, Inc, d/b/a Anthem Blue Cross and Blue Shield of Colorado ("Anthem"), UnitedHealthCare of Colorado, Inc. ("United"), Aetna, Inc. ("Aetna"), and Kaiser Foundation Health Plan of Colorado ("Kaiser") (collectively "Insurers" or "Insurer Defendants") are health insurance companies doing business in Colorado.  (*Id.* ¶¶ 46-49.)

Plaintiffs allege that, beginning in 2010, Centura and HCA conspired to reduce competition for ambulatory surgery services by not doing business with Plaintiffs, and by using their market power to pressure physicians and insurers with whom HCA and Centura have relationships not to do business with Plaintiffs.  (FAC ¶¶ 33, 52-55, 82.) CASCA provided the site for the meetings at which the conspiracy was formed.  (*Id.* ¶ 45.)

A non-hospital ambulatory surgery center requires transfer agreements with hospitals to ensure that a patient requiring emergency hospitalization receives rapid and adequate care.  (*Id.* ¶ 56.)  HCA and Centura have both refused to sign transfer agreements between their hospitals and Plaintiffs' facilities, despite the predicted benefit to the hospital of increased patient flow.  (*Id.* ¶¶ 56-57.)  In April 2010, a Centura-owned hospital canceled a planned patient transfer agreement with Plaintiff Kissing Camels, and in February 2012, a HCA-HealthONE hospital refused to sign a transfer agreement with Cherry Creek.  (*Id.*)

At the request of Centura and HCA, CASCA's Executive Director sent a letter to the Colorado Department of Regulatory Agencies ("DORA"), asking it to take legal action against Plaintiffs for allegedly violating state law prohibiting them from waiving or discounting insurance copayments and deductibles.  (*Id.* ¶ 68.)  DORA took no action against Plaintiffs based on this letter, and noted that no complaints had been received by the Colorado Medical Board for unlawful billing practices.  (*Id.*)

Plaintiffs also allege that on August 30, 2012, Centura, HCA, and CASCA held a meeting at which they requested that the Insurer Defendants and other insurers join them in a concerted boycott of Plaintiffs.  (*Id.* ¶¶ 65-69.)  At the meeting, Centura and Audubon representatives asserted that Plaintiffs' billing practices violated state law because Plaintiffs were waiving copayments and deductibles, and requested that the Insurers not do business with Plaintiffs.  (*Id.* ¶¶ 54, 69.)

Starting in 2010, Plaintiffs allege that Centura asked United to penalize physicians referring business to Plaintiff Kissing Camels, and both Centura and HCA

made similar requests of other Insurers.  (*Id.* ¶ 55.)  The Insurers were compelled to comply because they needed Centura's and HCA's hospitals in their provider networks. (*Id.* ¶ 34.)  All of the Insurer Defendants have refused to negotiate network agreements directly with Plaintiffs.  (*Id.* ¶¶ 47-49.)  Aetna threatened physicians with termination from its provider network, and also threatened to post information on its provider website that those physicians were referring patients to out-of-network providers, which would increase costs for patients. (*Id.* ¶¶ 59, 63.)  Aetna also sent certified letters terminating physicians for out-of-network referrals to Plaintiffs' facilities.  (*Id.* ¶ 76.) Anthem also contacted physicians who were using Plaintiffs' facilities, and sent letters threatening network termination for purportedly inappropriate referrals, including a letter to Colorado Orthopaedic Consultants that was sent on August 31, 2012, the day after the CASCA meeting.  (*Id.* ¶¶ 64, 73-75.)

Plaintiffs allege that in 2011, United threatened Dr. Steven Topper of Colorado Hand Center with termination for breach of his network contract based on his referral of patients to Kissing Camels, and terminated his contract by letter on December 16, 2011.  (*Id.* ¶¶ 49, 60.)  On August 31, 2012, United terminated another facility, Metro Denver Pain Management, purportedly "for cause" due to its regular use of Arapahoe's facility.  (*Id.* ¶¶ 61-62.)  United also threatened primary care physicians with termination from its network because they referred patients to specialists that used Plaintiffs' facilities.  (*Id.* ¶¶ 71-72.)

According to Plaintiffs, at an Audubon shareholder meeting on October 4, 2012, Audubon administrator Brent Ashby stated that it was his goal to put Kissing Camels

out of business.  (*Id.* ¶ 81.)

