FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
1:38 pm, Aug 12, 2014
JEFFREY P. COLWELL, CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-03012-WJM-BNB

KISSING CAMELS SURGERY CENTER, LLC,
CHERRY CREEK SURGERY CENTER, LLC,
ARAPAHOE SURGERY CENTER, LLC, and
HAMPDEN SURGERY CENTER, LLC,

   Plaintiffs,

v.

CENTURA HEALTH CORPORATION,

   Defendant.

---

### SECOND AMENDED COMPLAINT

---

   Plaintiffs, Kissing Camels Surgery Center LLC, Cherry Creek Surgery Center, LLC, Arapahoe Surgery Center, LLC and Hampden Surgery Center, LLC (collectively the "Plaintiffs" or the "Facility Plaintiffs") bring this action alleging violations of Section 1 and Section 2 of the Sherman Antitrust Act and violations of the Colorado Antitrust Act, against Defendants Centura Health Corporation ("Centura"), the Colorado Ambulatory Surgery Center Association, Inc. (CASCA"), Aetna, Inc. ("Aetna"), Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado ("Anthem"), UnitedHealthcare of Colorado, Inc. ("United"), and Audubon Ambulatory Surgery Center, LLC ("Audubon"), and their various subsidiaries and divisions, as described below, (collectively, "Defendants"), as part of this Complaint.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

1.      This case is brought by four ambulatory surgery centers ("ASCs") located in Colorado Springs and Denver that provide services to patients in a more efficient, less expensive and more effective manner than hospitals that traditionally provided those services.   The Defendants include Centura, one of the most dominant private hospital systems in the State of Colorado, and its joint venture ASC Audubon.   Centura has significant market power in the Metro Denver South and Colorado Springs geographic areas included in this complaint.   As Defendants Centura and Audubon along with their co-conspirator HCA-HealthONE, LLC ("HealthONE") realized that they could not compete fairly in the marketplace with Plaintiffs, they have abused their market power in a concerted effort to put the Plaintiffs out of business.

2.      As will be described and documented in detail below, from the time the four Plaintiff ASCs opened, executives at Centura, Audubon, and HealthONE, including Centura and HealthONE's CEOs, considered the Plaintiffs a competitive threat.   Their view of the Plaintiffs as a competitive threat stemmed both from their fear of patients choosing to have their procedures performed at the Plaintiff ASCs and from their fear of physicians choosing to join the Plaintiff ASCs in order to perform their surgeries there. As a result, Centura, Audubon and HealthONE used their market power and threatened to terminate their network contracts with the Defendants United, Anthem and Aetna unless the insurers took action to dry up patient referrals to the Plaintiff facilities.   At times, Centura, Audubon, HealthONE, and their co-conspirator CASCA used the pretext - later proven erroneous when investigated by United and Anthem - that the Plaintiffs'

**Contains Information marked Highly Confidential Pursuant to Protective Order**

prices were excessive.   At other times, Centura, Audubon, HealthONE and CASCA used the pretext that the Plaintiffs' policy of reducing patients' co-pays and deductibles to their in-network levels was illegal, even though the Plaintiffs' policies are the same as those generally used in the industry, including at Audubon and other Centura joint venture ASCs.   Rather, Centura, Audubon and HealthONE's real goal was to impede competition from the Plaintiff ASCs by entering into an agreement with CASCA, United, Anthem, Aetna, Kaiser, Cigna and other insurers pursuant to which the health insurers illegally threatened to terminate and terminated the network participation contracts of physicians who referred patients to the Plaintiff ASCs.   Defendants United, Anthem and Aetna, as well as Kaiser and Cigna, did not act independently but rather acted in concert with Centura, Audubon, HealthONE and other co-conspirators to threaten physicians referring patients to the Plaintiff ASCs.   United, Anthem and Aetna, as well as their co-conspirators Cigna and Kaiser took these action as a result of agreements reached at a series of conference calls and meetings, including a March 22, 2012 meeting between CASCA and Anthem, a May 18, 2012 joint CASCA/Colorado Association of Health Plans (a health insurer trade association that's members include the insurer Defendants) ("CAHP") conference call, a July 24, 2012 HealthONE/Anthem meeting, and a joint CASCA/CAHP August 29, 2012 meeting.

3.     Centura, Audubon and HealthONE used their control over the majority of Board seats of Defendant CASCA, the Association that is supposed to represent the interests of all ASCs in Colorado, including the Plaintiffs, and brought that Association

**Contains Information marked Highly Confidential Pursuant to Protective Order**

into the conspiracy.  CASCA did not merely serve as a venue for the conspiratorial meetings or as a conduit for information regarding the conspiracy.  Rather, as will be detailed and documented below, CASCA was an active conspirator.  Among other actions, it formed a sub-committee in the fall of 2011 to "thwart" competition from out-of-network facilities; it wrote Colorado's Department of Regulatory Agencies ("DORA") to express concern about allegedly illegal billing practices even though those same practices were in effect at most of its member ASCs; it separately met with Anthem on March 22, 2012 to address out-of-network ASCs, it conducted a conference call to address competition from the Plaintiff ASCs in April, 2012; it reached agreement with United, Anthem, Aetna, Cigna and other health insurers that action needed to be taken against the Plaintiff ASCs in the joint CASCA/CAHP conference call on May 18, 2012, it reached agreement with United, Anthem, Aetna, Cigna and other participants in the joint CASCA/CAHP August 29, 2012 meeting to stop the flow of dollars to the Plaintiff ASCs; and in a September, 2012 meeting with CAHP it reached agreement on a number of specific actions designed to stop the flow of dollars to the Plaintiff ASCS, including the termination of referring physicians' contracts.

4.     Finally, Centura, Audubon and HealthONE have used their market power and brought Kaiser, Anthem, United, Aetna, Cigna, and other co-conspirators into the conspiracy in an effort to stop the flow of dollars to the Plaintiff facilities and to put them out of business.  As part of the conspiracy, Centura, Audubon, HealthONE, United, Aetna, Anthem and other co-conspirators agreed that Kaiser should not sign a contract

**Contains Information marked Highly Confidential Pursuant to Protective Order**

that it had negotiated with Plaintiff Kissing Camels, which as a result Kaiser refused to execute.  In addition, as part of the conspiracy they reached agreement that United, Anthem, Aetna, Cigna and other co-conspirator insurers should take other actions designed to hurt the businesses of the Plaintiffs, including continued threats to terminate and continued terminations of the contracts of physicians who refer patients to the Plaintiff ASCs, which letters were sent immediately following the August 29, 2012 meeting.

5.     The result of this anti-competitive agreement between Centura, Audubon, HealthONE, CASCA, United, Anthem, Aetna, Kaiser, Cigna and others is that the Plaintiffs and the patients they serve have been and are being damaged.

## PARTIES

**PLAINTIFFS**

6.     Plaintiff Kissing Camels Surgery Center LLC is a Colorado limited liability company with its principal place of business in Colorado Springs, Colorado.  Plaintiff Kissing Camels was licensed to do business on June 14, 2010.  It has suffered and in all likelihood will continue to suffer antitrust injuries as a result of Defendants' anticompetitive activities and agreements in restraints of trade, including but not limited to decreased utilization and/or decreased revenues.

7.     Cherry Creek Surgery Center LLC is a Colorado limited liability company with its principal place of business in Denver, Colorado.  Plaintiff Cherry Creek was licensed to do business on June 21, 2012.  It has suffered and in all likelihood will

**Contains Information marked Highly Confidential Pursuant to Protective Order**

continue to suffer antitrust injury as a result of Defendants' anticompetitive activities and agreements in restraints of trade, including but not limited to decreased utilization and/or decreased revenues.

8.      Hampden Surgery Center LLC is a Colorado limited liability company with its principal place of business in Denver, Colorado.  Plaintiff Hampden was licensed to do business on September 19, 2012.  It has suffered and in all likelihood will continue to suffer antitrust injury as a result of Defendants' anticompetitive activities and agreements in restraints of trade, including but not limited to decreased utilization and/or decreased revenues.

9.      Arapahoe Surgery Center, LLC d/b/a SurgCenter on Dry Creek is a Colorado limited liability company with its principal place of business in Englewood, Colorado.  Plaintiff Arapahoe was licensed to do business on April 12, 2010.  It has suffered and in all likelihood will continue to suffer antitrust injury as a result of Defendants' anticompetitive activities and agreements in restraints of trade, including but not limited to decreased utilization and/or decreased revenues.

**DEFENDANTS**

10.      Defendant Centura Health Corporation ("Centura") is a Colorado nonprofit corporation whose principal place of business is in Englewood, CO.  Centura was formed in 1996 by Adventist Health System and Catholic Health Initiatives.  According to its website, Centura operates Colorado's largest hospital and health care network and the state's largest trauma network.  According to its website, Centura provides care

**Contains Information marked Highly Confidential Pursuant to Protective Order**

to over 500,000 patients a year through its health care network, which includes 13 hospitals, 11 ambulatory surgery centers, seven senior living communities, six diagnostic imaging services, several medical clinics, Flight for Life® Colorado, and home care and hospice services  The hospitals in the Centura system include Avista Adventist Hospital, Littleton Adventist Hospital, OrthoColorado Hospital, Parker Adventist Hospital, Porter Adventist Hospital, St. Anthony Adventist Hospital, St. Anthony North Hospital, Penrose Hospital, and St. Francis Medical Center.   The freestanding ambulatory surgery centers in the Centura system include Hand Surgery of Colorado, Summit View Surgery Center at Littleton Adventist Hospital, Flatirons Surgery Center, Golden Ridge Surgery Center, Crown Point Surgery Center, Harvard Park Surgery Center, Endoscopy Center at Porter, Audubon Surgery Center and Sisters Grove Pavilion at St. Francis.   The following hospitals and surgery centers are located in the Colorado Springs geographic market:   Penrose Hospital, St. Francis Medical Center, the Audubon Surgery Center and Audubon Sisters Grove Pavilion at St. Francis Medical Center.   The following hospitals and surgery centers are located in the Denver Metropolitan geographic market:   Avista Adventist Hospital, Littleton Adventist Hospital, OrthoColorado Hospital, Parker Adventist Hospital, Porter Adventist Hospital, St. Anthony Adventist Hospital, and St. Anthony North Hospital, Hand Surgery of Colorado, Summit View Surgery Center at Littleton Adventist Hospital, Flatirons Surgery Center, Golden Ridge Surgery Center, Crown Point Surgery Center, Harvard Park Surgery Center, and Endoscopy Center at Porter.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

11.    Defendant Audubon is a Colorado limited liability company with its principal place of business at 3030 North Circle Drive, Colorado Springs, CO 80909. According to its website, Audubon is a joint venture between Penrose St Francis Health Services (a Centura Hospital) and several local physicians.  Centura owns more than 40% of Audubon.  Audubon's Administrator Brent Ashby is an officer on Defendant CASCA's Board of Directors, and actively works with CASCA and Centura.