On November 15, 2012, Plaintiffs filed a Complaint against Defendants HCA, Centura, CASCA, and Kaiser, bringing claims under the Sherman Act and the Colorado Antitrust Act.  (ECF No. 1.)  Plaintiffs filed their FAC on April 3, 2013, adding claims against Defendants Arapahoe, Anthem, United, and Aetna.  (ECF No. 70.)  The FAC alleges that Defendants conspired to restrain trade in the Metro Denver and Colorado Springs markets for ambulatory surgery services, under both § 1 of the Sherman Act (Count 1) and the parallel provision of the Colorado Antitrust Act (Count 6).  (FAC ¶¶ 87-91, 114-118.)  The remaining claims (Claims 2-5 and 7-10) are brought under § 2 of the Sherman Act and the parallel Colorado law against Defendants HCA, Centura, and Audubon.  (*Id.* ¶¶ 92-103, 119-40.)

On April 22, 2013, Defendants CASCA, HCA, Kaiser, and Centura filed Motions to Dismiss the respective claims against them.  (ECF Nos. 88, 91, 93, 94.)  Plaintiffs filed an Omnibus Response (ECF No. 111), and CASCA, HCA, Kaiser, and Centura filed Replies (ECF Nos. 120, 122, 123, 124).  On May 23, 2013, Defendants Aetna, Anthem, and Audubon filed Motions to Dismiss (ECF Nos. 112, 113, 114), Plaintiffs filed Responses (ECF Nos. 124, 125), and Aetna, Anthem, and Audubon filed Replies (ECF Nos. 129, 130, 131).  Defendant United filed its Motion to Dismiss (ECF No. 128) on June 28, 2013, to which Plaintiffs filed a Response (ECF No. 132), and United a Reply (ECF No. 136).

Plaintiffs subsequently stipulated to dismiss Defendants Kaiser and HCA from this action.  (ECF Nos. 140 & 175.)  Accordingly, Kaiser's and HCA's Motions to Dismiss (ECF Nos. 91 & 93) are moot.  The remainder of the Motions are fully briefed

and ripe for disposition.

### III.  ANALYSIS

Each Defendant's respective Motion moves for the dismissal of all claims asserted against it.  The Insurer Defendants and CASCA each move for dismissal of Plaintiffs' claim under § 1 of the Sherman Act (Count 1), and the analogous state claim pursuant to Colorado Revised Statutes § 6-4-104 (Count 6), the only claims asserted against them.  (ECF Nos. 88, 112, 113, 128; *see* FAC ¶¶ 87-91, 114-18.)  Defendant Audubon moves to dismiss Plaintiffs' § 1 claim, as well as Plaintiff Kissing Camels' § 2 claims for Attempted Monopolization and Conspiracy to Monopolize the Colorado Springs market (Claims 4 and 5), and the analogous state law claims (Claims 9 and 10).  (ECF No. 114; *see* FAC pp. 31-33, 36-38.)  Defendant Centura moves for the dismissal of Plaintiffs' § 1 claims, Plaintiffs' § 2 claims with respect to the Colorado Springs market, and Plaintiffs' § 2 claims for Attempted Monopolization and Conspiracy to Monopolize the Metro Denver market (Claims 2 and 3) and the analogous state claims (Claims 7 and 8).  (ECF No. 94; *see* FAC pp. 29-31, 34-36.)

The Sherman Act is a federal statute prohibiting monopolies and combinations in restraint of trade.  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 1.  Section 2 of the Sherman Act prohibits monopolization, attempted monopolization, or conspiracy to monopolize any part of interstate trade or commerce.  *Id.* § 2.

The parties agree that federal antitrust law principles control both the federal and state antitrust claims.  *See Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1220 n.1 (10th Cir. 2009); (ECF Nos. 88 at 2 n.1; 94 at 6 n.3; 111 at 3 n.2; 112 at 4 n.2; 113 at 4 n.2; 114 at 2 n.2).  The Court will discuss each of Plaintiffs' claims and the Motions' arguments for their dismissal below.

A.    **Section 1 — Claims 1 and 6**

Plaintiffs' claims under § 1 of the Sherman Act allege that Defendants conspired to put Plaintiffs out of business, which unreasonably restrained trade in the Metro Denver and Colorado Springs markets for ambulatory surgery services and damaged Plaintiffs.  (FAC ¶¶ 87-91, 114-18.)