12.    Defendant Colorado Ambulatory Surgical Center Association ("CASCA"), 3333 S. Bannock St. #400, Englewood, CO 80110.  CASCA is a tax-exempt 501(c)(6) trade association that purports to represent ambulatory surgery centers across the state of Colorado, including in the Metro Denver South and Colorado Springs markets.  As alleged below, CASCA is dominated by its hospital members led by Defendant Centura and its co-conspirator HealthONE.

13.    Defendant Aetna includes a number of affiliated companies including Aetna Health Inc. PA, Corp., Aetna Life Insurance Company, Aetna Health, Inc., Aetna Health Insurance Company, which offer, insure, underwrite and administer commercial health benefits.  Aetna had over 22,000 members in Colorado in 2011 according to regulatory filings.  In 2012, Aetna health insurance premium revenue in Colorado was $232 million.  Aetna is a Pennsylvania corporation with its principal place of business located at 151 Farmington Avenue, Hartford, CT 06156.

14.    Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a as Anthem Blue Cross Blue Shield of Colorado (hereinafter "Anthem") is based at 700

**Contains Information marked Highly Confidential Pursuant to Protective Order**

Broadway, Denver, CO 80203.   Anthem offers, insures, underwrites and administers

commercial health benefits in Colorado.   Anthem has over 500,000 members in

Colorado.  In 2012, Anthem's Colorado premium revenue was $1.3 billion.

15.    Defendant United is a Colorado Corporation with its headquarters located

at 6465 South Greenwood Plaza Blvd, Suite 300, Centennial, CO 80111.  United offers,

insures, underwrites, and administers commercial health insurance benefits.   United

holds the largest share of the health insurance premium revenue in Colorado with 18%

of all Colorado health insurance premium revenue in 2012.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331, in that most of the claims asserted herein are brought under federal

statutes and necessarily involve adjudication of one or more federal questions.   For

Plaintiffs' Sherman Act claims, jurisdiction arises under 28 U.S.C. § 1331 and 28 U.S.C.

§ 1337.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under

28 U.S.C. §1367.

17.    This Court has personal jurisdiction over the parties because Plaintiffs

submit to the jurisdiction of this Court, and each Defendant systematically and

continuously conducts business in this State, and otherwise has minimum contacts with

this State sufficient to establish personal jurisdiction over each of them.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

18.     Venue is appropriately established in this Court under 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### INTRODUCTION

19.     The Plaintiffs are four ASCs which offer patients who can be treated in an ambulatory care setting an important alternative to treatment in a hospital.  Historically, the treatments performed at the ASCs were performed in hospitals. Hospitals generally require large amounts of capital expenditures and employ significant staffs, both of which result in costs that are allocated across all procedures performed at the hospitals. As healthcare costs in this country increased, ASCs developed as an alternative to hospitals and provided comparable procedures at lower costs.  While Centura and HealthONE have formed free-standing surgery centers, those hospital systems have an inherent conflict of interest to direct as many patients as possible to their hospitals (as opposed to their ASCs) where Centura and HealthONE are paid more for the services. In fact, through their relationships with doctors, with health insurers such as Defendants United, Anthem and Aetna, and otherwise, Centura and HealthONE can determine where patients will receive their procedures.  Moreover, the ASCs established by Defendant Centura and its co-conspirator HealthONE prefer not to compete with the Plaintiffs in a fair and open market.  The Plaintiff centers are modern and efficient, certified by the Centers for Medicare and Medicaid Services, and accredited by The

**Contains Information marked Highly Confidential Pursuant to Protective Order**

Accreditation Association for Ambulatory Health Care.   A group of board certified physicians, many of whom have been nationally recognized, perform procedures at the Plaintiffs ASCs.   The treatments performed at the ASCs are less likely to result in infection than if similar procedures were performed in hospitals.   The treatments performed at the centers are almost always less expensive than similar procedures performed at hospitals.   Patients can schedule procedures at the centers with more flexibility than if they were scheduling similar procedures at hospitals, where surgeons must compete with longer, less predictable and emergency surgery procedures. Patients find that they have fewer cancelled and/or delayed procedures when they come to the Plaintiff centers.   In general, patients find more convenience such as closer parking and shorter wait times when they have procedures at the centers instead of at hospitals such as those operated by Centura and HealthONE.   As an example of lower prices charged by and paid to ASCs, Medicare pays $1,332.19 for carpal tunnel surgery when performed in a hospital in Colorado, but pays only $762.31 when that same surgery is performed in a free-standing ASC in Colorado.   As a further example, Medicare pays $4,246.76 for reconstruction of a wrist joint when that surgery is performed in a hospital, but pays only $2,457.95 when that same surgery is performed in a free-standing ASC.

20.   As is common in the ASC industry, including at Audubon and other of Centura's ASCs, in order to keep healthcare costs as affordable for patients as possible, the Plaintiff ASCs collect co-payments and deductibles based on the patients'

**Contains Information marked Highly Confidential Pursuant to Protective Order**

in-network benefit levels.   In other words, the Plaintiff ASCs collect co-payments and deductibles from patients based on their in-network benefits when the centers are out-of-network with the patients' health insurers.   This policy allows patients to utilize their out-of-network benefits for which they have paid additional premiums.   The Plaintiffs fully disclose their billing policies to health insurers.

21.   As a result of all these factors and others, the Plaintiffs provide an important alternative for their patients, who are consumers of healthcare, and the Plaintiffs increase consumer welfare.   Also as a result of these factors and others, Defendant Centura and its co-conspirator HealthONE have chosen not to compete with Plaintiffs with respect to surgical procedures that can be performed without the necessity of hospitalization.   Defendant Centura and its co-conspirator HealthONE have experienced an increasing number of patients exercising their rights to make their own healthcare decisions by choosing these lower cost, more efficient, and generally safer facilities.   As such, the Defendant Centura and its co-conspirators have resorted to the concerted activity and anticompetitive practices alleged in this complaint.

## MARKET DEFINITION

22.   The Relevant Product Market for the claims in this case is the market for surgical services or procedures which do not require hospitalization, including orthopedic surgery, neurosurgery, hand surgery, ocular plastics, otolaryngology, oral and maxillary surgery, anesthesia, podiatry and pain management.   A linked and related Product Market is the Market for hospital services.   A reason that these markets are

**Contains Information marked Highly Confidential Pursuant to Protective Order**

linked or related is that the services or procedures performed at ASCs can also be performed at hospitals, although at higher costs. A third product market that is related to the claims in this case is the market for health benefit financing or health insurance. The provider networks of the co-conspirator health insurer Defendants, United, Anthem and Aetna, must include dominant hospital systems like those of the Defendant Centura and its co-conspirator HealthONE. As a result, those Defendants have significant market power that they can exercise in dealing with health insurance companies like Kaiser, Aetna, Cigna, United, Anthem, and the other health insurance companies doing business in Colorado.

23.     The Relevant Geographic Markets are the Metro Denver South, Colorado market and the Colorado Springs (Teller and El Paso Counties), Colorado market.

24.     Barriers to entry for each of these markets are high because it requires substantial investment and expertise as well as compliance with numerous regulatory requirements. In addition, as demonstrated by this action, Defendant Centura and its co-conspirator HealthONE endeavor mightily to stop competitive facilities from entering the market.

## INTERSTATE COMMERCE

25.     The activities of the Defendants are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

26.     Communications between Defendants' employees often occurred through interstate communications.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

## HEALTHONE

27.     Co-conspirator HealthONE's system includes:   The Medical Center of Aurora; North Suburban Medical Center and the NorthEast ER; Presbyterian/St. Luke's Medical Center & Rocky Mountain Hospital for Children; Rose Medical Center; Sky Ridge Medical Center; Swedish Medical Center; Spalding Rehabilitation Hospital; Centennial Medical Plaza (affiliated with The Medical Center of Aurora); Swedish Southwest ER (affiliated with Swedish Medical Center); 14 stand-alone ambulatory surgery centers; 8 occupational medicine & rehabilitation clinics; dozens of specialty clinics; two radiation oncology centers; and AIRLIFE-DENVER, which provides critical care air and ground transportation across an eight-state region.

28.     The 14 stand-alone ambulatory surgery centers operated by HealthONE in the Metro Denver area compete with the Cherry Creek, Arapahoe and Hampden Surgery Centers in the Metro Denver South ambulatory surgery market.   In addition, HealthONE as a hospital system competes with the Plaintiffs in that many services provided by Plaintiffs are also provided at hospitals on a less efficient basis.

29.     As at least one Colorado health insurer, United, has previously pointed out, HealthONE's hospitals demand higher rates than its competitor facilities and higher than the Plaintiff facilities.

30.     According to HealthONE's RFP response last year in bidding to purchase Memorial Hospital in Colorado Springs in 2012, "HealthONE currently contracts with

**Contains Information marked Highly Confidential Pursuant to Protective Order**

every major health insurer and many smaller payers in Colorado and expects to continue to do so. HCA and HealthONE have great relationships with these insurers."

31.     HealthONE has made clear that it is antagonistic to the competition it is facing from the Plaintiff facilities in a number of different ways.

32.     In January of 2012, counsel for a number of surgery centers operated by HealthONE (including Sky Ridge Surgery Center and Rose Surgery Center) threatened to file suit against SurgCenter at Dry Creek (Arapahoe) and SurgCenter Development, Inc. for what it claimed were unfair business practices related to copays and deductibles.  In its letter, these facilities noted in the midst of their threats of legal action that they wanted to preserve an "open and honest competitive marketplace for ambulatory surgical services."  Further, counsel for the HealthONE facilities noted that no legal confrontation was sought if all participants abide by rules of fair play and elect to compete on a level field untainted by marginal or illegal business practices.  In fact, the letter was written while HealthONE was not engaging in open and honest competition but when it was abusing its market power.

33.     Despite the above, the letter claimed that the HealthONE entities would file suit against the Plaintiffs if they did not change their billing and collection services to be less competitive with HealthONE, and to increase costs collected from Plaintiff's patients.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

## CENTURA AND AUDUBON

34.     According to its website, Centura provides care to over 500,000 patients a year through its health care network, which includes 13 hospitals, 11 ambulatory surgery centers, seven senior living communities, six diagnostic imaging services, several medical clinics, Flight for Life® Colorado, and home care and hospice services.

35.     The hospitals in the Centura system include seven in the Denver metropolitan area:   Avista Adventist Hospital, Littleton Adventist Hospital, OrthoColorado Hospital, Parker Adventist Hospital, Porter Adventist Hospital, St. Anthony Adventist Hospital, and St. Anthony North Hospital.   These hospitals provide services which compete with services provided by Plaintiffs Cherry Creek Surgery Center, Hampden Surgery Center, and Arapahoe Surgery Center.   St. Anthony, Littleton, Parker and Porter serve the South Denver Metro market.