Section 1 prohibits only concerted, multilateral action.  *See Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1232 (10th Cir. 2003).  "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553 (internal citations and brackets omitted). Accordingly, at the pleading stage, stating a § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Id.* at 556.  Such an agreement is established by evidence that the conspiring parties "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

8

If the complaint does not directly allege an agreement but instead makes only "allegations of parallel conduct . . . in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That is, the complaint must contain "allegations plausibly suggesting (not merely consistent with) agreement". *Id.*

Each Defendant argues that Plaintiffs have insufficiently alleged that it participated in a conspiracy. Accordingly, the Court will discuss the allegations of conspiracy against each Defendant in turn.

1.   Centura

Centura argues that Plaintiffs' § 1 claims against it should be dismissed because Plaintiffs fail to allege sufficient facts establishing Centura's involvement in the conspiracy. (ECF No. 94 at 5.)

In the FAC, Plaintiffs allege that Centura and HCA agreed, during and prior to at least one CASCA meeting in August 2012, not to do business with Plaintiffs, and to pressure physicians and insurers with whom HCA and Centura have relationships not to contract with Plaintiffs. (FAC ¶¶ 33, 52-55, 82.) Plaintiffs allege that beginning in 2010, Centura specifically asked United to penalize physicians referring business to Kissing Camels, and made similar requests of other Insurers. (*Id.* ¶ 55.) Plaintiffs also allege that in April 2010, a Centura-owned hospital canceled a planned patient transfer agreement with Kissing Camels, despite the predicted benefit to the hospital of increased patient flow. (*Id.* ¶ 57.) Finally, Plaintiffs contend that, because Centura controls Audubon, Centura is also responsible for the statement by Audubon employee

9

Brent Ashby that it was his goal to put Kissing Camels out of business.  (*Id.* ¶ 81.)

Centura recognizes that the Court must take Plaintiffs' well-pled factual allegations as true for the purposes of a motion to dismiss, but argues that these allegations are conclusory, not well-pled factual allegations.  (ECF No. 94 at 5-9.)  The Court has little difficulty rejecting this argument.  Allegations are deemed "conclusory" where they state a legal conclusion without supplying a factual narrative for that conclusion, such that they "amount to nothing more than a 'formulaic recitation of the elements' of a . . . claim".  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (quoting *Twombly*, 550 U.S. at 555).

For example, a conclusory allegation in a § 1 claim would state little more than that the defendant joined a conspiracy to unreasonably restrain trade.  In contrast, Plaintiffs describe an overt agreement between competing parties to put Plaintiffs out of business by influencing physicians and insurers not to do business with Plaintiffs, with the goal of reducing competition for their own respective hospitals and surgery centers. Plaintiffs allege specific actions Centura took, both with the Insurers and directly with Kissing Camels, that support the alleged conspiratorial agreement between Centura and HCA.  These are factual, not conclusory, allegations that the Court must take as true when considering Centura's Motion.

Centura next argues, citing an unpublished case from the Northern District of California, that to plead a meeting to conspire a plaintiff must allege that the individuals in attendance had authority to act on the defendant's behalf, and that those employees reported back to their parent organizations.  (ECF No. 94 at 7 (citing *In re Cal. Title Ins. Antitrust Litig.*, 2009 WL 1458025, at *6 (N.D. Cal. May 21, 2009)).)  However, that case

is not analogous to the instant case.  The plaintiff in the California case alleged an opportunity to conspire through participation in a trade organization, but did not allege any formal meetings, let alone any details about such meetings that would give rise to an inference of a plausible conspiracy.  *See In re Cal. Title*, 2009 WL 1458025, at *5-6. Were Plaintiffs here relying solely on their allegations of "a number of meetings . . . among various Defendants and other co-conspirators from 2010 to the present" (FAC ¶ 54), this general reference to opportunities to conspire may not be a sufficient factual basis from which the Court may properly infer an agreement.

However, Plaintiffs have also set forth discrete actions taken by Centura and HCA in furtherance of the conspiracy, as well as a specific CASCA meeting on August 30, 2012, at which the agreement was solidified and an overt attempt was made to persuade the Insurers to assist with Centura's and HCA's conspiratorial goals, after which a number of the Insurers took the actions Centura and HCA discussed.  These factual allegations are sufficiently specific that Plaintiffs need not state the names or employment positions of the attendees at the meeting to nudge their allegations of conspiracy across the line from possible to plausible.  *See Twombly*, 550 U.S. at 556.