36.     Centura also operates two hospitals in Colorado Springs:   Penrose Hospital and St. Francis Medical Center.   These hospitals provide services which compete with services provided by Plaintiff Kissing Camels Surgery Center.

37.     Centura has elected to provide outpatient surgery primarily in the hospital setting.

38.     Centura has a significant percentage of the hospital market in Colorado Springs.   Due to substantial volume of outpatient surgery at Penrose and St. Francis and due to substantial volume of outpatient surgery at its joint venture Audubon,

**Contains Information marked Highly Confidential Pursuant to Protective Order**

16

Centura has a significant percentage of the market for outpatient procedures in Colorado Springs.  Centura has market power in both of these markets.

39.    The free-standing ambulatory surgery centers in the Centura system include seven in the Denver metropolitan area:  Hand Surgery of Colorado, Summit View Surgery Center at Littleton Adventist Hospital, Flatirons Surgery Center, Golden Ridge Surgery Center, Crown Point Surgery Center, Harvard Park Surgery Center, and Endoscopy Center at Porter.  Crown Point Surgery Center, Flatirons Surgery Center, Summit View Surgery Center, and Harvard Park Surgery Center are managed by United Surgical Partners International ("USPI"), which represents Centura on CASCA's Board, furthering Centura's interests at CASCA.  Pinnacle iii manages five of Centura's ASCs.  Pinnacle iii has two CASCA Board seats and represents Centura's interests on CASCA's Board.   Centura's Denver centers compete with Plaintiffs Cherry Creek Surgery Center, Hampden Surgery Center, and Arapahoe Surgery Center.

40.    The free-standing ambulatory surgery centers in the Centura system include two in Colorado Springs, Audubon Surgery Center and Sisters Grove Pavilion at St. Francis Medical Center.  These centers compete with Plaintiff Kissing Camels Surgery Center.

41.    Audubon is a Centura joint venture that upon information and belief is controlled by and acts for the benefit of Centura.

42.    Centura, Audubon and their co-conspirator HealthONE have conspired to prevent competitive ASCs and specialty hospitals from opening in their markets.  In a

**Contains Information marked Highly Confidential Pursuant to Protective Order**

highly confidential e-mail dated October 2, 2012, Defendant Centura's President and CEO stated that he had "just met with (HealthONE['s] CEO)" about two ASC companies that had "targeted Denver for expansion."  Centura's President and CEO asked the recipients of the e-mail whether they are "hearing anything about these organizations" and stated that the HealthONE CEO "said that she has spoken with Steven Summer about CHA getting involved with the State to look at how they might fight the expansion of the physician-owned commercial payer-only health care facilities."  On information and belief, one of the companies referenced in the e-mail was SurgCenter Development.

43.    Plaintiffs allege that on numerous occasions over a long period of time, Defendant Centura and its co-conspirator HealthONE have used their market power to convince health insurance companies not to contract with independent surgery centers and others that compete in their market.  For example, there was a Dry Creek Surgery Center that is not related to the Plaintiffs in this action.  Based on information and belief, Plaintiffs allege that because of pressure by one or more of the Defendant Hospitals, many health insurance companies agreed to keep the previous Dry Creek out-of-network.  That surgery center then went out of business.  Based on information and belief, Plaintiffs also allege that Defendant Centura and/or its co-conspirator HealthONE have opposed other efforts by physicians to establish facilities that compete with the hospitals owned by Defendants, with the assistance of the health insurer Defendants.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

44.     Centura and HealthONE are in a position to put significant pressure on health insurance companies operating in their markets because the health insurance companies need these dominant hospitals in their networks.   The market power of Defendant HealthONE was specifically recognized by United, the largest health insurer in Colorado, when it brought antitrust claims against HealthONE and then dismissed those claims when HealthONE agreed to return to United's network.   As will be documented herein, Centura and HealthONE have repeatedly used this market power to impede competition from the Plaintiffs.

### COLORADO AMBULATORY SURGERY CENTER ASSOCIATION ("CASCA")

45.     While CASCA purports to represent the interest of ASCs, and is required by its tax-exempt status not to favor any particular member or market sector, CASCA has become dominated by Defendant Centura and its co-conspirator hospital system HealthONE.   That domination is alleged more specifically below.

46.     Of CASCA's fifteen Board members, at least six are employed by companies with contractual relationships with Defendant Centura, including three who are employed by companies which manage certain of Centura's ambulatory surgery centers, one of whom is a physician owner of one of Centura's ambulatory surgery centers, and one of whom is the Administrator of two of Centura's joint venture ambulatory surgery centers.   In addition, two board members are directly employed by HealthONE and, on information and belief, another Board member is a physician owner of one of HealthONE's ambulatory surgery centers.   Through actions of its Executive

**Contains Information marked Highly Confidential Pursuant to Protective Order**

Director and Assistant Executive Director, CASCA directly participated in planning, perpetrating, and communicating information about the conspiracy.  In addition, CASCA worked directly with the Colorado Association of Health Plans ("CAHP") to plan a joint CASCA/CAHP May 18, 2012 membership conference call and an August 29, 2012 joint CASCA/CAHP meeting, and to develop and implement an action plan furthering the goals of the anti-competitive conspiracy as developed at these and other meetings and conference calls.  Consequently, CASCA did not merely provide the venue for the conspiracy but was an active participant, reaching agreement with its co-conspirators and with CAHP and its members to stop the flow of dollars going to the Plaintiff facilities.

## DEFENDANTS' ABUSE OF THEIR MARKET POWER
## AND DEVELOPMENT OF THE CONSPIRACY

47.    HealthONE has market power in the market for surgical services that do not require hospitalization in the Denver Metro South market and in the hospital market in the Denver Metro South area.  Defendant Centura has market power in the market for surgical services that do not require hospitalization in the Metro Denver South area and in the hospital market in the Metro Denver South area.  Defendant Centura has market power in the market for surgical services that do not require hospitalization in Colorado Springs and in the hospital market in Colorado Springs.  In addition, as dominant hospital systems, Defendant Centura and its co-conspirator HealthONE have power over health insurers, such as Defendants United, Anthem and Aetna, and others, such as Cigna and Kaiser, who need their hospitals in their networks.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

48.     As alleged above Plaintiffs Arapahoe and Kissing Camels began doing business in 2010.  Since that time, Defendants Centura and Audubon have abused their market power in opposition to the Plaintiffs in various ways.

49.     First, these Defendants and their co-conspirator HealthONE employ doctors and otherwise have relationships with doctors.  Defendant Centura and its co-conspirator HealthONE have used these relationships to keep referral of surgery procedures away from the Plaintiffs.  Based on information and belief, Plaintiffs allege that the Centura, Audubon and HealthONE have encouraged doctors whom they employ and with whom they have other relationships not to refer patients to the Plaintiffs.

50.     Second, Defendants Centura, Audubon and their co-conspirator HealthONE have used their market power with Defendants United, Anthem and Aetna and with Cigna and other health insurance companies that operate in Colorado to discourage them from entering into contracts with Plaintiffs, to encourage them to pay lower rates to doctors who do business with Plaintiffs, and to persuade them to take steps to stop the referral of patients to the Plaintiff facilities, including threatening to terminate and terminating the contracts of physicians referring patients to the Plaintiffs.

51.     In fact, a number of meetings were held among various Defendants and other co-conspirators from 2010 to the present, including a secret joint meeting between CASCA and CAHP on August 29, 2012.  This meeting was attended by representatives of Audubon, HCA, United, Anthem, Aetna, Cigna, Kaiser, CASCA, USPI and others.  At

**Contains Information marked Highly Confidential Pursuant to Protective Order**

the meeting, all of the parties present once again expressed their mutual desire to destroy the Plaintiffs' businesses and agreed to implement a strategy to stop the flow of dollars to these facilities, thereby effecting an illegal boycott.

52.     For example, starting in 2010 Defendant Centura met with United repeatedly and asked that United take actions against doctors who referred business to Plaintiff Kissing Camels, and United took the actions requested by Centura.  Based on information and belief, Plaintiffs allege that Defendant Centura had similar meetings and communications with other health insurance companies and that Defendant HealthONE engaged in similar activities.

53.     Soon after Plaintiff Kissing Camels opened, Defendant Audubon's Administrator (and CASCA Board officer) Brent Ashby advised United that action needed to be taken against Kissing Camels as result of allegedly excessive prices, which allegations later proved to be erroneous.  In a highly confidential September 1, 2010 e-mail with the subject line "Shocking Development," Mr. Ashby stated that Kissing Camels' "type of business practice if not fraudulent is certainly unethical" and asked:  "Is UHC aware of what is going on here?  Are there any plans or means to put a stop to this kind of practice.  It has never been our practice to engage in unethical billing practices, but **if we lose cases to Kissing Camels because of this we will need to respond in some fashion.**"  (emphasis added)   Mr. Ashby's e-mail was widely distributed up the chain of command at United.   In addition, at the request of the President and CEO of Centura's Penrose St. Francis Hospital, Mr. Ashby's e-mail was

**Contains Information marked Highly Confidential Pursuant to Protective Order**

also forwarded to Centura's Chief Business Development Officer, who in turn forwarded it to other executives at United, with a message stating "this is not our first rodeo."

54.     In an effort to impede competition from Kissing Camels, Audubon and Centura threatened to leave United's network unless United took measures to stop referrals of patients to Kissing Camels.  In a highly confidential September 17, 2010 e-mail, United's Medical Director asked that a meeting be scheduled to "discuss messaging to other providers re:  Kissing Camels ASC."  Even though he acknowledged that "the payment data doesn't support the allegations that we are paying exorbitant fees, but rather reasonable, customary and with the scope of the patients benefits," he stressed the need to get back to Mr. Ashby and Centura executives "as well as others who are holding up contracting and/or threatening to go non-par."

55.     Despite the fact that physicians' contracts permitted referrals of patients with out-of-network benefits to out-of-network facilities, shortly after Centura and Audubon threatened to leave its network and in direct response to these threats, United started calling physicians who referred patients to Kissing Camels and demanded that they stop all such referrals.  The results of these discussions and a proposal for further punitive measures for physicians who refused to stop referring patients to Kissing Camels was set forth in a highly confidential October 6, 2010 e-mail:

**Contains Information marked Highly Confidential Pursuant to Protective Order**

Donna was able to call each of the provider groups who have been using the Kissing Camels ASC.  She was successful with most discussions, and we should anticipate a change in use in the future.  We intend on following up with each of these offices with a letter detailing the conversation and agreement.  We can try to pull spend after dates of service Oct 1, and be sure there isn't additional utilization.