Finally, Centura argues that the allegedly conspiratorial conduct of Audubon and CASCA cannot be attributed to it merely because Centura is a part-owner of Audubon and because an Audubon employee is a CASCA officer.  (ECF No. 94 at 9.)  Centura cites Tenth Circuit caselaw holding that a parent company's involvement in a § 1 conspiracy cannot be proven solely through the conspiratorial activity of its wholly owned subsidiary.  (*Id.* at 10 (citing *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th

Cir. 1999)).).)[1]  Because Plaintiffs' allegations that Centura conspired with HCA to put

Plaintiffs out of business (by allegedly pressuring insurers and physicians not to do

business with Plaintiffs) suffice on their own to plead a plausible conspiracy, even

without attributing any of Audubon's or CASCA's conduct to Centura, the Court need

not decide the issue of whether Audubon's actions can be imputed to Centura in order

to resolve the instant Motions.[2]

Accordingly, the Court finds that Plaintiffs have sufficiently alleged a conspiracy

in restraint of trade between HCA and Centura, and Centura's Motion is denied with

respect to Plaintiffs' § 1 claims.

2.   CASCA

CASCA's Motion argues that Plaintiffs have failed to allege sufficient facts to

establish that CASCA was a member of a conspiracy to put Plaintiffs out of business.

(ECF No. 88 at 3-4.)  CASCA further argues that participation in a trade group meeting

on its own is insufficient to give rise to § 1 liability, and that CASCA's letter petitioning

the state government to take action against Plaintiffs is protected by the First

Amendment and the *Noerr-Pennington* doctrine.  (*Id.*)

---

[1] In *Mitchael*, the Tenth Circuit declined to extend Supreme Court precedent establishing that "the coordinated activity of a parent and subsidiary must be viewed as that of a single enterprise," and thus a parent and subsidiary cannot conspire with each other for purposes of § 1.  179 F.3d at 857 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)).  However, neither *Mitchael* nor *Copperweld* apply precisely to Plaintiffs' allegations against Centura, where Plaintiffs have alleged conspiratorial activity by both Centura and Audubon, and where Audubon is only partially, and not wholly, owned by Centura.

[2] Centura also argues that its participation in CASCA's actions to petition DORA regarding Plaintiffs' business practices cannot provide the basis for § 1 liability.  (ECF No. 94 at 11-13.)  Because the Court finds that Plaintiffs have sufficiently alleged a conspiracy without imputing CASCA's actions to Centura, the Court will defer consideration of this argument to its discussion of CASCA's Motion, below in Part III.A.2.

Plaintiffs' allegations involving CASCA are far more limited than those involving Centura.  First, Plaintiffs assert that CASCA, which is dominated by HCA and Centura, provided the site for the meetings at which the conspiracy was formed, including the August 30, 2012 meeting.  (FAC ¶¶ 45, 65-67.)  CASCA contends that its role in providing a venue for the trade association meetings at which the alleged conspiracy was formed does not necessarily imply that CASCA itself was a member of the conspiracy.  (ECF No. 88 at 3.)  CASCA cites a Pennsylvania case holding that "[a] trade association can only be held liable for concerted action if it acted as an entity . . . . Therefore, the Court will not impute the activities of an organization's members to the organization itself absent allegations that the entity participated in the conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 753 (E.D. Pa. 2011).  The Court agrees with this reasoning and finds that a trade association does not become a conspirator merely because a conspiracy was formed at meetings it hosted.  Thus, CASCA's role as the venue for conspiratorial meetings is insufficient, on its own, to establish its agreement to join as a conspirator.

However, Plaintiffs also allege that CASCA took action in furtherance of the conspiracy, namely that CASCA's Executive Director sent a letter to DORA asking it to take legal action against Plaintiffs for allegedly violating state law.  (*Id.* ¶ 69.)  CASCA argues that the Court cannot attribute any antitrust liability to concerted activity in the form of a petition to the government.  (ECF No. 94 at 4 (citing *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138-39 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669-70 (1965)).)  The Court agrees that

the Supreme Court's decisions in *Noerr* and *Pennington* establish that no Sherman Act liability arises from "a concerted effort to influence public officials, regardless of [anticompetitive] intent or purpose." *Pennington*, 381 U.S. at 670 (citing *Noerr Motor Freight*, 365 U.S. at 138). Plaintiffs' only response to CASCA's *Noerr-Pennington* argument is that CASCA's letter petitioning the state "is only one small piece of a much larger conspiracy". (ECF No. 111 at 12 n.9.) However, the only specific allegations relating to CASCA in the FAC are that it sent the petition, provided the meeting venue, and was controlled by HCA and Centura. (*See* FAC ¶¶ 45, 65-67, 69.)