\*\*\*\*\*

Unfortunately, 3 of the discussions did not go as well.  And stated they would continue use as the language in the contract indicates that if member benefit allows Out of Network benefits than a Non PAR provider could be used.  Again, unfortunately, it would appear they are correct.  The language is pretty soft.

\*\*\*\*\*

So, probably a couple of different ways to manage.  We can continue discussions with the groups about why we would want them to use participating providers and see if we can get them to agree.  And if not, we could consider term[ination] letters…If letters were sent now with future termination dates, maybe they would change their minds.   Another consideration would be to unilaterally change the fee schedule down to reflect use of Non PAR providers where PAR providers available?

United adopted the recommended proposals.

56.    Thus, despite acknowledging that Kissing Camel's fees were reasonable and despite acknowledging that physicians' contracts allowed referrals of patients with out-of-network benefits to the Plaintiffs' facilities, due to Centura's and Audubon's threats to leave its network, United explicitly agreed with Audubon and Centura to take measures to stop the referral of patients to Kissing Camels. In December of 2010, shortly after these discussions, United followed through on its agreement and sent termination letters to Dr. Steven Topper, a physician who had utilized Kissing Camels Surgery Center.  United ultimately backed off this termination presumably because its

**Contains Information marked Highly Confidential Pursuant to Protective Order**

contract basis for such a with cause termination was "soft."  After that attempt, United implemented an aggressive and illegal strategy of threatening termination of physicians who utilized Kissing Camels, terminating physicians who continued such referrals on the contracts' anniversary date under the without cause termination provisions, and unilaterally reducing fee schedules for physicians who continued such referrals.  On information and belief, United deferred termination until the anniversary dates and relied on the contracts' without cause termination provision because Colorado law prohibits health insurers from terminating medical providers' contracts as a result of their referrals to out-of-network facilities.  (Colorado Revised Statutes 10-16-12(d)).

57.    United carefully tracked the success of its threats to physicians who continued to refer to Plaintiffs' ASCs.  A highly confidential February 24, 2011 e-mail lists all physician practices referring patients to Kissing Camels and specifies when each practice was threatened with termination either by phone or by letter and the results of these communications.  The e-mail demonstrates that in many cases United's threats to terminate contracts for continued referrals to Kissing Camels had the desired effect.

58.    For example, United had sent the Colorado Center for Otolaryngology a termination letter with "a future termination date" of October 1, 2012.  After the provider called and assured United that none of its physicians would refer members to Kissing Camels, the provider was not terminated.  Through these actions, United recognized that it had no legal right to terminate physicians' contracts for the referral of patients with

**Contains Information marked Highly Confidential Pursuant to Protective Order**

out-of-network benefits to Kissing Camels.   Therefore, it sent termination dates with termination dates far in the future to ensure that physicians stopped such referrals.

59.   Similarly, HealthONE asked United, Anthem, Aetna, Cigna and other insurers to take measures to stop referrals to Plaintiff Arapahoe d/b/a SurgCenter on Dry Creek, the first of the Plaintiff ASC's to open in Denver.  For example, in the fall of 2011, a HealthONE executive advised United of his concern that physicians would leave HealthONE to join the Plaintiff center.  In an October 13, 2011 e-mail, one of United's Senior Network Contract Managers forwarded "**a list of physicians (46 total) from HCA who apparently have or soon will start using the non-par ASC, SurgCenter on Dry Creek**" to others at United and asked for action. (emphasis added). As will be discussed below, in this same timeframe, HealthONE's CASCA board members raised issues about the Plaintiff centers with CASCA's Executive Director and asked CASCA to take action.  Later, in a July 19, 2012 e-mail, HealthONE's Regional Vice President for Managed Care notified a senior United executive that "We have a growing group of docs asking us to take our ASCs OON or they will walk."  He supplicated the United executive to "Help me Yoda."

60.   HealthONE also endeavored to stop the Defendant health insurers from contracting with the Plaintiff ASCs.  For example, in a highly confidential November 30, 2011 Aetna e-mail, a Colorado-based Aetna executive stated:   "The HCA hospital system in our market is very interested in the outcome of our relationship with this provider."

**Contains Information marked Highly Confidential Pursuant to Protective Order**

61.     By at least July of 2012, HealthONE's CEO became involved.  In a July 9, 2012 e-mail, she asked HealthONE's Vice President of Operations for the Continental Division whether it was true that the second Plaintiff ASC had opened in Denver.  He responded in the affirmative that same day, stating:  "It will impact Sky Ridge and Rocky Mountain volumes primarily.  The third one, off Hampden, is supposed to open in the fall.  That one will impact Lincoln and Lowry."  Sky Ridge, Rocky Mountain, Lincoln and Lowry are all HealthONE ASCs.  Incredibly, in response HealthONE's CEO said: **"TIME TO CALL IN THE DOGS!!!!!  … can we discuss Round 2 with the payer community – off-line not on email?"**  (Bold added.  Other emphasis in the original). In an e-mail later that month, another HealthONE executive asked HealthONE's Vice President for Managed Care:  "Can we add more pressure to the payers to stop the proliferation of the out-of-network ASCs?   Their letters aren't working."   Both HealthONE's CEO and one of HealthONE's representatives on CASCA's Board were copied on this message.   By requesting that such discussions take place off-line, HealthONE's CEO seemed to suggest that she knew such discussions were inappropriate.

62.     HealthONE's requests that United, Anthem, Aetna, Cigna and other health insurers take action was summarized in a highly confidential July 24, 2012 e-mail from HealthONE's Vice President for Managed Care on which HealthONE's CEO   and one of HealthONE's representatives on CASCA's Board were copied:

> [We] have been involved with this issue for over a year when Dry Creek
> ASC opened (2 rooms).  We are in constant coordination with [the Vice

**Contains Information marked Highly Confidential Pursuant to Protective Order**

President of Operations] of the ASC Div.  Contractually, we cannot prevent OON ASCs.  We do not have exclusives with these payors.  Since Anthem, UHC, CIGNA and Aetna make-up about 80% of the volume, we have focused our efforts with these payors.  Anthem ran reports and believe they have paid at high OON rates only twice last year – the rest they claim to have paid a low OON at lower benefits.  UHC assures us they pay a very low OON allowable and they kicked two surgeons off the panel in Col Springs (same company) for OON use and are now fighting arbitration.  CIGNA has run reports and will pursue corrective action with the surgeons directing to OON.  Aetna is caught in a similar battle in California and the CMA and docs are suing them for kicking them off their panel.  We met with [HealthONE's General Counsel] and outside counsel 6 months ago and there is no solid basis for legal action.

*****

And I am asking the lead contracting person in our large payors to meet with a group of our Hospital CEOs and [our Vice President of Operations of the ASC Division] in the next 45 days so that they can hear directly from each other.

So, as [HealthONE's Vice President for Managed Care] has stated to our operators and [HealthONE's Vice President of Operations of the ASC Division] many times…What else do you want us to do.  **We will obviously address this matter when each payor renegotiates contracts…."**  (emphasis added)

63.     No mention was made in these e-mails of any alleged illegal waiver of co-pays by the Plaintiffs.  Rather, the concern expressed was the competitive threat to HealthONE's ASCs.

64.     During the same timeframe as these July 2012 e-mails, CAHP and CASCA were planning for the joint meeting on August 29, 2012 meeting.

65.     During the same general timeframe as these July, 2012 e-mails, HealthONE was re-negotiating contracts with United, Anthem and Aetna.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

66.     Defendant Centura and its co-conspirator HealthONE have made other efforts to prevent the Plaintiffs from starting their businesses and from remaining in business.  For example, ASCs are required to have transfer agreements with hospitals to assure that patients who require hospitalization due to unexpected emergencies receive adequate care.  On or about February 7, 2012, HealthONE refused to sign a transfer agreement with the Cherry Creek Surgery Center in an effort to prevent Cherry Creek from having an on-going business.  HealthONE refused to sign the agreement even though such an agreement is in the interest of a hospital because it increases the patient flow to a hospital.  HealthONE's refusal to sign the agreement was an abuse of its monopoly market power and an attempt to maintain that power irrespective of potential harm to patients.

67.     Likewise, by letter dated December 16, 2010, Centura owned Penrose Hospital unilaterally cancelled its transfer agreement with Kissing Camels Surgery Center effective January 16, 2011.  Centura cancelled the agreement even though such an agreement is in the interest of a hospital because it increases the patient flow to a hospital.  Penrose is the closest hospital to Kissing Camels and a number of the physicians who utilize Kissing Camels maintain medical staff privileges at Penrose.  For those reasons, and in the interest of patients, Kissing Camels requested that Penrose reconsider its decision. The hospital refused.   Centura's decision to cancel the agreement was an abuse of its monopoly market power in Colorado Springs and an attempt to maintain that power irrespective of potential harm to patients.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

68.     While the Defendant Centura and its co-conspirator HealthONE damaged Plaintiffs through their abuse of their market power, when they were not successful in using their market power to force Plaintiffs out of business, they engaged in additional concerted activity to achieve the same end.   As part of its conspiracy with Centura and/or HealthONE, the major health plans in Colorado, including Defendants Anthem, United, and Aetna, as well as Kaiser and Cigna have taken actions to pressure these facilities out of business.   As previously discussed with respect to United, one of the primary methods of putting Plaintiffs out of business was to attempt to dry up "referrals" to the Plaintiffs by physicians and other healthcare providers.

69.     Many of these health insurers sent notices to healthcare providers who performed surgeries or other procedures at the Plaintiffs' facilities threatening them with termination from provider networks, or other financial penalties, if they continued to perform those surgeries or procedures at the Plaintiffs' facilities.   Some of these healthcare providers were ultimately terminated from the health insurance networks. The Plaintiff facilities have lost patients and otherwise been harmed by these threats.

## **UNITED**

70.     In response to the requests from Centura and HealthONE and in furtherance of the conspiracy to effect a boycott of the Plaintiff facilities, United implemented a multi-prong plan to end patient referrals to the Plaintiffs.   This strategy was outlined in a highly confidential e-mail:

> What we have been told is that these ASC (all part of the parent organization SurgCenter Development) encourage physician ownership

**Contains Information marked Highly Confidential Pursuant to Protective Order**

and referrals by promising reimbursement that exceeds contracted ASC rates.

*****

The first ASC in the CO market was Kissing Camels ASC in CO Springs. They opened SurgCenter at Dry Creek in Denver shortly after that and we heard word that they were opening (and appear to have recently opened) another ASC here in Denver.

We've approached the issue from a number of directions:

*****

- If a physician referred a member without OON benefits, we issued termination due to material breach.  Most physicians remedied the breach and agreed not to refer.

- If a physician had referred only members with OON benefits, we issued terminations as of the contract renewal (*i.e.* we chose not to renew their agreement.)