The Court finds that Plaintiffs' limited allegations are insufficient to support a plausible inference that CASCA joined HCA and Centura in conspiring to put Plaintiffs out of business. At most, Plaintiffs' allegations suggest that CASCA provided passive facilitation of the conspiracy, not that it agreed to participate, tacitly or expressly. Indeed, Plaintiffs apparently concede that CASCA was a tool of the conspiracy, rather than a co-conspirator, when they state in their Response that "CASCA has been used as a conduit for bringing about actions detrimental to Plaintiffs". (*See* ECF No. 111 at 12.) Therefore, Plaintiffs have failed to allege a plausible § 1 claim against CASCA.

As Plaintiffs' § 1 claims were the only claims asserted against CASCA, CASCA's Motion is granted in its entirety.

3.    Audubon

Audubon's Motion contends that Plaintiffs have not alleged sufficient facts to establish that Audubon agreed to join the conspiracy. (ECF No. 114 at 4-6.)

Plaintiffs' FAC alleges that Audubon attended the CASCA meetings at which HCA and Centura established the conspiracy, that Audubon representatives joined with

Centura representatives at the August 2012 CASCA meeting to assert that Plaintiffs'

billing practices violated state law and request that the Insurers not do business with

Plaintiffs, and that Audubon administrator Brent Ashby stated at a shareholder meeting

that it was his goal to put Kissing Camels out of business.  (FAC ¶¶ 54, 69, 81.)

Apart from these statements, Plaintiffs make no other allegations as to Audubon

specifically, and Plaintiffs do not contend that Centura's acts are attributable to

Audubon because Centura is a partial owner of Audubon.[3]  Therefore, Audubon

contends that Plaintiffs' § 1 claims should be dismissed because these facts are

insufficient to establish Audubon's involvement in the conspiracy.  (ECF No. 114 at 4-6.)

Plaintiffs argue that because of Audubon's role in CASCA and attendance at the

CASCA meetings, and its ability to benefit from Kissing Camels' demise, Audubon was

part of the conspiracy with HCA and Centura to boycott Plaintiffs, and Mr. Ashby's

statement to shareholders supports that agreement.  (ECF No. 125 at 4.)  However,

Plaintiffs have alleged no facts suggesting that Audubon was actually a member of the

conspiracy.  Instead, the FAC is replete with allegations that Centura and HCA agreed

to work together to reduce competition from Plaintiffs, and used their market power to

pressure insurers and physicians in furtherance of that goal.  Plaintiffs do not allege that

Audubon agreed to join the conspiracy, that it had any market power over insurers or

physicians, or that it took any action in furtherance of the conspiracy apart from its

statement with Centura at the CASCA meeting that Plaintiffs' billing practices violated

state law.  As discussed above, a "concerted effort to influence public officials" for

---

[3] Thus, the Court need not consider Audubon's argument that, even if Audubon acted as Centura's agent, Centura's acts are not attributable to Audubon.  (*See* ECF No. 114 at 4-6.)

alleged violations of state law cannot support a finding of antitrust liability, even if accompanied by anticompetitive intent. *See Pennington*, 381 U.S. at 670.

Thus, the only allegation in the FAC that could conceivably give rise to Audubon's § 1 liability is Mr. Ashby's statement to shareholders that he sought to put Kissing Camels out of business. (*See* FAC ¶ 81.) In the context of Audubon's belief—according to the FAC—that Kissing Camels' billing practices violated state law, the Court finds this sole factual allegation insufficient to support a plausible inference that Audubon joined the conspiracy. This single statement of competitive intent at a shareholder meeting does not "raise a reasonable expectation that discovery will reveal evidence of illegal agreement" with Centura and HCA. *See Twombly*, 550 U.S. at 556.

Therefore, the Court finds that Plaintiffs have failed to state a § 1 claim against Audubon, and Audubon's Motion is granted with respect to Plaintiffs' § 1 claims.

4.      Insurer Defendants

The Motions filed by Aetna, Anthem, and United all argue that Plaintiffs' allegations are insufficient to establish an agreement to conspire against Plaintiffs. (ECF Nos. 112, 113, 128.)