- If we were unable to term a physician's contract in the near future due to the contract's renewal date or due to their importance in our network (*i.e.* they're the only group in their specialty area in the community,) we've also considered issued a unilateral Fee Schedule reduction.

71.     This anti-competitive strategy and the termination of physician participation agreements "without cause" on their renewal dates were undertaken as part of United's agreement with Defendants Audubon and Centura's and their co-conspirator HealthONE to stop the referral of patients to the Plaintiff ASCs.  This agreement was not made because of a concern that the Plaintiffs' prices were too high or that the Plaintffs were improperly waiving co-pays and deductibles, but rather were in response to Audubon, Centura and HealthONE's fear of competition from the Plaintiff

**Contains Information marked Highly Confidential Pursuant to Protective Order**

facilities.  Some of the terminated physicians have sought arbitration over their wrongful and pretexural terminations.

72.     United terminated from its networks a number of physicians and practices affiliated with the Plaintiffs' facilities.  For instance, United sent a letter dated December 16, 2011 to Dr. Steven Topper of Colorado Hand Center stating "United is exercising its right to terminate the agreement effective May 1, 2012," under the "without cause" termination provision in United's standard physician contracts.  This letter followed a December 10, 2010 letter from United asserting that "your practice's referral of this member to Kissing Camels Surgery Center, an out-of-network surgery center, constitutes a material breach of our agreement."  Recognizing that Dr. Topper and other physicians had the right to refer patients with out-of-network benefits to the Plaintiffs' ASCs, United had rescinded its threat of termination for cause and waited until the renewal date to terminate him "without cause" under the contract.  Dr. Topper has filed an arbitration proceeding alleging that United wrongfully used the pretext of the "without cause" provision to punish him for his continued referrals to Plaintiff Kissing Camels. United's terminations of Dr. Topper and other physicians were part of the agreement United reached with Centura, Audubon, HealthONE and others designed to deter referrals of patients and surgeries to the Plaintiff facilities.

73.     United has repeatedly threatened many other physicians and practices with termination from its networks if they continue to treat patients at the Plaintiff facilities.  In fact, United went one step further and threatened to terminate primary care

**Contains Information marked Highly Confidential Pursuant to Protective Order**

physicians who referred patients to specialists who ultimately performed surgeries and procedures at the Plaintiffs' facilities.  These terminations and threatened terminations were part of the agreement United reached with Centura, Audubon, HealthONE and others designed to deter referrals of patients and surgeries to these facilities.

74.    United has held meetings and otherwise corresponded with the other Defendants and co-conspirators regarding the Plaintiff facilities and has made extensive efforts to put the Plaintiff facilities out of business.

## ANTHEM

75.    Similarly, Anthem has held meetings and otherwise corresponded with the other Defendants and co-conspirators regarding the Plaintiff facilities and has made extensive efforts to put the Plaintiff facilities out of business.  Specifically, Anthem met separately with CASCA in March of 2012 to discuss the issue of out-of-network facilities.  It met at least twice with HealthONE to discuss the Plaintiff ASCs, including a meeting on July 24, 2012.

76.    Starting in at least October of 2011, at the same timeframe as the HCA and Centura Board members were asking CASCA to take action, at the behest of its co-conspirators, and in furtherance of the conspiracy, Anthem began threatening physicians associated with Arapahoe Surgery Center and Kissing Camels Surgery Center.  In those letters, Anthem threatened termination of the Provider Agreements in the event the doctors did not "stop using Arapahoe or Kissing Camels Surgery Center … for all Anthem Blue Cross/Blue Shield and HMO Colorado members."

**Contains Information marked Highly Confidential Pursuant to Protective Order**

77.     Anthem's actions were carefully coordinated with the hospital co-conspirators.  For example, in a February 6, 2012 e-mail, an Anthem Vice President advised HealthONE's then Regional Vice President of Managed Care:

> I am having reports pulled from the ASCs I am aware of in the Denver and Colorado Springs markets that I know are non-par but seeing Anthem patients.  We pulled a list in 2011 and sent out notices to them but will step it up in 2012 as we need to (up to and including the possible termination of the physicians performing the procedures at those facilities after notifying them that they were using non-par facilities.)

78.     As a further example, in response to an e-mail from CAHP regarding whether its members had heard about the issue of ASCs waiving co-pays, Anthem's Senior Director of Government Relations responded in a March 20, 2012 e-mail:  "I think we can put our finger on those limited number of ASC's that have adopted this practice.  One in Colorado Springs and most likely the few down south.  **Our hospital partners are complaining about this practice."**  (emphasis added)  On information and belief, the referenced facilities were Plaintiff Kissing Camels in Colorado Springs and the three Plaintiff ASCs in Denver, all of which are located in south Denver.  Just two days later, on March 22, 2012, Anthem met separately with CASCA to discuss out-of-network issues.  As yet another example, in a July 20, 2012 e-mail, at the same time as planning was ongoing for the August 29, 2012 joint CASCA/CAHP meeting and at the same time Anthem was negotiating its contract with HealthONE, Anthem's Regional Vice President stated:

> I was able to talk to HCA yesterday about what their expectation was around this activity.  … [HealthONE's Vice President for Managed Care] is scheduling a meeting with their system CEO to discuss this and how

**Contains Information marked Highly Confidential Pursuant to Protective Order**

payers are handling this situation so I want to make sure I have the Anthem facts right.

I did tell HealthONE's Vice President for Managed Care that Anthem has been proactive in this space.

\*\*\*\*\*

Also he told me some of their surgeons are pulling out of the JV'd ASCs and joining these ASC's because of their ability to make more $.

79.    HealthONE's Vice President for Managed Care called Anthem's Regional Vice President before the joint meeting, in response to which the Regional Vice President made inquires to ensure that "we have the right folks there to represent us (Anthem.)"

## AETNA[1]

80.    In a highly confidential March 1, 2012 e-mail with the subject line "Dry Creek", an Aetna executive stated that "We will be meeting next week to review the physicians/groups utilizing the ASC and targeting those we can term without major network disruption.  Fulfilling that pledge, beginning in at least May of 2012, at the same time as the joint CASCA/CAHP conference call about the Plaintiff facilities, and in furtherance of the conspiracy, Aetna threatened physicians associated with Kissing Camels Surgery Center and the Plaintiff facilities in Denver with termination from its provider network and/or with information posted on its provider website that the

---

[1]  Aetna's documents were among the last produced and originally lacked certain electronic files to allow them to be searched.  Plaintiffs reserve the right to replead again against Aetna if additional documents are discovered upon further review which provide additional support for Aetna's agreement in restraint of trade.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

physicians regularly referred "patients to out-of-network providers, resulting in significantly higher out-of-pocket costs for your patient."

## CASCA

81.     One of the ways that Defendants Centura, Audubon and their co-conspirator HealthONE advanced their concerted activity was to gain control over Defendant CASCA.

82.     As previously alleged, Centura exerts a great deal of control over CASCA through the Executive Director of Audubon Surgery Center, who also serves as an officer of CASCA, and through relationships with at least five other CASCA Board members, including employees of companies that manage several of Centura's ASCs and a physician owner of one of its joint venture ASCs.

83.     Defendant Centura and its co-conspirator HealthONE also have a close relationship with CASCA through their financial support.  For example, they are the top (Diamond Level) sponsors of CASCA.  The only other Diamond Level Sponsor of CASCA is USPI, the previously mentioned company that manages four of Centura's joint venture ASCs and holds a CASCA Board seat.  As the Plaintiffs have been successful in attracting and treating patients, CASCA, HealthONE, Centura, Audubon and others have engaged in a concerted effort to put the Plaintiffs out of business. Although some of the Plaintiffs have been members of CASCA and CASCA accepted their dues, CASCA has become a supporter and supported the anti-competitive agenda of its top level members, the monopoly hospital systems.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

84.     CASCA's involvement in the conspiracy dated from at least the fall of 2011 when CASCA's Executive Director was contacted by four CASCA Board members representing HCA, Audubon and Centura interests:   A Board member who on information and belief is a physician investor in one of HCA's joint ventures; Brent Ashby, Administrator of Centura joint venture, Defendant Audubon; Rob Carrera, CEO of a company that on information and belief manages some of Centura's joint venture ASCs, and  an administrator of one of HCA's ASCs.  All four expressed concern with the development of the Plaintiff ASCs and the direct competition they would face from these centers.    The CASCA Board member who on information and belief  is a physician investor in one of HCA's joint ventures specifically complained that one of the Plaintiff centers was "a new business endeavor to compete head to head with Rose," the HCA ASC that another CASCA Board member  at that time administered.

85.     Some of the Board members contacting CASCA's Executive Director also expressed concern with the Plaintiffs' billing practices, even though those billing practices were consistent with those prevalent in the industry, including those in place at Audubon, the Centura ASC's managed by USPI, and other CASCA members.  For example, Audubon's billing policy states:   "Whenever we schedule a patient whose insurance company is not contracted with Audubon, we … work with the patient to adjust our billing, to the extent possible, to match the in-network benefits that are available under the patient's plan."   Similarly, USPI's policy states with respect to the processing claims for out-of-network patients:   "USPI does not want to penalize a

**Contains Information marked Highly Confidential Pursuant to Protective Order**

patient who is out-of-network.  Therefore, the purpose of the Out-of-Network Policy is to establish procedures that will be applied consistently to all patients that are approved for 'in-network' treatment and not assessed their carrier's out-of-network penalties." Pursuant to the policy, all such claims contain an alert stating "**This claim is being processed with the intention of honoring your members' in-network deductible and co-pay provisions."**  (emphasis in the original)  Consequently, the real concern of the individuals complaining about the Plaintiff centers was a competitive threat rather than anything having to do with their billing practices.

86.     As a result of these contacts from Board members, CASCA's Executive Director requested that its outside legal firm prepare an article on Colorado law governing co-pays and deductibles, which was published in a September, 2011 Legal Update.  That Legal Update stated:  "§ 18-13-119 provides that eliminating a patient's health benefit plan copayment or deductible is an abuse of health insurance …."  The Legal Update went on to opine:  "We generally view waiving an OON deductible or copayment as riskier than discounting such amounts (*e.g.* discounting the OON deductible to the in-network deductible amount.)  We advise providers to fully disclose any amounts or waivers to the insurer on the OON claim…."

87.     Perhaps because they knew that the Plaintiff ASC's did not waive co-pays, some of CASCA's Board members did not believe that the September 2011 Legal Update went far enough.  As a result, in November, 2011, CASCA published a "Clarification of September 2011 Legal Update" for which CASCA requested approval

**Contains Information marked Highly Confidential Pursuant to Protective Order**

and sign-off before publication from at least one CASCA Board member, the Administrator of HCA's Rose Surgery Center.  The November 2011 "Legal Update" eliminated the statement regarding discounting co-pays and deductibles and the advice to fully disclose any such discounts to insurers.