Plaintiffs allege that the Insurer Defendants were involved in the conspiracy in that Centura and HCA requested and pressured them not to do business directly with Plaintiffs, and to take actions against physicians using Plaintiffs' facilities or referring patients to Plaintiffs' facilities. (FAC ¶¶ 33, 53.) Plaintiffs then set forth specific actions each Insurer Defendant took against physicians and facilities utilizing or referring patients to Plaintiffs, and argue that Centura and HCA were able to compel the Insurers to take these actions because the Insurers needed to keep Centura's and HCA's

16

hospitals in their provider networks.  (*Id.* ¶ 34.)

Specifically, the FAC states that all three remaining Insurer Defendants joined the conspiracy on or before the August 30, 2012 CASCA meeting, that at least Aetna and United participated in that meeting, and that all three Insurers refused to negotiate network agreements with Plaintiffs.  (*Id.* ¶¶ 47-49.)

Plaintiffs allege that Aetna threatened physicians with termination from its provider network, and also threatened to post information on its provider website that those physicians were referring patients to out-of-network providers, noting that this practice increases the out-of-pocket costs for patients. (*Id.* ¶¶ 59, 63.)  Plaintiffs also state that Aetna sent certified letters terminating physicians for out-of-network referrals to Plaintiffs' facilities.  (*Id.* ¶ 76.)

Plaintiffs allege that Anthem sent similar letters to physicians that were using Arapahoe's and Kissing Camels' facilities, either threatening to terminate them from its network or actually terminating them, for allegedly inappropriate referrals.  (*Id.* ¶¶ 64, 73.)  Plaintiffs further allege that one such threatening letter was sent on August 31, 2012, the day after the CASCA meeting, and other termination letters were sent on September 6, 2012, less than a week after the meeting.  (*Id.* ¶¶ 74-75.)

Plaintiffs allege that United threatened and then terminated a physician in 2011 for breach of the network contract based on his referral of patients to Kissing Camels, terminated another facility purportedly "for cause" due to its regular use of Arapahoe's facility on the day after the CASCA meeting, and even threatened primary care physicians with termination from its network because they referred patients to specialist

physicians who used Plaintiffs' facilities.  (*Id.* ¶¶ 61-62, 71-72.)

Plaintiffs' allegations of the specific actions each Insurer Defendant took against physicians and health care providers using Plaintiffs' facilities are numerous and detailed.  However, with regard to an agreement to conspire, these allegations fall short.  Although Plaintiffs allege that Centura and HCA requested that the Insurers perform these kinds of actions in furtherance of the conspiracy, Plaintiffs do not directly allege that the Insurers made such an agreement, nor do they allege facts directly evidencing the Insurers' agreement with Centura and HCA.[4]  Instead, Plaintiffs' allegations only indirectly support an inference of such an agreement, pleading parallel acts by each Insurer against physicians that were using Plaintiffs' facilities.

A plaintiff can sufficiently plead a § 1 claim solely with allegations of "conscious parallel conduct" if those allegations "raise[] a suggestion of a preceding agreement," but such allegations are insufficient if they establish "merely parallel conduct *that could just as well be independent action*."  *Twombly*, 550 U.S. at 557 (emphasis added).  Accordingly, the question before the Court is whether the allegations in the FAC suggest that the Insurers agreed with Centura and HCA to participate in the conspiracy,

---

[4]  Plaintiffs contend in their Response to Aetna's and Anthem's Motions that they have not only alleged conscious parallel conduct, but also alleged that the Insurer Defendants actually reached agreement with Centura and HCA.  (ECF No. 124 at 6-7, 9.)  However, the Court has reviewed the paragraphs Plaintiffs cite in support of this contention, as well as the entirety of the FAC, and finds that Plaintiffs in fact allege only that Centura and HCA "attempted . . . to convince" the Insurers (FAC ¶ 33), "asked the health insurance companies . . . to join them", "requested health insurers not to do business with Plaintiffs" (*id.* ¶ 69), and "attempted to use their market power to reach agreement with" the Insurers (*id.* ¶ 82).  Apart from these allegations of attempts and requests, Plaintiffs make only conclusory references to the Insurers' role in the "conspiracy".  (*See, e.g., id.* ¶¶ 54, 58.)  Thus, the Court finds that Plaintiffs have not directly alleged an agreement, and instead supply facts (such as Centura's and HCA's requests, and the Insurers' subsequent parallel actions) that are intended to permit the reasonable inference of an agreement.

or whether their actions could equally have been independent.  At this stage, Plaintiff

need not disprove all possible independent motivations or show that a conspiracy is

more probable than independent action, but they must show that the existence of a

prior agreement is at least plausible, not merely possible.  *Id.* at 556 (holding that the

plausibility requirement "simply calls for enough fact to raise a reasonable expectation

that discovery will reveal evidence of illegal agreement.").