88.     HealthONE and other Board members' companies paid for this legal work.

89.     In November, 2011, CASCA made calls to payers in an effort to "'thwart'" out-of-network activity.

90.     At its December, 2011 Board Meeting, a Board member employed by HCA  moved to authorize CASCA staff to "develop a strategy for addressing the OON/Co-pay Waiver issue" that was seconded by the Board member employed by USPI.  On information and belief, the motion and all actions taken thereunder were a pretext to thwart competition from the Plaintiff ASC's.

91.     On or about March 22, 2012, in furtherance of this strategy, CASCA met with Anthem.  In a confidential e-mail dated March 20, 20112, CASCA's Assistant Executive Director stated that "this meeting will be to primarily discuss the OON/copay issue."

92.     Also in March of 2012, Plaintiff Cherry Creek Surgery Center, which at that point had not yet opened, contacted CASCA for assistance in obtaining state licensure. In a March 13, 2012 e-mail, Craig Davis, MD stated that "[t]hese doctors and ASC's have supported CASCA since its inception, both financially and serving on the Board." Nonetheless, CASCA declined to assist.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

93.     On April 13, 2012, a CASCA Board member employed by Pinnacle iii, which manages some of Defendant Centura's joint venture ASCs, requested a conference call to discuss the Denver Plaintiff ASCs.  In a confidential April 13, 2012 e-mail she stated:  "This group is infiltrating the Denver market in a HUGE way and plans on having 5 centers in Denver soon, already have two up and built."  In a subsequent e-mail she stated:  "I have a lot of new information on what is occurring in Denver with the OON facilities.  This group is very aggressive in what they have planned for Denver."  The requested conference call was held on April 16, 2012.  Again, the focus was on the CASCA Board members' fear of competition from the Plaintiffs, not on the Plaintiff Centers' alleged billing practices.

94.     As part of its strategy to thwart competition from the Plaintiff centers, CASCA reached out to CAHP through its legal counsel and requested a meeting.  That meeting was held by conference call on May 18, 2012.  That conference call was attended by representatives from Defendants Aetna, Anthem, United, as well as by representatives from other insurers such as Cigna, and CASCA Board members.

95.     The stated purpose of the joint CASCA/CAHP call was to discuss OON ASC's that discount deductibles and copayments.  The agenda included time for the "health plan participants to describe their positions on the issues, as well as any proposed strategies for resolution."  On information and belief, the sole focus of the call was to discuss the Plaintiff ASC's.  That the sole focus was on the Plaintiffs is confirmed by a May 17, 2012 e-mail to CAHP participants notifying them of a change in the call-in

**Contains Information marked Highly Confidential Pursuant to Protective Order**

number because "unfortunately CASCA sent tomorrow's call-in number to some ambulatory surgical centers that were not meant to be on the call (*i.e.* centers that are part of the issue)."  The CASCA and CAHP participants on the call agreed to set up a follow-up in-person meeting with the "right people in the room."

96.     The follow-up joint CASCA/CAHP meeting was held on August 29, 2012. The agenda provided in advance stated that the main focus of the meeting would be the OON/copay waiver issue.  In advance of the meeting, CAHP Associate Director sent a message to members in order to ensure that the right decision makers were there from the health insurers.  In bold and in caps, his message asked:  "**DOES THIS TIME WORK FOR THE PERSONNEL THAT NEEDS TO ATTEND.**"

97.     The meeting was attended in person by four executives from Defendant Anthem, including two from Anthem's in-house counsel's office, two from Defendant United, three from Cigna, one from Kaiser and one from Humana.  In addition, an executive from Aetna participated by telephone.  Two CASCA Board members employed by HCA attended the meeting and three CASCA Board members affiliated with Defendant Centura, including the Administrator of Audubon, also attended.

98.     At the meeting, despite the fact that the Plaintiffs' billing policies are consistent with those in place at Audubon and other of Centura's ASCs, Audubon and Centura representatives asserted that Plaintiff facilities' billing and collection practices violated Colorado law and asked that the health insurers not do business with Plaintiffs.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

The clear intent behind this action, under the pretext of alleged illegal billing practices, was to effect a boycott of the Plaintiff facilities and to drive them out of business.

99.     According to notes from the meeting taken by CAHP, confirmed by notes taken by United, the strategy decided upon at the meeting was to "stop" the "flow of dollars" from the insurers to the Plaintiff facilities.

100.    Following the August 29, 2012 meeting, CASCA's Executive Director and Assistant Executive Director met with CAHP's Executive Director and Associate Director.  At that meeting, they agreed on a strategy to fulfill the goal of the August 29, 2012 to stop the flow of dollars to the Plaintiffs' ASC's.  As memorialized in a confidential e-mail from CASCA's Executive Director, the ideas on which they had a "meeting of the minds" that they would take to their respective Boards included the following:  CAHP would approach the AG and possibly the DOJ to seek an investigation of some of the principals.  CAHP would send a strong letter to CASCA about issues of concern while complimenting CASCA for its initiatives.  They would work to seek termination of the offending physicians and to ensure that physician contracts contain language prohibiting referral to OON facilities.

101.    CAHP's Board of Directors subsequently approved several actions, including all of the above referenced action items.  CAHP's Board of Directors includes executives from Defendants United and Anthem as well as executives from Cigna, Humana, and Kaiser.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

102.   In furtherance of the agreements made at the August 29, 2012 meeting and in accordance with the action plan developed at the meeting of CASCA's and CAHP's Executive Directors and approved by CAHP's Board, CAHP wrote CASCA's Executive Director a letter dated November 12, 2012.  This letter states:

> On behalf of the members of the Colorado Association of Health Plans, I'd like to thank you for reaching out to us regarding concerning out-of-network billing practices by certain ambulatory centers.
>
> *****
>
> First and foremost, we have discussed this issue with our industry's executive leadership and have been instructed to curb this destructive billing practice as soon as possible.  We are working on several different approaches right now, including:
>
> *****
>
> Reviewing carrier's provider contracts to ensure referring physicians are compliant.   Physician's knowingly referring patients to out-of-network surgical centers may be in violation of their provider contracts, particularly if they have a financial stake in the particular surgical center.
>
> *****
>
> We hope that a multifaceted approach provides multiple leverage points that can help stop this practice.
>
> Again, than you for brining (sic) this issue to our members, and we commit to working with you to stop this destructive practice.

103.   CASCA has also attempted to bring about actions detrimental to Plaintiffs. For example, at the request of Defendants Centura and Audubon and their co-conspirator HealthONE, CASCA Executive Director Rob Schwartz sent a letter to the DORA noting concern that "no adverse action" had been taken against providers for waiving or discounting insurance copayments or deductibles.  The letter encouraged the

**Contains Information marked Highly Confidential Pursuant to Protective Order**

state of Colorado to take action against the Plaintiff facilities. In fact, as previously stated, the Plaintiffs do not generally waive copayments or deductibles, but rather utilize the same general billing policies as Defendant Audubon and as at least one company that manages many of Centura's joint venture ASC's. The response from DORA noted that Colorado Medical Board staff had received no information that such a complaint had been filed in the last year and suggesting an open meeting with the Attorney General's office, the Colorado Medical Society and Colorado Hospital Association. CASCA never asked for or participated in such a meeting. Moreover, when the Insurance Commissioner called CASCA's Executive Director seeking a meeting on the issue, on the advice of an HCA Board member, CASCA declined the invitation. In fact, there was no follow-up whatsoever to the letter from DORA and CASCA took no other legislative or political action on the issues raised in the DORA letter. Instead, they continued to act to exclude the Plaintiffs from the relevant markets.

### UNITED, ANTHEM AND AETNA'S ACTIONS TO IMPLEMENT THE ANTI-COMPETITIVE AGREEMENTS REACHED IN THE MAY 18, 2012 JOINTCASCA/CAHP CONFERENCE CALL AND THE AUGUST 29, 2012 JOINT CASCA/CAHP MEETING

104. As a result of the May 18, 2012 conference call and the August 29, 2012 meeting and the agreements reached with HealthONE, Centura, Audubon, and CASCA a number of the health insurers, including Kaiser, United, Aetna, Anthem and Cigna took actions designed to further their agreement to attempt to marginalize or put the Plaintiffs out of business.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

## UNITED

105.   For instance, United terminated a number of physicians and practices affiliated with the Plaintiffs' facilities from its networks.  As previously alleged in detail, these terminations were designed to deter referrals of patients and surgeries and procedures to these facilities.   United has threatened many other physicians and practices with termination if they continue to treat patients at the Plaintiff facilities and has threatened primary care physicians with termination if they continue to refer patients to surgeons who perform surgery at the Plaintiff facilities.  In fact, United went one step further and threatened to terminate primary care physicians who referred patients to specialists who ultimately performed surgeries and procedures at the Plaintiffs' facilities.

106.   On August 31, 2012, just two days after the secret meeting at CASCA and in furtherance of the agreement in restraint of trade, United sent a letter to Metro Denver Pain Management purporting to terminate that practice "for cause" on October 31, 2012 for "continued use of SurgCenter on Dry Creek [Arapahoe]."

107.   As previously demonstrated, United's terminations were not independent actions, but rather were done at the request of Centura, Audubon and HealthONE and in furtherance of the conspiracy.

## ANTHEM

108.   Anthem met with CASCA on March 22, 2012 and was also present on the May 18, 2012 conference call and at the August 29, 2012 meeting.  Anthem also met at least twice with HealthONE to discuss the Plaintiff ASCs, including a meeting on July

**Contains Information marked Highly Confidential Pursuant to Protective Order**

24, 2012. As a direct result of these meetings and in furtherance of the conspiracy, it has threatened practices affiliated with Kissing Camels, Arapahoe and Cherry Creek Surgery Centers with termination from their provider networks on the basis of their treatment of patients at those facilities.

109. On August 31, 2012, just two days after the secret joint CASCA/CAHP meeting, Anthem sent correspondence to Colorado Orthopaedic Consultants, a practice which performed surgeries at Arapahoe SurgCenter, threatening to terminate the practice's contracts with Anthem if it did not stop using Arapahoe SurgCenter for all of Anthem's members.

110. On September 6, 2012, approximately a week after the secret meeting, Anthem sent letters to providers that performed surgeries and other procedures at SurgCenter facilities including Colorado Hand Center and Interwest Rehabilitation, purporting to terminate those practices from its provider network effective January 1, 2013 due to "inappropriate referrals." Other providers who performed surgeries at the Plaintiffs' facilities received similar letters from Anthem.