The Court finds that Plaintiffs' allegations of the Insurers' parallel conduct, which

targeted physicians using Plaintiffs' facilities and caused indirect injury to Plaintiffs, are

insufficient to reasonably suggest that the parallel conduct was the result of an

agreement and not the result of independent factors.  The FAC itself describes the

reasons the Insurers gave for terminating or threatening to terminate these physicians

from their networks: the physicians were in breach of their network contracts because

they were referring patients to out-of-network facilities, namely Plaintiffs' facilities.

Plaintiffs specifically allege that the Insurers took these actions as a result of Centura's

and Audubon's assertion that Plaintiffs' billing practices violated state law, and were

influenced because of the market power Centura and HCA possess, giving the Insurers

further independent, non-conspiratorial reasons to take these actions.  (FAC ¶¶ 53, 69.)

Although Plaintiffs now contend that those reasons were pretextual, the FAC

sets forth no facts supporting the inference of pretext, nor does the FAC clearly assert

pretext.  Instead, Plaintiffs ask the Court to reasonably infer that the Insurers, under

pressure from powerful hospitals and in the face of allegations that Plaintiffs were

violating state law, did not terminate these physicians' network contracts because their

out-of-network referrals breached those contracts, but instead terminated them

19

because the Insurers had previously agreed with the hospitals to conspire to put Plaintiffs out of business.  While such an inference is possible, Plaintiffs' FAC does not "raise[] a suggestion of a preceding agreement" or otherwise make it plausible. *Twombly*, 550 U.S. at 557.  Plaintiffs' allegations with respect to the Insurers do not suggest that they made "a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto*, 465 U.S. at 764.  Instead, the Court finds that the Insurers' parallel conduct could just as well be independent action.  *See Twombly*, 550 U.S. at 557.  Accordingly, the Court finds that Plaintiffs have failed to state a § 1 claim against the Insurer Defendants.

Plaintiffs' § 1 claims were the only claims asserted against the Insurer Defendants.  Accordingly, the Motions filed by Aetna, Anthem, and United are granted in their entirety.

**B.    Section 2 — Claims 2-5 and 7-10**

A claim for attempted monopolization requires proof of four elements: "[1] a dangerous probability of success . . . [2] acts in furtherance of the attempt, although these acts need not be successful . . . [3] a specific intent to monopolize . . . [4] a relevant market, within which the attempted monopolization occurred."  *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 436-37 (10th Cir. 1983).  A claim for conspiracy to monopolize also has four elements: "[1] the existence of a combination or conspiracy to monopolize . . . [2] overt acts done in furtherance of the combination or conspiracy . . . [3] an effect upon an appreciable amount of interstate commerce . . . [4] a specific intent to monopolize."  *Id.* at 438.

20

Plaintiffs' FAC sets forth claims of both attempted monopolization and conspiracy to monopolize.  Plaintiffs' § 2 claims are brought against HCA and Centura in the Metro Denver market (Claims 2, 3, 7, and 8), and against Centura and Audubon in the Colorado Springs market (Claims 4, 5, 9, and 10).

1.   Colorado Springs

Plaintiffs' § 2 claims in the Colorado Springs market are brought by Plaintiff Kissing Camels against Centura and Audubon.  (FAC pp. 31-33, 36-38.)  Centura and Audubon both argue in their Motions that Plaintiffs' § 2 claims should be dismissed for failure to plead overt acts in furtherance of the conspiracy or attempt to monopolize, but make no arguments regarding the other elements of the § 2 claims.  (ECF Nos. 94 at 13; 114 at 7.)