111. Anthem's threats of termination in such close proximity to the August 29, 2012 meeting at which it was agreed to stop the flow of dollars to the Plaintiff facilities cannot reasonably be considered independent actions, but rather were actions in furtherance of the anti-competitive purpose of the conspiracy.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

## AETNA

112.   After the meeting of August 29, 2012, Aetna again made written threats by certified mail to doctors associated with the Plaintiffs about terminating them from that company's network for referrals to out-of-network facilities.   Aetna's threats of termination in such close proximity to the August 29, 2012 meeting at which it was agreed to stop the flow of dollars to the Plaintiff facilities cannot reasonably be considered independent actions, but rather were actions in furtherance of the conspiracy.

113.   None of these letters from Aetna, United, Anthem and other health insurers threatening to terminate doctors from their provider networks expressed any concerns about the Plaintiff facilities' copay or deductible practices.  All of these letters expressed the similar view that referrals to the Plaintiff facilities were, in the view of the insurance companies, barred by the terms of their various contracts, and in fact, many specifically, but erroneously, stated-that patients might pay *more* at the Plaintiff facilities.

114.   Each of these letters was designed to hurt the business of a Plaintiff facility and to deter doctors and other healthcare providers from utilizing the Plaintiff facilities in fulfillment of the agreement at the August 29, 2012 meeting to stop the flow of dollars to the Plaintiff facilities.  Each case which was shifted away to another facility due to the Defendants' threats resulted in lost revenue and profits for a Plaintiff.

115.   Further, some of these insurers have taken it one step further in an effort to deter other healthcare providers from referring patients to doctors who utilize the

**Contains Information marked Highly Confidential Pursuant to Protective Order**

Plaintiff facilities. For instance, United threatened a Colorado Springs physician practice with termination for simply referring patients to a surgical practice it had previously terminated for referring patients to and performing procedures at Plaintiff Kissing Camels Surgery Center.

116. After the August 29, 2012 joint CASCA/CAHP meeting and as a direct result of that meeting, Defendant Kaiser notified Plaintiff Kissing Camels Surgery Center that it no longer intended to finalize its previously negotiated participation agreement with Kissing Camels. In addition, as a further result of the August 29, 2012 meeting, Kaiser refused to authorize the treatment of its members at Kissing Camels Surgery Center on an out-of-network basis, even when surgery was urgently needed. These actions were taken in furtherance of the conspiracy that Kaiser had joined with competitors Aetna, United, Anthem, as well as, HealthONE, Centura, and CASCA.

117. In the Colorado Springs market, Defendant Centura owns and operates the Audubon Surgery Center and the Audubon AC at St. Francis and Women's Surgical Center. The administrator of Audubon Surgery Center is Brent Ashby. As previously alleged, Mr. Ashby has been concerned with competition from Kissing Camels from its inception. As recently as on or about October 4, 2012 at a meeting of shareholders of Audubon and others, and on other occasions, Ashby stated that it was his goal to put the Kissing Camel Surgery Center out of business. In addition, in consultation with CASCA and CAHP, Mr. Ashby spent two hours with a reporter from the Colorado Springs *Gazette* on October, 16, 2012, in which, among other things, Mr. Ashby

**Contains Information marked Highly Confidential Pursuant to Protective Order**

erroneously informed the reporter of egregious amounts being charged at Kissing Camels.

118.    Based on information and belief, Plaintiffs allege that on numerous occasions since at least 2010, Defendants Audubon and Centura have attempted to use their joint market power to reach agreement with one another and health insurance companies not to contract, or otherwise do business with independent surgery centers such as Plaintiffs and others that compete in their market.

119.    As a direct result of Defendant Audubon's and Defendant Centura's anticompetitive restraint on trade, patients who sought treatment at Plaintiffs' facilities have been required by their health insurers to seek treatment at other facilities, including Defendants' facilities.

120.    Consumers and competition have been harmed by Audubon and Centura's monopolist action and agreements in restraint of trade.  Consumer choices are limited when Audubon, Centura and their co-conspirators attempt to run potential competitors out of business

121.    As alleged, Plaintiff facilities were damaged, and the damage caused was the direct and intended outcome of Defendants' agreements in restraint of trade and Audubon and Centura's abuse of their respective monopoly power and the harm to competition.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

122.   There is no pro-competitive justification for Defendants' conduct and attempts to put the Plaintiff facilities out of business and exclude them from insurer networks.

## THE ANTI-COMPETITIVE AGREEMENT AMONG THE DEFENDANTS AND THEIR CO-CONSPIRATORS TO EFFECT A BOYCOTT OF THE PLAINTIFF ASC'S AND TO DRIVE THEM OUT OF BUSINESS

123.   As previously alleged in detail, Plaintiff Kissing Camels opened in Colorado Springs in June, 2010.  Defendant Audubon and its more than 40% owner, Defendant Centura, immediately felt threatened by this competition.  On September 1, 2010, Audubon's Executive Director notified Defendant United of the "shocking development" of Kissing Camels' opening and its charging allegedly "excessive" prices – allegations that upon United's investigation turned out to be untrue.  Despite the fact that United's investigation showed that Kissing Camels' prices were reasonable and that physicians' contracts allowed referrals of patients with out-of-network benefits to out-of-network facilities such as Kissing Camels, United entered into an agreement with Centura and Audubon to dry up patient referrals to Kissing Camels.  United entered into this agreement with Centura and Audubon because Centura and Audubon had market power and threatened to terminate their contracts with United.  For the same reason, Defendant United also entered into an agreement with Centura and HealthONE to dry up referrals to the Plaintiff ASC's in Denver.  Therefore, as documented herein, United's implementation of a multi-prong anti-competitive plan designed to stop physicians from

**Contains Information marked Highly Confidential Pursuant to Protective Order**

referring patients to the Plaintiff facilities did not result from independent decision making, but rather from an express agreement with its co-conspirators.

124.   As also previously alleged, from the time the Plaintiff ASCs opened, HealthONE asked United, Anthem, Aetna and Cigna to take measures to stop referrals to the Plaintiff ASCs and these insurers sent the requested letters.  That the insurers' letters were in response to HealthONE's requests is confirmed by the above quoted February 6, 2012 e-mail from an Anthem Vice President to HealthONE's Regional Vice President of Managed Care stating:  "We pulled a list in 2011 and sent out notices to them but will step it up in 2012 as we need to (up to and including the possible termination of the physicians performing the procedures at those facilities after notifying them that they were using non-par facilities."  Later, executives at HealthONE, up to and including HealthONE's CEO were concerned that the letters weren't enough and HealthONE's CEO implored her executive team to "call in the dogs" and discuss these issues with insurers off-line.  Throughout, HealthONE used the leverage of their ongoing contract negotiations to obtain agreement from these insurers to stop referrals.

125.   Through their dominant position on CASCA's Board, co-conspirators Centura, Audubon and HealthONE asked CASCA to join the conspiracy and CASCA entered into an agreement to join the conspiracy in the fall of 2011.  CASCA did not merely serve as the venue for meetings at which the conspiracy was developed or merely as a trade association conduit pursuant to which the conspiracy was conducted, but rather as an active participant in it.  In agreement with its members who were

**Contains Information marked Highly Confidential Pursuant to Protective Order**

concerned with competition from the Plaintiff facilities, among other actions. CASCA formed a sub-committee in the fall of 2011 in an effort to "thwart competition" from out-of-network facilities; it wrote DORA in March, 2012; it separately met with Defendant Anthem in March, 2012 to address Anthem's actions concerning out-of-network facilities; it conducted a conference call to discuss competition from the Plaintiff facilities in April, 2012; it reached agreement with other participants in the joint CASCA/CAHP May 18, 2012 conference call that action against the Plaintiff facilities was necessary; it reached agreement with other participants at the joint CASCA/CAHP August 29, 2012 meeting to stop the flow of dollars to the Plaintiff facilities; it agreed with the members of CAHP on a number of specific actions intended to stop the flow of dollars to the Plaintiff facilities after the August 29, 2012 meeting; and it coordinated messaging with the press intended to paint the Plaintiff facilities in a bad light in a further anti-competitive effort to drive the Plaintiffs out of business.  In all of these actions, CASCA did not act as a trade association should on behalf of all ASCs in Colorado, but rather at the behest of and in agreement with its dominant hospital association members and against the interests of Plaintiffs, who were also members.

126.   Defendant Anthem joined the conspiracy and entered into the agreement by at least March of 2012 when it separately met with CASCA.  As detailed above, Anthem's actions were closely coordinated with the dominant hospital co-conspirators. Just two days before Anthem's meeting with CASCA, Anthem advised CAHP in an e-mail that "our hospital partners are complaining" about facilities that, on information and

**Contains Information marked Highly Confidential Pursuant to Protective Order**

belief were the Plaintiffs.  The day before the joint CASCA/CAHP August 29, 2102 meeting, HealthONE contacted Anthem to make sure that it was aware of the meeting and that it would have the "right folks" there.   Anthem sent four representatives, including two from its in-house counsel's office.  At that meeting, Anthem entered into the agreement with its co-conspirators to "stop the flow of dollars" to the Plaintiff ASCs.  Just two days later and in furtherance of the conspiracy, it started sending out letters to physicians threatening to terminate their contracts if they continued referring patients to the Plaintiff ASCs.  Thus, Anthem's actions were not independent, but rather were taken as part the express anti-competitive agreement among the co-conspirators to stop the flow of dollars to the Plaintiffs and to drive them out of business.  Aetna's agreement to join the conspiracy is evidenced by the above-quoted March 1, 2012 e-mail regarding Plaintiff ASC Dry Creek that Aetna executives would be "meeting next week to review the physicians/groups utilizing the ASC and targeting those se can term without major network disruption."  Aetna's agreement to join the conspiracy is further evidenced by its sending threatened termination letters immediately after the August 29, 2012 meeting at which it was agreed to stop the flow of dollars to the Plaintiff ASCs.

127.   Kaiser joined the conspiracy and entered into the agreement by at least the August meeting with CASCA.   Following this meeting where they reached agreement with the Defendants, Kaiser notified Plaintiff Kissing Camels Surgery Center that it no longer intended to finalize its previously negotiated participation agreement with Kissing Camels.  In addition, as a further result of the August 30, 2012 meeting,

**Contains Information marked Highly Confidential Pursuant to Protective Order**

Kaiser previously refused to authorize the treatment of its members at Kissing Camels Surgery Center on an out-of-network basis, even when surgery was urgently needed. These actions were taken in furtherance of the agreement that Kaiser had joined with competitors Aetna, United, Anthem, as well as, HealthONE, Centura, and CASCA.

## THE PRETEXTUAL NATURE OF THE ALLEGED ALLEGATIONS OF ILLEGAL WAIVERS OF CO-PAYS AND DEDUCTIBLES

128.   The reason that the co-conspirators entered into the anti-competitive agreement to boycott the Plaintiff ASC's was because co-conspirators Centura, Audubon and HealthONE viewed the Plaintiffs as competitive threats and they had the dominant market power to persuade the co-conspirator health insurers, United, Anthem, Aetna, Cigna, and others to join the conspiracy.   At times, the co-conspirators asserted that the reason for the agreement was that the Plaintiffs prices were too high and at times they alleged that the Plaintiffs illegally waived co-pays and deductibles.   However, these reasons were merely pretextual to the anti-competitive goal of driving the Plaintiffs out of business.