With respect to Audubon, the Court is persuaded by Audubon's argument that Plaintiffs' § 2 claims fail for the same reason their § 1 claims fail, namely, the paucity of Plaintiffs' allegations directly involving Audubon.  As discussed above, the only factual allegations involving Audubon are that it joined with Centura at the August 30, 2012 CASCA meeting to assert that Plaintiffs' billing practices violated state law, and that Mr. Ashby later stated that it was his goal to put Kissing Camels out of business.  (FAC ¶¶ 69, 81.)  Apart from Audubon's statement that Plaintiffs' billing practices violated state law, which is protected by the *Noerr-Pennington* doctrine, Plaintiffs do not allege any action taken by Audubon in furtherance of its agreement to boycott Plaintiffs. Accordingly, the Court finds that Plaintiffs have failed to allege overt acts in furtherance of the conspiracy or monopolization attempt, and Audubon's Motion is granted with respect to Plaintiffs' § 2 claims in the Colorado Springs market.

21

As for Centura, the Court found in its analysis of Plaintiffs' § 1 claims that Plaintiffs have sufficiently pled factual allegations linking it to the conspiracy to reduce competition.  For instance, Plaintiffs allege that Centura asked United to penalize physicians who referred business to Kissing Camels, and that a Centura-owned hospital, against its own interests, canceled a planned patient transfer agreement with Kissing Camels.  (*Id.* ¶¶ 55, 57.)  These allegations set forth overt anticompetitive acts in support of an attempt to exclude Kissing Camels from the Colorado Springs market. Centura does not raise any argument contesting whether Plaintiffs have adequately pled the remainder of the elements of their § 2 claims.  Accordingly, Centura's Motion is denied with respect to Plaintiffs' § 2 claims in the Colorado Springs market.

      2.   <u>Metro Denver</u>

Plaintiffs' Metro Denver claims are brought against Centura and HCA by Plaintiffs Arapahoe, Cherry Creek, and Hampden.  (FAC pp. 29-31, 34-36.)  Centura's Motion does not make separate or different arguments with respect to Plaintiffs' claims for monopolization of the Metro Denver market.  Those arguments fail with respect to Plaintiffs' Colorado Springs claims because Plaintiffs successfully allege the requisite acts with respect to Kissing Camels.  However, Plaintiffs' allegations of Centura's anticompetitive acts against Kissing Camels do not support Plaintiffs' § 2 claims with respect to the Metro Denver market, because Kissing Camels competes only in the Colorado Springs market.  (*See* FAC ¶¶ 2, 55, 57.)

Plaintiffs allege in the FAC that Centura and HCA conspired to pressure physicians and insurers not to contract with Plaintiffs, and agreed among themselves not to do business with Plaintiffs.  (FAC ¶¶ 33, 52-55, 82.)  However, Plaintiffs fail to

allege any acts in furtherance of this conspiracy in Metro Denver, or any acts showing

Centura's attempt to monopolize the Metro Denver market.  The Court concludes that

Plaintiffs have not pled sufficient facts to support their § 2 claims against Centura in the

Metro Denver market.  *See Olsen*, 703 F.2d at 436-38.

Therefore, Centura's Motion is granted with respect to Plaintiffs' § 2 claims in the

Metro Denver market (Claims 2, 3, 7, and 8).  Because Centura is the only remaining

Defendant against which these claims are asserted, Plaintiffs' Metro Denver claims

under § 2 of the Sherman Act are dismissed.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      The Motion to Dismiss filed by Centura Health Corporation (ECF No. 94) is

GRANTED IN PART and DENIED IN PART, and Plaintiffs' Claims 2, 3, 7, and 8

are DISMISSED as to Centura;

2.      The Motions to Dismiss filed by Colorado Ambulatory Surgery Center

Association, Inc. (ECF No. 88), Aetna, Inc. (ECF No. 112), Rocky Mountain

Hospital and Medical Service, Inc, d/b/a Anthem Blue Cross and Blue Shield of

Colorado (ECF No. 113), Audubon Ambulatory Surgery Center, LLC (ECF No.

114), and UnitedHealthCare of Colorado, Inc. (ECF No. 128) are GRANTED,

and all claims against these Defendants are DISMISSED;

3.      The Motions to Dismiss filed by Defendants HCA, Inc. and HCA-HealthONE LLC

(ECF No. 91) and Kaiser Foundation Health Plan of Colorado (ECF No. 93) are

DENIED AS MOOT; and

23

4.      This case remains pending against Centura Health Corporation as to Plaintiffs'

Claims 1, 4, 5, 6, 9, and 10.  The Clerk and the Parties shall amend the caption

of this case in all future pleadings to reflect the fact that Centura Health

Corporation remains as the sole Defendant in this action.

Dated this 13th day of February, 2014.

BY THE COURT:

William J. Martinez
United States District Judge