129.   As documented above, the first known contact between Audubon and its co-conspirator United about Plaintiff Kissing Camels occurred in a September 1, 2010 e-mail message in which Audubon's Executive Director complained of the prices charged by Kissing Camels and expressed concern that Audubon would "lose cases" to Kissing Camels.   United's investigation proved that Kissing Camels' prices were not excessive.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

130.   Likewise, when Centura, Audubon and HealthONE Board members asked CASCA to join the conspiracy, they initially only expressed concern with the competitive threat posed by the Plaintiffs.

131.   That the allegations concerning Plaintiffs' supposedly Illegal waivers of co-pays and deductibles were purely pretextural is proven by the fact that Audubon and the USPI managed Centura ASCs have the same policy as the Plaintiffs:  As is common in the industry, they reduce out-of-network patients' co-pays to their in-network levels in an effort to keep healthcare as affordable as possible.

132.   That the allegations regarding the Plaintiffs' alleged illegal waiver of co-pays was merely pretext is also demonstrated by the complete and noticeable absence of any communications from United, Anthem, Aetna or other co-conspirator insurers to the physicians threatened with termination that the Plaintiffs were engaged in allegedly illegal or wrongful activity and the predominant use of "without cause" termination provisions when terminating physician contracts.

133.   That the allegations regarding the Plaintiffs' alleged illegal waiver of co-pays was merely pretext is also demonstrated by CASCA's making absolutely no effort to reach out to Plaintiffs, who were CASCA members, in an effort to address the alleged illegal conduct.  In fact, it is clear that CASCA purposefully acted in secret so that the Plaintiffs would not be aware of their supposed concerns with the Plaintiffs collection practices.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

## VIOLATIONS ALLEGED

## COUNT I

**Contract, Combination, or Conspiracy in Restraint of Trade in
Violation of Section 1 of the Sherman Act
(On Behalf of All Plaintiffs Against All Defendants)**

134.   Plaintiffs incorporate the allegations set forth in paragraphs 1 through 133 as though set forth herein.

135.   The agreement among the Defendants and their co-conspirators to attempt to put Plaintiffs out of business through a variety of anticompetitive means represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

136.   As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.   Such injury flows directly from that which makes Defendants' conduct unlawful.   These damages consist of having been paid lower rates, having fewer surgeries performed at the facility, otherwise having business diverted to competitors who were part of the agreement, and/or having access to far fewer patients than they would have with fair competition and but for the Defendants' anticompetitive agreements and practices.

137.   Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

138.    The Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that have been entered into in restraint of trade.

## COUNT II

### Conspiracy to Monopolize in Violation of 15 U.S.C. § 2
### (On Behalf of Plaintiff Kissing Camels Against Centura and Audubon)

139.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 138 as though set forth herein.

140.    Centura and Audubon have conspired to acquire or maintain a monopoly in the market for surgical procedures that do not require hospitalization in the Colorado Springs market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  This offense is likely to continue to recur unless the relief requested is granted.

141.    For the purpose, and the actual effect, of maintaining, extending and exercising their monopoly in the Colorado Springs market, Centura and Audubon, along with their co-conspirators, threatened and intimidated health insurers and healthcare providers who utilize Plaintiff Kissing Camels Surgery Center and, in fact, took other actions designed to put Kissing Camels Surgery Center out of business.

142.    Centura's and Audubon's acts and practices and Centura's and Audubon's continuing course of conduct have harmed consumers and competition in the Colorado Springs market for surgical services not requiring hospitalization.

143.    Centura's and Audubon's anticompetitive, exclusionary and coercive conduct has directly and proximately caused injured to Kissing Camels Surgery Center

**Contains Information marked Highly Confidential Pursuant to Protective Order**

of a type the antitrust laws are intended to prohibit and unless the activities complained of are enjoined, Plaintiff Kissing Camels Surgery Center will continue to suffer injury for which there is no adequate remedy at law.

## COUNT III

### Attempted Monopolization in Violation of 15 U.S.C. § 2
### (On Behalf of Plaintiff Kissing Camels Against Centura and Audubon)

144.   Plaintiffs incorporate the allegations set forth in paragraphs 1 through 143 as though set forth herein.

145.   Centura and Audubon have willfully attempted to monopolize the Colorado Springs Market for surgical services not requiring hospitalization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  This offense is likely to continue or recur unless the relief requested is granted.

146.   With the specific intent and the dangerous probability of monopolizing the acute care hospital market in Colorado Springs, Centura and Audubon, along with their co-conspirators, threatened and intimidated health insurers and healthcare providers who utilize Plaintiff Kissing Camels Surgery Center and, in fact, took other actions designed to drive Kissing Camels Surgery Center out of business.

147.   Centura's and Audubon's acts and practices and Centura's and Audubon's continuing course of conduct have harmed consumers and competition in the Colorado Springs market for surgical services not requiring hospitalization.

148.   Centura's and Audubon's anticompetitive, exclusionary and coercive conduct has directly and proximately caused injury to Plaintiff Kissing Camels Surgery

**Contains Information marked Highly Confidential Pursuant to Protective Order**

Center of a type the antitrust laws are intended to prohibit and unless the activities complained of are enjoined, Plaintiff Kissing Camels Surgery Center will continue to suffer injury for which there is no other adequate remedy at law.

### COUNT IV

**Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Colorado Antitrust Act
(On Behalf of All Plaintiffs Against All Defendants)**

149.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 148 as though set forth herein.

150.    The agreement among the Defendants and their co-conspirators to attempt to put Plaintiffs out of business through a variety of anticompetitive means represents a contract, combination, or conspiracy in restraint of trade within the meaning of Colorado Revised Statutes 6-4-104.

151.    As a direct and proximate result of Defendants' continuing violations of the Colorado Antitrust Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the Colorado Antitrust Act was designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having fewer surgeries performed at Plaintiffs' facilities, otherwise having business diverted to competitors who were part of the agreement, and/or having access to far fewer patients than they would have with fair competition and but for the Defendants' anticompetitive agreements.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

152.     Plaintiffs seek money damages from Defendants for their violations of the Colorado Antitrust Act.

153.     The Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements or conspiracies that have been entered into in restraint of trade.

## COUNT V

### Conspiracy to Monopolize in Violation of C.R.S. 6-4-105
### (On Behalf of Kissing Camels Against Centura and Audubon)

154.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 153 as though set forth herein.

155.     Centura and Audubon have conspired to acquire or maintain a monopoly in the market for surgical procedures that do not require hospitalization in the Colorado Springs market in violation of C.R.S. 6-4-105.  This offense is likely to continue to recur unless the relief requested is granted.

156.     For the purpose, and the actual effect, of maintaining, extending and exercising its monopoly in the Colorado Springs market, Centura and Audubon, along with their co-conspirators, threatened and intimidated healthcare providers who utilize Plaintiff's facility and, in fact, took other actions designed to drive the Plaintiff Kissing Camels Surgery Center out of business.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

157.   Centura's and Audubon's acts and practices and Centura's and Audubon's continuing course of conduct have harmed consumers and competition in the Colorado Springs market for surgical services not requiring hospitalization.

158.   Centura's and Audubon's anticompetitive, exclusionary and coercive conduct has directly and proximately caused injured to Plaintiff Kissing Camels Surgery Center of a type the antitrust laws are intended to prohibit and unless the activities complained of are enjoined, Plaintiff will continue to suffer injury for which there is no adequate remedy at law.

## COUNT VI

**Attempted Monopolization in Violation of C.R.S. 6-4-105**
**(On Behalf of Kissing Camels Against Centura and Audubon)**

159.   Plaintiffs incorporate the allegations set forth in paragraphs 1 through 158 as though set forth herein.

160.   Centura and Audubon have willfully attempted to monopolize the Colorado Springs Market for surgical services not requiring hospitalization in violation of C.R.S. 6-4-105.  This offense is likely to continue or recur unless the relief requested is granted.

161.   With the specific intent and the dangerous probability of monopolizing the market for surgical services not requiring hospitalization in Colorado Springs, market, Centura and Audubon, along with their co-conspirators, threatened and intimidated healthcare providers who utilize Plaintiffs Kissing Camels Surgery Center and, in fact, took other actions designed to drive the Plaintiff out of business.

**Contains Information marked Highly Confidential Pursuant to Protective Order**

162.    Centura's and Audubon's acts and practices and Centura's and Audubon's continuing course of conduct have harmed consumers and competition in the Colorado Springs market for surgical services not requiring hospitalization.

163.    Centura's and Audubon's anticompetitive, exclusionary and coercive conduct has directly and proximately caused injured to Plaintiff Kissing Camels Surgery Center of a type the antitrust laws are intended to prohibit and unless the activities complained of are enjoined, Plaintiff will continue to suffer injury for which there is no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

a.      Adjudge and decree that all Defendants have violated Section 1 of the Sherman Act;

b.      Adjudge and decree that Centura and Audubon have violated Section 2 of the Sherman Act;

c.      Adjudge and decree that Defendants have violated C.R.S. 6-4-104 and 105;

d.      Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements to limit competition in the market for surgical services not requiring hospitalization including but not limited to retaliating against or taking anticompetitive actions against the Plaintiffs and/or  physicians affiliated with the Plaintiffs;

**Contains Information marked Highly Confidential Pursuant to Protective Order**

e.      Award Plaintiffs damages in the form of three times the amount of damages suffered by Plaintiffs as proven at trial;

f.      Award costs, expert fees and attorneys' fees to Plaintiff;

g.      For a trial by jury; and

h.      Award any such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury on all issues.

Dated: February 26, 2014.                    Respectfully Submitted,

*/s/ Joe R. Whatley, Jr.*
Joe R. Whatley, Jr.
Colorado State Bar No. 38820
WHATLEY KALLAS, LLP
720 East Durant Avenue, Suite E6
Aspen, CO  81611
Tel.: (800) 695-6750; (970) 300-4848
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com

Edith M. Kallas
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY  10036
Tel.: (212) 447-7060
Fax: (800)922-4851
Email: ekallas@whatleykallas.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA  30306
Tel.: (404) 607-8222
Fax: (404) 607-8451
Email: dwinegard@whatleykallas.com

**Contains Information marked Highly Confidential Pursuant to Protective Order**

W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place Tower, Suite 1000
Birmingham, AL  35203
Tel.: (205) 488-1200
Fax: (800) 922-4851
Email: tbrown@whatleykallas.com

*Attorneys for Plaintiffs*

**Contains Information marked Highly Confidential Pursuant to Protective Order**