# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

KISSING CAMELS SURGERY CENTER, LLC,
CHERRY CREEK SURGERY CENTER, LLC,
ARAPAHOE SURGERY CENTER LLC, and
HAMPDEN SURGERY CENTER, LLC

       Plaintiffs,

v.

CENTURA HEALTH CORPORATION,

       Defendant.

Civil Action No. 1:12-cv-03012-WJM-BNB

---

**DEFENDANT CENTURA HEALTH CORPORATION'S MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN SUPPORT**

---

FILED AS A RESTRICTED DOCUMENT—CONTAINS INFORMATION
SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

LIST OF CITATIONS AND ABBREVIATIONS ........................................................ v

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.   STATEMENT OF MATERIAL FACTS ................................................................ 4

    A.   Plaintiffs ......................................................................................................... 4

    B.   Centura ........................................................................................................... 5

    C.   The Insurance Companies ............................................................................. 6

    D.   Plaintiffs and Their Business Practices ...................................................... 13

    E.   No Evidence of Conspiracy ......................................................................... 15

    F.   Centura's Challenged Business Practices—CCOM And The Transfer
        Agreement .................................................................................................... 19

III.  STANDARD OF REVIEW .................................................................................... 20

IV.   ARGUMENT ........................................................................................................... 20

    A.   No Conspiracy:  Counts I, II, IV and V in the SAC Fail ........................... 21

        1.   There is no evidence of any conspiracy between Centura and HCA ....... 21

        2.   There is no evidence of any conspiracy between Centura and the
            payors ...................................................................................................... 22

            (a)   The relevant legal standard ................................................................ 23

            (b)   There is no evidence tending to exclude the possibility that
                 United and Anthem acted on the basis of their independent
                 self interests ................................................................................... 24

        3.   Even assuming any evidence of a conspiracy between HCA and
            any payor, Centura is still entitled to summary judgment ...................... 30

    B.   No Attempted Monopolization:  Counts III and VI Fail ............................. 30

        1.   Kissing Camels cannot prove that Centura has market power, much
            less a dangerous probability of acquiring monopoly power .................... 31

        2.   Kissing Camels cannot show that Centura engaged in any
            exclusionary conduct .............................................................................. 33

    C.   No Antitrust Injury:  All the Claims Fail .................................................... 34

V.    CONCLUSION ........................................................................................................ 36

# TABLE OF AUTHORITIES

**Page**

CASES

*Abraham v. Intermountain Health Care, Inc.*,
  461 F.3d 1249 (10th Cir. 2006) ...................................................................... *passim*

*All Weather Exteriors Distributing, Inc. v. Cal. Wholesale Mat'l Supply Co.*,
  No. 2:06-CV-346-TS, 2007 U.S. Dist. LEXIS 8902 .......................................27, 29

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................................................35

*Black v. JP Morgan Chase & Co.*,
  No. 10-848, 2011 U.S. Dist. LEXIS 103727 (W.D. Pa. Aug. 10, 2011) ................22

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ..........................................................................31, 34

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977).........................................................................................2, 35

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................20, 35

*Champagne Metals v. Ken-Mac Metals, Inc.*,
  No. 02-528-C, 2004 U.S. Dist. LEXIS 27313 (W.D. Okla. June 15, 2004)...........30

*Christy Sports, LLC v. Deer Valley Resort Co., Inc.*,
  555 F.3d 1188 (10th Cir. 2009) ................................................................31, 33, 34

*City of Moundridge, KS v. Exxon Mobile Corp.*,
  471 F. Supp. 2d 20 (D.D.C. 2007) ......................................................................32

*Cohlmia v. St. John Med. Ctr.*,
  693 F.3d 1269 (10th Cir. 2012) ......................................................................24, 31

*Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*,
  885 F.2d 683 (10th Cir. 1989) ........................................................................31, 32

*Credit Bureau Services v. Experian Info. Solutions, Inc.*,
  No. 12-61360, 2012 U.S. Dist. LEXIS 174487 (S.D. Fla. Dec. 7, 2012)...............29

*CTUnify, Inc. v. Nortel Networks, Inc.*,
115 Fed. Appx. 831 (6th Cir. 2004)...................................................................................35

*Dunnivant v. Bi-State Auto Parts*,
851 F.2d 1575 (11th Cir. 1988) .........................................................................................27

*Expert Masonry, Inc. v. Boone Cnty. Ky.*,
440 F.3d 336 (6th Cir. 2006) .............................................................................................36

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
848 F.2d 976 (9th Cir. 1988) .............................................................................................36

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*,
582 F.3d 1216 (10th Cir. 2009) ................................................................................. *passim*

*Gibson v. Greater Park City Co.*,
818 F.2d 722 (10th Cir. 1987) ....................................................................................24, 29

*In re Pa. Title Ins. Antitrust Litig.*,
648 F. Supp. 2d 663 (E.D. Pa. 2009) ................................................................................22

*Islami v. Covenant Medical Ctr. Inc.*,
822 F. Supp. 1361 (N.D. Iowa 1992).................................................................................30

*Lantec, Inc. v. Novell, Inc.*,
306 F.3d 1003 (10th Cir. 2002) .........................................................................................24

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
No. 13-1307, 2014 U.S. App. LEXIS 15049 (10th Cir. Aug. 5, 2014) ..............................32

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).....................................................................................................23, 24

*Milne v. USA Cycling Inc.*,
575 F.3d 1120 (10th Cir. 2009) .........................................................................................20

*Mitchael v. Intracorp, Inc.*,
179 F.3d 847 (10th Cir. 1999) ....................................................................................22, 24

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)................................................................................................. *passim*

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
311 F. Supp. 2d 1048 (D. Colo. 2004)...............................................................................22

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ................................................................33

*Precision Assocs. v. Panalpina World Transp. (Holding) Ltd.*,
  No. 08-CV-42, 2011 U.S. Dist. LEXIS 51330 (E.D.N.Y. Jan. 4, 2011) ...............................22

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................35

*Sanjuan v. Am. Bd. of Psych. & Neurology, Inc.*,
  40 F.3d 247 (7th Cir. 1994) ................................................................35

*Spectrum Sports v. McQuillan*,
  506 U.S. 447 (1993) ................................................................2, 31

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
  963 F. Supp. 2d 1212 (D. Kan. 2013) ................................................................32

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................2, 33, 34

STATUTES

C.R.S. § 7-126-101 *et seq.* ................................................................5

C.R.S. § 18-13-119 ................................................................8

C.R.S. § 18-13-119(1)-(2) ................................................................4

OTHER AUTHORITIES

IIB P. Areeda & H. Hovenkamp, *Antitrust Law* 250 ................................................................31

## LIST OF CITATIONS AND ABBREVIATIONS

| Exhibit | Abbreviation | Full Citation |
|---|---|---|
| | *Plaintiff Depositions* | |
| A | "Auen" | Deposition of Elaine Auen (6/13/14) |
| B | "Chain" | Deposition of Jeffrey Chain (6/18/14) |
| C | "Conner" | Deposition of Marc Conner (6/24/14) |
| D | "Cox" | Deposition of Lisa Cox (6/12/14) |
| E | "D'Ambrosia" | Deposition of Christine D'Ambrosia (6/19/14) |
| F | "Davis" | Deposition of Craig Davis (6/19/14) |
| G | "Elliot" | Deposition of J. Paul Elliot (6/6/14) |
| H | "Finn" | Deposition of Kenneth Finn (5/30/14) |
| I | "Foreman" | Deposition of Stephen Foreman, Ph.D (5/6/14) |
| J | "Gersoff" | Deposition of Wayne Gersoff (6/18/14) |
| K | "Gessner" | Deposition of Eric Gessner (6/18/14) |
| L | "Hammerstrom" | Deposition of Steven Hammerstrom (5/16/14) |
| M | "Huser" | Deposition of Christopher Huser (6/26/14) |
| N | "Kline" | Deposition of Tommy Kline (6/5/14) |
| O | "Leventis" | Deposition of Stephanie Leventis (6/25/14) |
| P | "Loucks" | Deposition of Craig Loucks (6/18/14) |
| Q | "McCarthy" | Deposition of Emily McCarthy, individually and as Plaintiffs' Rule 30(b)(6) witness (5/1/14) |
| R | "Merryman" | Deposition of Christine Merryman (6/20/14) |
| S | "Motz" | Deposition of Carl Motz (6/4/14) |
| T | "Ross" | Deposition of Scott Ross (5/21/14) |
| U | "Serafin" | Deposition of Kelley Serafin (5/29/14) |
| V | "Stull" | Deposition of Philip Stull (6/11/14) |
| W | "Topper" | Deposition of Steven Topper (5/20/14) |
| | *Centura Depositions* | |
| X | "Argue" | Deposition of David A. Argue, Ph.D (7/24/14) |
| Y | "Campbell" | Deposition of Gary Campbell (6/17/14) |
| Z | "Carley" | Deposition of Mark Carley (5/20/14) |
| AA | "Driscoll" | Deposition of Jackie Driscoll (5/14/14) |
| BB | "Haffner" | Deposition of Randy Haffner (3/4/14) |
| CC | "Reeves" | Deposition of Daniel J. Reeves, Jr. (6/10/14) |
| DD | "Sabin" | Deposition of Margaret Sabin (6/25/14) |
| EE | "Smith" | Deposition of Jameson Smith (6/10/14) |
| | *Payors* | |
| FF | "Greene" | Deposition of Dawn Greene (7/2/14) |
| GG | "Maurio" | Deposition of Donna Maurio dated (6/26/14) |
| HH | "Miller" | Deposition of Barbara Miller (6/27/14) |
| II | "Pogar" | Deposition of Janet Pogar (7/16/14) |
| JJ | "Trease" | Deposition of Katherine Trease (6/30/14) |
| | *Other Non-Party Depositions* | |
| KK | "Anderson" | Deposition of Stan Anderson (5/16/14) |

| Exhibit | Abbreviation | Full Citation |
|---------|-------------|---------------|
| LL | "Ashby" | Deposition of Brent Ashby, individually and as a 30(b)(6) witness for Audubon Ambulatory Surgery Center (3/18/14) |
| MM | "Austin" | Deposition of Lisa Austin (6/12/14) |
| NN | "Desautels" | Deposition of Jeanne Desautels (6/18/14) |
| OO | "Einspahr" | Deposition of Rosalie Einspahr (6/13/14) |
| PP | "Price" | Deposition of Ben Price (3/5/14) |
| QQ | "Reece" | Deposition of Marc Reece (3/6/14) |
| RR | "Roy" | Deposition of David Roy (5/15/14) |
| SS | "Schwartz" | Deposition of Robert Schwartz (10/29/13) |
| TT | "Skagen" | Deposition of Chris Skagen (11/5/13) |
| | *Expert Reports* | |
| UU | "Argue Rept." | Expert Rebuttal Report of David A. Argue, Ph.D. (5/23/14) |
| VV | "Foreman Rept." | Expert Report of Stephen Foreman, Ph.D., J.D., M.P.A. (4/3/14) |
| | *Other Exhibits* | |
| WW | "Haffke Decl." | Declaration of Robert E. Haffke |

## I.   PRELIMINARY STATEMENT

Plaintiffs, which operate four ambulatory surgery centers ("ASCs"), allege that Centura Health Corporation ("Centura") conspired with HCA-HealthONE LLC ("HCA"), a competing hospital system, and that the two systems then conspired with insurance companies to harm plaintiffs.   They also allege that Centura attempted to monopolize the business of outpatient surgery services in the Colorado Springs area.   Extensive discovery has shown that no evidence exists to support either claim.   Discovery instead has revealed that plaintiffs engaged in a strategy to violate the cost containment strategies developed by insurance companies so that plaintiffs' physician investors could reap millions of dollars from those companies and raise those companies' costs and ultimately premiums to consumers.   That scheme unraveled when the insurance companies took steps on their own to block it, leading plaintiffs to sue.

*First*, plaintiffs have unearthed no evidence of any conspiracy between Centura and HCA. Plaintiffs contend that Centura participated in an alleged conspiracy that culminated in a May 2012 conference call and an August 2012 meeting between a trade association of ASCs (Colorado Ambulatory Surgery Center Association, or "CASCA") and some insurance companies.   Centura, however, is not a member of CASCA, was not invited to the call or the meeting, did not attend either one, and did not even know about them until plaintiffs filed their lawsuit later that year.   Nor did Centura and HCA *ever* talk to each other about pressuring any insurers regarding plaintiffs, let alone did Centura and HCA collectively conspire with insurers.

Plaintiffs' conspiracy claim is deficient for another reason as well:  there is no evidence that Centura alone participated in any conspiracy with any insurer—there are only four emails even showing a communication between Centura and an insurer relating to plaintiffs and none of those emails supports a conspiracy claim.   It does not matter whether (as plaintiffs allege, but failed to prove) Centura and HCA conspired to pressure the payors as long as the payors made

their own, unilateral decisions, even if they made those decisions "in response" to any claimed pressure, as the Supreme Court held in *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), and this Court recognized in its earlier Order in this case.  (Dismissal Order (Feb. 13, 2014) (Dkt. 177) ("2/13/14 Order") at 19-20.)

*Second*, plaintiffs have no evidence to support a claim of attempted monopolization.  To prove such a claim, plaintiffs must present evidence that Centura engaged in exclusionary conduct directed at plaintiffs and that Centura had a dangerous probability of success in achieving a monopoly in a relevant market.  *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).  Centura has a modest presence in the ambulatory surgery business in Colorado Springs, well short of any monopoly power, and in any event the alleged acts of exclusionary conduct are legally deficient.  Plaintiffs point out that Centura terminated a patient transfer agreement with one of the plaintiffs, but Centura did so in accordance with its terms and plaintiffs can identify no harm flowing from that decision.  In any event, Centura has no duty to deal with an alleged competitor under well-established Supreme Court and Tenth Circuit precedent.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1221 (10th Cir. 2009).

*Third*, all of the claims fail because plaintiffs cannot prove antitrust injury, which requires plaintiffs to link any harm to themselves to any adverse effect on competition in the market as a whole.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Plaintiffs bear the burden of proof on this element of their claim and their expert defaulted completely on the issue—conceding that he had not addressed it.

This case is not only factually and legally unsupportable, but misguided as well.  Plaintiffs should hardly have been surprised when the insurers took steps to block plaintiffs'

scheme to squeeze exorbitant fees from those insurers— REDACTED

REDACTED —and enrich themselves through extraordinary

returns on modest investments.[1]   Central to this lucrative scheme is the practice by which

plaintiffs attract patients to their facilities.    Plaintiffs choose not to accept the terms for

participation in many insurers' networks and are therefore not contractually limited on what they

can bill those insurers.   Patients, however, are ordinarily reluctant to use out-of-network facilities

because insurers typically require patients to pay a higher portion of the fees charged for services

performed at out-of-network facilities rather than in-network facilities.    To overcome this

reluctance, plaintiffs promised patients that plaintiffs would not collect the higher fees required

by those patients' health plans, and instead would charge the patients no more than what the

patients would have been charged had they used an in-network facility.   This created an

environment where patients were indifferent to the insurers' plan incentives.

Not surprisingly, the insurers took steps to block plaintiffs' scheme, and plaintiffs cried

"conspiracy."   But insurers had ample reason, acting on their own, to take steps to enforce their

contractual provisions and prevent plaintiffs from extracting high fees from insurers that would

otherwise raise healthcare premiums for everyone.   Indeed, not only did plaintiffs' scheme

violate the payors' policies, but it also violated the Colorado statute finding that "practices that

---

[1] Plaintiffs billed insurers at rates equal to REDAC percent of Medicare rates— REDACTED (Auen, Ex. A, 51:16-21; Topper, Ex. W, 62:2-7, 64:1-4; Greene (United), Ex. FF, 100:19-25; Anthem-00043487, Ex. WW-8 ( REDACTED "); *accord* Trease (Humana), Ex. JJ, 110:5-111:12.)

For the 12 month period ending in February 2014, Cherry Creek produced profits of REDACTED (McCarthy, Ex. Q, 122:19-124:7; Stull, Ex. V, 93:6-96:11 and Ex. 22 at CCSC00174700.)   Hampden produced profits of REDACTED (McCarthy, Ex. Q, 122:19-124:7; Gersoff, Ex. J, 10:7-14:14 and Ex. 2 at SCD00131191.)   That translates into rates of return on physician investors' capital investments of REDACTED for just those twelve months. (*Id.*; Stull, Ex. V, 93:6-96:11 and Ex. 22 at CCSC00174700.)

have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans interfere with contractual obligations entered into between the insured and the insurer relating to such payments," and specifically prohibiting that practice. C.R.S. § 18-13-119(1)-(2).

The physicians who invested in plaintiffs hatched a scheme to reap millions of dollars from insurance companies in violation of those companies' cost containment efforts and Colorado law. There was no conspiracy between Centura and HCA, and each of the payors had unilateral reasons to enforce their own policies and decline to pay the outrageous reimbursement amounts sought by plaintiffs. Despite having taken substantial discovery plaintiffs cannot prove their claims against Centura, which is entitled to summary judgment.

## II.   STATEMENT OF MATERIAL FACTS

### A.   Plaintiffs

1.      Plaintiffs are four ASCs, three in the Denver area and one in Colorado Springs: Arapahoe Surgery Center ("Dry Creek") is located in Englewood; Cherry Creek Surgery Center ("Cherry Creek") and Hampden Surgery Center ("Hampden") are located in Denver; and Kissing Camels Surgery Center ("Kissing Camels") is located in Colorado Springs. (Second Amended Complaint ("SAC") (Dkt. 213) at ¶¶ 6-9; *accord* McCarthy, Ex. Q, 8:5-6 (an ASC is "an outpatient surgery center for outpatient elective surgeries").)

2.      Each plaintiff is partially owned by Surgical Center Development ("SurgCenter"), an investor in approximately 88 ASCs throughout the country. (McCarthy, Ex. Q, 7:21-8:3, 13:6-9.)

3.      SurgCenter owns     REDACTED

. (McCarthy, Ex. Q, 9:25-10:5, 14:14-16; Hammerstrom, Ex. L, 86:19-87:14 and Ex.

10 at CCSC00174700 (Cherry Creek)[2]; Merryman, Ex. R, 27:1-10 and Ex. 4 at SCD00131191 (Hampden); Elliot, Ex. G, 114:25-117:14 and Ex. 18 at SCDC00045245 (Dry Creek); Topper, Ex. W, 227:11-19 and Ex. 72.)

**B.    Centura**

4.    Centura is a faith-based Colorado nonprofit corporation that operates healthcare facilities, including eight hospitals in Denver and one hospital in Colorado Springs.  (SAC ¶ 10; Haffner, Ex. BB, 7:18-8:1, 32:8-11, 57:8-20.)

5.    Centura has two members, Catholic Health Initiatives of Colorado ("CHIC") and Adventist Health Systems.  (Campbell, Ex. Y, 13:7-9.)[3]

6.    Centura has relationships with seven ASCs in the Denver area and one ASC in Colorado Springs (Audubon Surgery Center, or "Audubon").  (Haffner, Ex. BB, 9:17-10:8 and Ex. 37.)

7.    Each of these eight ASCs is a joint venture between physicians and one of Centura's two members.  (Haffner, Ex. BB, 9:17-10:13 and Ex. 37.)

8.    One of Centura's two members owned an approximate [REDACTED] interest in Audubon during the 2010-12 period.  (Ashby, Ex. LL, 20:5-17, 21:11-18, 88:5-89:3.)

9.    Centura has accounted for approximately [REDACTED] of the hospital outpatient and ambulatory surgery patient visits and [REDACTED] of the operating rooms used for such surgeries in

---

[2] Documents that were marked at depositions are appended to the Exhibits containing the excerpts of the depositions at which the documents were marked.   For example, Exhibit 10 was marked at the deposition of Steven Hammerstrom and is appended to Dr. Hammerstrom's deposition transcript at Exhibit L.

[3] A "member" (sometimes called a "sponsor") of a not-for-profit entity is the equivalent of a shareholder of a for-profit company.  C.R.S. § 7-126-101 *et seq*.  Therefore, if Centura were a for-profit company, its members would be its only shareholders.

Colorado Springs.  (Argue, Ex. X, 10:4-9 (authenticating Argue Rept.); Argue Rept., Ex. UU, ¶ 84 and Ex. 23.)

10.     Added together, Centura's and Audubon's hospital outpatient and ambulatory surgery patient visits in Colorado Springs and their operating rooms used for such surgeries, respectively, are ▮REDACTED▮ and ▮REDACTED▮.  (Argue Rept., Ex. UU, ¶¶ 84, 88 and Ex. 23.)

## C.      The Insurance Companies

11.     Health insurance companies (payors), either purchase services from healthcare providers such as hospital and ambulatory surgery centers, or administer the purchase of those services by health plans of self-insured employers.  (Foreman, Ex. I, 67:10-68:10, 69:8-19)

12.     Payors, as or on behalf of buyers, seek to lower the prices they pay for hospital and other health care services.  (Foreman, Ex. I, 74:22-76:5; Trease (Humana), Ex. JJ, 97:22-98:25; Maurio (United), Ex. GG, 54:17-22; Pogar (Anthem), Ex. II, 201:6-202:24.)

13.     Payors build networks of providers and then market those networks to employers and other purchasers of health care insurance.  (Foreman Rept., Ex. VV, ¶ 95; Miller (United), Ex. HH, 53:9-15; Pogar (Anthem), Ex. II, 193:21-194:12; Trease (Humana), Ex. JJ, 16:23-17:15.)

14.     A provider (such as a hospital or ASC) that has negotiated an agreement with a payor to be included in that payor's network is an "in-network provider," and a provider that has no agreement with a payor is an "out-of-network provider" with respect to that payor.  (Foreman, Ex. I, 49:12-51:6, 94:11-14.)

15.     Payors such as United and Aetna, in negotiating agreements with providers for inclusion in their networks, seek to negotiate rates that are lower than the rates the providers otherwise would charge and offer in return an expectation of an increased volume of patients. (Foreman, Ex. I, 78:20-83:21, 88:2-17; Greene (United), Ex. FF, 121:5-16; AETNA00020107, Ex. WW-2, at 201109; AETNA00062845, Ex. WW-6.)

16.     Anthem, unlike United or Aetna, reimburses out-of-network ASCs at $1,200 per claim, which at times may be lower than the rate at which Anthem reimburses in-network providers.  (Pogar (Anthem), Ex. II, 153:1-17.)

17.     Like United and Aetna, though, Anthem prefers that its members (insureds, or patients) seek treatment at in-network facilities rather than out-of-network facilities, ▓▓▓▓

**REDACTED**

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  (Pogar (Anthem), Ex. II, 194:13-195:3.)

18.     Payors, including Aetna, Anthem and United, typically require their members (insureds or patients) to bear a portion of the financial responsibility for their health care in the form of copays (fixed amounts the patient pays at the time of each service), coinsurance (a percentage of the bill for a service that is shared by the patient after the deductible is met) and/or deductibles (amounts the patient must pay before the payor pays for services).  (Foreman, Ex. I, 84:21-85:11, 94:18-23, 98:7-12; McCarthy, Ex. Q, 252:5-253:13; Miller (United), Ex. HH, 54:21-57:12; Pogar (Anthem), Ex. II, 195:18-23; Trease (Humana), Ex. JJ, 92:3-22; CCSC00117180, Ex. WW-9, at 117185 (Aetna explanation of benefits showing patient responsibility amount for a procedure at Cherry Creek).)

19.     Payors, including Aetna, Anthem and United, encourage their patients to use in-network providers rather than out-of-network providers by reducing the patients' financial responsibility when the patients select in-network providers.  (Foreman, Ex. I, 84:21-85:11; McCarthy, Ex. Q, 120:3-121:2; Pogar (Anthem), Ex. II, 198:18-21; Greene (United), Ex. FF, 117:5-118:13; Trease (Humana), Ex. JJ, 93:3-95:24; AETNA00045174, Ex. WW-5, at 45175 ("▓▓▓▓▓▓▓▓▓▓

**REDACTED**

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓").)

20.     Out-of-network providers that only collect a patient's in-network responsibility rather than the patient's out-of-network responsibility as required by the patient's healthcare plan create an environment where patients are indifferent on where they receive treatment, disrupting the incentives built into payors' healthcare plans to encourage patients to use the payors' in-network providers, thus raising the payors' costs.  (Foreman, Ex. I, 74:22-76:7, 105:25-107:12; Pogar (Anthem), Ex. II, 199:9-201:5; Greene (United), Ex. FF, 119:8-121:4; Miller (United), Ex. HH, 58:18-59:4, 60:15-25; Trease (Humana), Ex. JJ, 102:8-15; AETNA00039041, Ex. WW-4, at 39043 (August 2012 email to Aetna's regional leadership referring to the "REDACTED

"); Topper, Ex. W, 74:10-17 ("So by eliminating the need for actual payment of the required higher out of network co-payments and deductibles in the patient's health benefit plans, Kissing Camels is able to get its patients to come to an out of network facility because the disincentive that's imposed by the insurance company's higher co-payments and deductibles is eliminated.")); *see also* C.R.S. § 18-13-119.

21.     Payors include provisions in their contracts with physicians in Colorado and elsewhere requiring the physicians to use their best efforts to refer their patients to the payors' in-network facilities.  (Foreman, Ex. I, 89:23-90:12; Pogar (Anthem), Ex. II, 31:7-21; Trease (Humana), Ex. JJ, 99:20-100:15; Maurio (United), Ex. GG, 75:2-6; AETNA00004295, Ex. WW-1, at 4296 ("REDACTED

."); SCD00129531-34, Ex. WW-10, (United letter to a physician in Maryland threatening termination for failure to refer members to in-network facilities as required by network contract); SCD00137119, Ex. WW-17, (Blue Cross Blue Shield,

in Minnesota); SCD00136430, Ex. WW-14, (United, in Utah); SCD00137607, Ex. WW-20,

(Aetna, in Maryland); SCD00136355, Ex. WW-12, (SCD letter to its physician investors titled,

"Surviving and Thriving with Managed Care Threats," in August 2012, advising the physicians

that "[m]any physicians nationwide" who have referred patients to out-of-network facilities have

been faced with "tactics" by payors, including as among the tactics communications threatening

to terminate the payors' relationships with those physicians; the document's metadata indicates

that the letter was written on August 25, 2012 by Eric Zinckgraf, SCD's senior director of

operations).)[4]

22.    Payors have enforced this provision in Colorado and elsewhere by sending notices

to physicians and physicians' groups who violate it to remind them of their obligation to refer

patients to in-network providers and to warn them that they will be terminated as in-network

providers or that they will incur financial penalties if they continue to ignore their obligation to

refer patients to in-network providers.  (Topper, Ex. W, 150:18-151:21 and Ex. 38 (REDACTED

REDACTED ); McCarthy, Ex. Q, 108:25-110:11, 119:14-120:2 and Ex. 15 (payors

discourage use of out-of-network facilities all over the country), 141:20-143:18 and Ex. 22

(REDACTED"), 167:14-

168:16 and Ex. 30 (between 2003 and 2008, United threatened SurgCenter physicians in St.

Louis and Utah with termination for referring patients to out-of-network facilities); Auen, Ex. A,

99:5-21 and Ex. 27 (REDACTED

REDACTED"); Hammerstrom,

Ex. L, 36:13-37:6, 41:14-43:12 and Ex. 4 (listing thirteen states where payors made similar

---

[4] Documents numbered SCD00136106 and later were produced pursuant to Centura's motion to compel after discovery closed, so were not introduced in any depositions.  All documents cited herein that were not introduced in a deposition are appended to the declaration of Robert E. Haffke.  *See* Ex. WW.

threats); Pogar (Anthem), Ex. II, 217:15-219:2 ( ███████████ REDACTED ███████████

███████████████████████████████████████████ ), 34:2-17, 35:21-36:3,

201:6-15 (Anthem implemented a program in 2010 to send letters to physicians threatening

network termination for continued referrals out-of-network); AETNA00020107, Ex. WW-2, at

20109 (Aetna had a national strategy to educate physicians and threaten network termination if

the physicians failed to stop referring out of network); AETNA00020111, Ex. WW-3,

(identifying physicians in Aetna's West Region to be targeted for education and possible

termination).) *See also* Complaint in *Advanced Surgery Center of Bethesda, LLC, v. Carefirst of*

*Maryland, Inc.*, No. 2:13-cv-00562-RDP (N.D. Ala.) (Dkt. 1) ("Maryland Complaint"), filed Mar.

12, 2013, ¶¶ 5, 56, 63, 65, 90-92 (SurgCenter's ASCs in Maryland sued CareFirst of Maryland (a

payor) alleging that it "threaten[ed], intimidate[d], and even terminate[d] in-network healthcare

providers" who referred to those plaintiffs' out-of-network facilities); SCD00136350-52, Ex.

WW-11, ( ███████████████ REDACTED ███████████████

█████████████████████████████████████████████████████████

███████████████████████████████ "); SCD00136394-96, Ex. WW-13, (email from

physician investor in SCD's Pinellas, Florida ASC attaching an email threatening termination by

Cigna, in response to an SCD email stating that such communications "are a common tactic by

Aetna (and others)"; SCD00136462, Ex. WW-15, (letter from United Healthcare to a

Pennsylvania physician threatening termination for failure to refer in-network where possible);

SCD00137039-40, Ex. WW-16, (letter from Cigna to a Tennessee physician threatening same);

SCD00137635, Ex. WW-22, ( ███████████████ REDACTED ███████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

**REDACTED**

.”); SCD00137630, <u>Ex. WW-21</u>, **REDACTED**

).)

23.     In Colorado and elsewhere, payors have ended relationships with physicians who continued to ignore their contractual obligation to refer patients to in-network facilities after having received notices from the payors regarding those contractual obligations. (Pogar (Anthem), <u>Ex. II</u>, 224:8-228:3 and Exs. 5 and 6 ( **REDACTED**

); Hammerstrom, <u>Ex. L</u>, 110:20-24 and Ex. 15 ( **REDACTED**

); AETNA00020107, <u>Ex. WW-2</u>, at 20109 (since 2011, Aetna has actively enforced a national strategy to target and, if needed, terminate network contracts of physicians who had a pattern of referring members to out-of-network facilities);   AETNA00039041, <u>Ex. WW-4</u>, at 39043 (August 2012 email to Aetna's regional leadership referring to the " **REDACTED**

" and requesting the identification of " **REDACTED**

"); Maryland Complaint at ¶¶ 84-87 (alleging that physicians were terminated for referring to out-of-network plaintiffs in Maryland);

SCD00137119, Ex. WW-17, (letter from Blue Cross Blue Shield regarding the termination of physicians in Minnesota).)

24.     In Colorado and elsewhere, the payors encouraged the use of in-network providers by requiring out-of-network providers or physicians referring to out-of-network providers to expressly advise patients of the provider's out-of-network status. (Greene (United), Ex. FF, 107:7-21 and Ex. 255 (detailing United's national protocol for giving such notice); Leventis, Ex. O, 118:20-119:16 and Ex. 27 (████████REDACTED████████ ████████████████████████); Pogar (Anthem), Ex. II, 130:2-21 and Ex. 277 (████████REDACTED████████ ████████████████████████"); SCD00137234, Ex. WW-19, (Cigna requiring same, in Texas); SCD00137222, Ex. WW-18, at SCD00137224 (Aetna requiring same, in Maryland).)

25.     Payors developed at least some of their out-of-network policies, including some of their policies outside Colorado, prior to plaintiffs' existence.  (Greene (United), Ex. FF, 105:17-23, 107:7-21, 108:13-109:19 (United had a nationwide program that commenced before plaintiffs began to operate); McCarthy, Ex. Q, 167:14-168:16 and Ex. 30 (United had policies in St. Louis and Utah between 2003 and 2008); Pogar (Anthem), Ex. II, 34:2-17, 35:21-36:3 (Anthem had a practice beginning in 2010 of sending letters to physicians who were referring patients to out-of-network facilities), 217:15-219:2 and Ex. 3 (similar program in New York); AETNA00020107, Ex. WW-2, at 20109 (Aetna had a policy in 2011 of educating physicians regarding their contractual obligations to refer patients to in-network providers and of thereafter ending its relationships with physicians that continued to refer patients to out-of-network providers); Maryland Complaint ¶¶ 61-62 (in 2010, CareFirst allegedly began its "campaign of

intimidation, coercion and exclusion" against the Maryland plaintiffs for referring out-of-network).)

### D.    Plaintiffs and Their Business Practices

26.    Plaintiff ASCs commenced operations as out-of-network providers.  (McCarthy, Ex. Q, 89:4-25 and Ex. 10.)

27.    The physician-investors in plaintiff ASCs, in their individual or group practices, had in-network relationships with payors.  (Chain, Ex. B, 64:9-67:15; Conner, Ex. C, 65:10-12; D'Ambrosia, Ex. E, 70:21-72:3, 74:2-4, 77:1-17, 79:21-80:4; Davis, Ex. F, 106:1-5, 107:20-108:13; Elliot, Ex. G, 177:21-178:9, 198:9-199:2; Finn, Ex. H, 96:23-97:4, 137:8-138:7, 141:3-10; Gersoff, Ex. J, 33:20-34:6, 72:23-73:2, 73:21-74:4; Gessner, Ex. K, 64:11-15; Huser, Ex. M, 25:14-26:15, 74:13-75:20; Loucks, Ex. P, 15:7-15, 91:16-23; Motz, Ex. S, 90:5-12; Ross, Ex. T, 169:3-6, 171:16-21,175:16-176:10; Stull, Ex. V, 54:2-18, 59:25-60:4, 123:3-6; Topper, Ex. W, 157:21-24, 187:25-188:9.)

28.    The physician-investors in plaintiff ASCs have sought to refer as many patients as possible to plaintiffs' out-of-network facilities.  (Ross, Ex. T, 167:14-22 and Ex. 28 at SCD00087159 (" REDACTED ");  Loucks, Ex. P, 61:19-24 and Ex. 16 at CCSC00376359 (" REDACTED .");  Chain, Ex. B, 23:25-24:2, 50:3-13 (policy to bring all patients with out-of-network benefits to Dry Creek);  Motz, Ex. S, 124:19-126:5 (Dr. Motz performs 80 percent of his surgeries at Hampden);  accord, Hammerstrom, Ex. L, 163:8-164:16 and Ex. 22 at SCDC00129116 (instructing a physician investor that REDACTED ").)

29.     As out-of-network providers, plaintiffs did not accept the payors' in-network rates, but instead billed payors fees equal to **REDACTED**

**REDACTED**

(McCarthy, Ex. Q, 118:19-119:4, 217:7-220:25, 229:16-20; Topper, Ex. W, 62:2-7; Greene (United), Ex. FF, 100:19-101:12; Maurio (United), Ex. GG, 79:17-80:25; Ashby, Ex. LL, 163:16-173:12 and Exs. 88 and 89, 193:1-22; *accord*, Cox, Ex. D, 62:4-66:11 and Exs. 8 and 9

( **REDACTED**

**REDACTED**

**REDACTED**

); Kline, Ex. N, 107:8-111:10 and Ex. 22 ( **REDACTED**

); Topper, Ex. W, 101:8-20 and Ex. 25 ( **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED** ").)

30.     Plaintiffs, although they were out-of-network providers, as a policy and general practice only charged patients their in-network patient responsibility, such that "a patient doesn't pay more than their in network obligation."  (McCarthy, Ex. Q, 152:10-17, 221:1-10; Auen, Ex. A, 19:25-22:4 and Ex. 4 at SCDC00082667 (plaintiffs' operations manual at SCDC00082721:

" **REDACTED**

**REDACTED**

**REDACTED** ."), 33:16-21 ("[ **REDACTED**



”); Stull, <u>Ex. V</u>, 158:5-12

); Topper, <u>Ex. W</u>, 35:6-24 (

); SAC ¶¶ 32, 103.)

**E.     No Evidence of Conspiracy**

31.     No witness associated with any of the plaintiffs has any personal knowledge of any conspiracy involving Centura—not even the physician-investor in plaintiff Cherry Creek who was a member and Vice President of the CASCA board from 2003 until November 2011 and thus served on that Board during the purported conspiracy period.  (Davis, <u>Ex. F</u>, 14:17-15:2, 35:25-37:15, 40:6-18, 59:5-11, 60:3-9, 60:25-61:9, 80:22-81:1, 91:10-12; *see also* Auen, <u>Ex. A</u>, 166:1-19; Chain, <u>Ex. B</u>, 79:12-22; D'Ambrosia, <u>Ex. E</u>, 82:25-83:6; Elliot, <u>Ex. G</u>, 192:9-195:13; Gersoff, <u>Ex. J</u>, 70:24-75:5; Gessner, <u>Ex. K</u>, 62:18-63:21, 75:19-81:12; Hammerstrom, <u>Ex. L</u>, 47:13-51:10, 77:4-78:18; Huser, <u>Ex. M</u>, 73:22-79:4, 82:5-17; Kline, <u>Ex. N</u>, 131:13-132:21; Leventis, <u>Ex. O</u>, 172:2-174:8; Loucks, <u>Ex. P</u>, 70:4-74:7; Merryman, <u>Ex. R</u>, 63:13-68:8, 81:11-82:11; Motz, <u>Ex. S</u>, 94:2-5; Serafin, <u>Ex. U</u>, 121:15-122:22; Stull, <u>Ex. V</u>, 118:23-123:25.)

32.     Centura and HCA never had any contacts with each other regarding plaintiffs except maybe for one conversation in October 2012 referenced in an email, and the email shows that the conversation did not include any reference to insurance companies, much less any reference to pressuring or reaching agreements with insurance companies.  (Anderson, <u>Ex. KK</u>, 119:19-24; Roy, <u>Ex. RR</u>, 187:9-15; Campbell, <u>Ex. Y</u>, 106:17-113:15 and Carley Ex. 139 (in October 2012, Centura's Campbell spoke to HCA's Young about two Texas companies, noting

(incorrectly, since SCD is not located in Texas) that one of the two companies had opened two centers in South Denver in an apparent reference to two of the plaintiffs, but the communication had nothing to do with payors and took place several months after the allegedly conspiratorial acts identified in the complaint).)

33.     No one from Centura or on Centura's behalf attended the conference call in May 2012 between CASCA and payors.  (Anderson, Ex. KK, 115:17-116:17 and Ex. 132 at CASCA-0060211 (list of invitees to the conference call, which includes no one from Centura).)

34.     No one from Centura or on Centura's behalf attended the August 2012 meeting between CASCA and payors.  (Schwartz, Ex. SS, 200:12-202:4 and Ex. 19 (sign-in sheet from the August 2012 CASCA meeting); Reece, Ex. QQ, 35:2-38:5 and Ex. 76 (listing attendees of the August 2012 meeting and not including anyone from Centura).)

35.     Centura did not learn about the May 2012 conference call or the August 2012 meeting from anyone who attended them.  (Ashby, Ex. LL, 284:9-14; Anderson, Ex. KK, 119:19-24; Roy, Ex. RR, 187:9-15; Haffner, Ex. BB, 163:7-19; Trease (Humana), Ex. JJ, 112:5-9.)

36.     Centura is not represented on the CASCA Board.  (Schwartz, Ex. SS, 20:15-20, 21:24-22:16 (only surgery center members, not corporate members, of CASCA may nominate or vote to appoint board members and, in any event, Centura was never a corporate member of CASCA).)

37.     Centura does not control the activities of CASCA.  (Schwartz, Ex. SS, 21:24-22:16 (Centura is not a member of CASCA), 248:12-16 and Ex. 25 (October 2012 email to all CASCA Board members, none of whom are employed by Centura).)

38.     There is no evidence that any agreement regarding plaintiffs was ever reached between the participants in the May 18, 2012 conference call between CASCA and payors. (Reece, Ex. QQ, 25:7-11; Schwartz, Ex. SS, 192:18-193:23; Skagen, Ex. TT, 96:20-103:14; Desautels, Ex. NN, 111:11-112:10; Pogar (Anthem), Ex. II, 56:1-62:4.)

39.     There is no evidence that any agreement was ever reached between the participants in the August 29, 2012 meeting between CASCA and payors.  (Reece, Ex. QQ, 41:19-42:7; Price, Ex. PP, 39:15-40:18; Schwartz, Ex. SS, 222:4-224:24; Ashby, Ex. LL, 260:2-271:23; Austin, Ex. MM, 65:14-69:22; Einspahr, Ex. OO, 39:14-43:12; Roy, Ex. RR, 162:19-179:2; Skagen, Ex. TT, 103:15-110:11, 123:5-125:2; Trease (Humana), Ex. JJ, 46:18-58:19; Anderson, Ex. KK, 107:5-113:10; Desautels, Ex. NN, 113:22-124:1; Pogar (Anthem), Ex. II, 73:23-74:12.)

40.     No one from Centura had any conversation with any payor regarding any of the plaintiffs.  (Driscoll, Ex. AA, 63:20-25, 107:6-8, 110:16-19; Carley, Ex. Z, 72:16-24.)

41.     A Centura employee in 2010 and 2011 sent two emails to United and one email to Anthem providing information regarding Kissing Camels in Colorado Springs.  (Driscoll, Ex. AA, 60:10-63:25 ( REDACTED ), 71:23-78:16 and Ex. 98 (identifying and describing the 2010 email to United), 103:7-107:8 and Ex. 102 at UHC0013744 (identifying and describing the September 2011 email to United), 110:6-9, 13-15; Anthem-00033152-53, Ex. WW-7, ( REDACTED .)

42.     On the three occasions referenced in SOF ¶ 41, the Centura employee did not ask United or Anthem to take any action against plaintiffs.  (Driscoll, Ex. AA, 62:3-15, 63:8-19.)

43.     A Centura employee sent an email to United in October 2012 (one month before plaintiffs filed their complaint) to ask how United reimbursed three ASCs, two of which were plaintiffs in this case.  (Carley, <u>Ex. Z</u>, 71:19-72:23 and Ex. 140.)

44.     On the 2012 occasion reference in SOF ¶ 43, the Centura employee did not ask United to take any action against plaintiffs.

45.     Plaintiffs contend that non-defendant payors Kaiser Permanente and Cigna were part of the alleged conspiracy, but there is no evidence of any communication between Centura and Kaiser Permanente concerning plaintiffs, and the single such communication with Cigna is an email that is nearly identical to the email to United described above in SOF ¶¶ 43-44.  (Carley, <u>Ex. Z</u>, 72:25-74:18 and Ex. 141.)

46.     There is no evidence that United agreed to take any action pursuant to a conscious commitment to a common design with Centura.  (Greene (United), <u>Ex. FF</u>, 99:8-100:5, 123:3-124:17 (United did not **REDACTED** " with Centura or anyone else " **REDACTED** ."); Maurio (United), <u>Ex. GG</u>, 86:5-88:16 (never spoke to anyone associated with Centura or any other defendant regarding Kissing Camels or Topper); Miller (United), <u>Ex. HH</u>, 117:2-118:15 (never discussed plaintiffs with Centura); Driscoll, <u>Ex. AA</u>, 107:6-8 and Ex. 102 (never received follow-up communications from United after contacting United in 2010 and 2011); SOF ¶¶ 41-42.)

47.     There is no evidence that Anthem agreed to take any action pursuant to a conscious commitment to a common design with Centura.  (Pogar (Anthem), <u>Ex. II</u>, 229:14-230:24 (Anthem took no actions as a result of a request from Centura or anyone else).)

48.     There is no evidence that any other payor agreed to take any action pursuant to a conscious commitment to a common design with Centura.  (Trease (Humana), Ex. JJ, 112:5-113:20 (Humana never spoke with Centura or any other defendants regarding plaintiffs and did not agree with anyone not to do business with plaintiffs or to take any actions related to plaintiffs); SOF ¶ 45.)

**F.      Centura's Challenged Business Practices—CCOM And The Transfer Agreement**

49.     Centura developed a program called Centura Centers for Occupational Medicine ("CCOM"), a workers' compensation program that Centura offered to employers in the Colorado Springs area for managing the care and treatment of their employees' at-work injuries.  (Driscoll, Ex. AA, 68:19-69:14; Smith, Ex. EE, 67:14-68:15.)

50.     Centura enlisted physicians for inclusion in a panel of physicians created by Centura who employees of participating employers could contact for care and treatment of their workplace injuries.  (Smith, Ex. EE, 67:10-68:19, 117:21-118:15.)

51.     Centura, which is responsible for managing the care and treatment of CCOM members, requires physicians who Centura listed on its CCOM panel to treat those members at, or refer them for treatment to, facilities and providers within Centura's network.  (Sabin, Ex. DD, 109:21-110:14, 142:21-144:7; Smith, Ex. EE, 67:10-68:19, 69:9-70:25; Driscoll, Ex. AA, 68:22-69:17.)

52.     Centura's Penrose Hospital terminated its patient transfer agreement with Kissing Camels in 2010 as permitted by Section 15.a of that agreement.  (Reeves, Ex. CC, 60:24-61:3 and Exs. 158 and 162.)

53.     Centura terminated the transfer agreement with Kissing Camels because Centura disagreed with Kissing Camels' out-of-network business model.  (Smith, Ex. EE, 68:16-21, 101:15-24, 104:11-107:9; Sabin, Ex. DD, 96:17-97:16; Reeves, Ex. CC, 55:5-56:16, 59:2-19.)

54.     Plaintiffs concede that the cause of their injuries were actions by insurers, not by Centura.  (Foreman, Ex. I, 43:20-44:6, 44:19-46:18 (stating that plaintiffs' alleged harm flows directly from decisions of the insurers); McCarthy, Ex. Q, 310:23-311:1 (stating that plaintiffs do not intend to seek damages on the basis of anything other than Dr. Foreman's report, and the evidence that he relied on).)

### III.     STANDARD OF REVIEW

"[S]ummary judgment is proper if the pleadings, depositions…and admissions on file…show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted).  "[A] scintilla of evidence" is not enough, but "[a] plaintiff… must proffer facts such that a reasonable jury could find" in the plaintiff's favor.  *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1130 (10th Cir. 2009) (citations omitted).

### IV.     ARGUMENT

Plaintiffs allege that Centura conspired with HCA and that the two of them then conspired with payors to harm plaintiffs.  (SAC ¶¶ 43, 49-52; 2/13/14 Order at 12.)  Discovery has confirmed the absence of any evidence that Centura and HCA discussed, let alone reached, any conspiracy relating to plaintiffs.  Summary judgment should be granted for that reason alone.

Summary judgment should be granted for a second, and independent, reason:  there is no evidence of any conspiracy between Centura and any payor.  Plaintiffs point to isolated emails sent by two Centura employees to two payors (United and Anthem), but those sporadic contacts are legally insufficient to support a conspiracy involving Centura.  HCA is not mentioned in the emails, nor do the emails show a conspiracy between Centura and United or between Centura and Anthem, let alone between Centura and HCA, on the one hand, and United and Anthem, on the other:  United did not know about the email to Anthem, Anthem did not know about the

emails to United, and HCA did not know about any of them.  Moreover, United and Anthem each had independent, unilateral reasons for their dealings with plaintiffs.  There is no evidence tending to exclude the possibility that United and Anthem acted unilaterally.  *Monsanto*, 465 U.S. at 768.

Plaintiffs' attempted monopolization claim also fails.  Centura at most has about 16% of any conceivably relevant market and, moreover, there is no evidence of any exclusionary conduct.  All of the claims fail, finally, for failure to present triable evidence of antitrust injury.

## A.    No Conspiracy:  Counts I, II, IV and V in the SAC Fail.

Plaintiffs allege a two-part conspiracy—first, between Centura and HCA and, second, between the two of them and the payors.  Both parts must be met under plaintiffs' theory.  To avoid summary judgment, then, plaintiffs must have evidence of a horizontal conspiracy (Centura and HCA) *and* evidence of a vertical conspiracy (between Centura/HCA and payors).  Plaintiffs have no evidence to support either part of their conspiracy theory. [5]

### 1.    There is no evidence of any conspiracy between Centura and HCA.

No evidence exists to support a conclusion that Centura and HCA reached any agreement relating to plaintiffs.  HCA's witnesses testified unequivocally that they never spoke with anyone from Centura regarding plaintiffs.  (SOF ¶ 32.)  Plaintiffs focus on a conference call in May 2012 and a meeting in August 2012 between CASCA and payors that two HCA employees also attended, but Centura was not present at, and knew nothing about, either one.  (SOF ¶¶ 33-35.)

Plaintiffs point out that employees from the three companies managing the eight ASCs that have relationships with Centura did attend the May call and the August meeting, but there is

---

[5] Kissing Camels alone, in Counts II and V, alleges a conspiracy between Centura and Audubon, but no evidence supports it and, in any event, there is no evidence of any conspiracy between the two of them and any payor.  SOF ¶¶ 46-48; *see also* Section II.A.2, below.

no evidence that those employees represented Centura at those gatherings or, more importantly, that they had any discussions with anyone at Centura regarding the gatherings either before or after they occurred.  (SOF ¶¶ 35-37.)  Further, Centura is not an owner of any of those three companies, but even if it was, mere ownership is not enough:  there must be evidence that Centura *itself* was involved in the challenged conspiracy—and there is no such evidence. *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1068-69 (D. Colo. 2004); *Precision Assocs. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42, 2011 U.S. Dist. LEXIS 51330, at *59 (E.D.N.Y. Jan. 4, 2011); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688 (E.D. Pa. 2009); *Black v. JP Morgan Chase & Co.*, No. 10-848,  2011 U.S. Dist. LEXIS 103727, at *104-08 (W.D. Pa. Aug. 10, 2011).  In any event, and although it is not material to this motion since there is no evidence linking Centura to the May conference call or the August meeting, there is no evidence that any agreement regarding plaintiffs was ever reached by anyone who did attend those gatherings.  (SOF ¶¶ 38-39.)

As a last resort, plaintiffs point to one conversation between a Centura employee and an HCA employee that occurred in October 2012, well after the other claimed conspiratorial meetings and just a few weeks before the filing of the complaint, but there is no evidence that those employees discussed any joint approach to any payor about plaintiffs.   (SOF ¶ 32.)

**2.     There is no evidence of any conspiracy between Centura and the payors.**

Evidence of a conspiracy between Centura and HCA, even assuming plaintiffs had evidence of any such conspiracy, would be insufficient under the theory in plaintiffs' complaint. Plaintiffs concede that their alleged injuries result from conduct by payors, not Centura.  (SOF ¶ 54.)  So, unless there is evidence that connects Centura to any conspiracy involving the payors, Centura is still entitled to summary judgment on all of the conspiracy claims, whether involving

-22-

HCA or Audubon.  Arguing (as plaintiffs are likely to do) that Centura complained to some of the payors, and even that payors took steps "in response to" those complaints, is legally insufficient to support a conspiracy between Centura and the payors under the Supreme Court's decision in *Monsanto* as this Court has already ruled.  (2/13/14 Order at 18 n.4 and 19; *see also* Section IV.A.2.b., below.)

Here is the sum total of the evidence against Centura—one Centura employee sent a total of three emails to United and Anthem employees about Kissing Camels' billing practices in 2010 and 2011, and a second Centura employee sent an email making a general inquiry about United's reimbursement practices in 2012.  (SOF ¶¶ 41-45.)  Even crediting plaintiffs with every conceivable inference, those contacts are not enough to show a conspiracy involving Centura and either payor, let alone both of them, and in any event nothing links those contacts to HCA.  *All* of the payors had independent, non-collusive reasons to enforce contractual commitments with in-network physicians and other providers who improperly diverted patients to plaintiffs' out-of-network facilities in violation of the payors' policies (SOF ¶¶ 11-25) and there is no evidence that tends to exclude the possibility that United and Anthem acted separately and on their own.

### (a)     The relevant legal standard

An "antitrust plaintiff must present evidence that the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006) (quoting *Monsanto*, 465 U.S. at 764).  Plaintiffs have no direct evidence of a conspiracy involving Centura, and are therefore forced to rely on circumstantial evidence.  When a plaintiff relies on circumstantial evidence to prove a conspiracy, "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *accord, Abraham*, 461 F.3d at 1257.

As the Supreme Court has explained, "'[t]o survive a motion for summary judgment…, a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility' that the alleged conspirators acted independently.'"[6] *Matsushita*, 475 U.S. at 588 (quoting *Monsanto*, 465 U.S. at 752); *accord*, *Gibson v. Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir. 1987). "[A]mbiguous conduct [does not] suffice to create a triable issue of conspiracy." *Matsushita*, 475 U.S. at 597 n.21. Thus, as the Tenth Circuit has confirmed, courts cannot "infer a conspiracy if the defendants' 'conduct is consistent with other, equally plausible explanations.'" *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1284 (10th Cir. 2012) (quoting *Matsushita*, 475 U.S. at 596). This is because "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support an inference of conspiracy." *Id. See also Mitchael*, 179 F.3d at 858 ("ambiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy") (citation omitted).

> **(b)    There is no evidence tending to exclude the possibility that United and Anthem acted on the basis of their independent self interests.**

Plaintiffs have no evidence connecting Centura to any contacts relating to plaintiffs with Aetna, one of the three remaining payor-defendants, or Kaiser, which previously settled. As to the two other payor-defendants (United and Anthem), plaintiffs can point only to a few isolated contacts regarding the plaintiffs' business practices between two Centura employees with United and, separately, with Anthem. Those isolated contacts, which were identified in the First Amended Complaint and therefore evaluated by the Court in dismissing plaintiffs' claim against

---

[6] The fact that plaintiffs also assert a conspiracy to monopolize claim under Section 2 makes no difference because "the limits on inferences of concerted actions under § 1 apply in § 2 cases" as well. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1028 n.13 (10th Cir. 2002).

United and Anthem in that complaint, get no better with age—they still do not support a conspiracy claim between Centura and either United or Anthem, let alone the overarching conspiracy plaintiffs promised to prove.

The facts relating to those between Centura and United or Anthem are undisputed:

- In September 2010, Ashby (Audubon's administrator, but not a Centura employee) sent an email to United enclosing evidence that United had reimbursed Kissing Camels for a procedure well in excess of what United would have reimbursed Audubon for the same procedure, and asking whether there are "REDACTED ██████████████████████" Ashby then forwarded his email to Centura's Driscoll, who forwarded it to United's Riegel, stating, "██ REDACTED ███████ ████████████████████████" (SOF ¶¶ 41-42.) There was no other communication involving Centura regarding this event.

- A year later, in September 2011, Centura's Driscoll sent emails separately to United's Riegel and Anthem's Pogar, providing evidence that Kissing Camels had submitted reimbursement requests for high fees. (SOF ¶ 41-42.) There was no other communication involving Centura regarding these events.

- On October 3, 2012, Centura's Carley emailed a United employee to ask how United reimbursed three ASCs, two of which were plaintiffs in this case. (SOF ¶¶ 43-44.)[7]

Complaints are legally insufficient to support a conspiracy claim, as this Court has already ruled—*yet those emails (even assuming they could be viewed as complaints) are all plaintiffs can muster after 47 depositions*. (SOF ¶¶ 31-48.) The Supreme Court made clear in *Monsanto* that businesses may lawfully complain about others in the marketplace: "Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct." *Monsanto*, 465 U.S. at 763. The Supreme Court explained:

> [D]istributors are an important source of information for manufacturers.… To bar a manufacturer from acting solely because the information upon which it acts originated as a price

---

[7] The only other communication between Centura and any other payor about plaintiffs was a 2012 email to non-defendant payor Cigna asking a similar question. (SOF ¶ 45.)

> complaint would create an irrational dislocation in the market. [Citations omitted.]  In sum, "[to] permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of its independent business judgment and emasculate the terms of the statute." [Citations omitted.]

*Id.*  The Court thus held that a plaintiff needed to present evidence "that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently."  *Id.* at 764; *Abraham*, 461 F.3d at 1259 ("manufacturer's exclusion of [distributor] in response to another [distributor's] complaints is insufficient as a matter of law to establish conspiracy").

The Tenth Circuit decision in *Abraham* is instructive.  There, the Court affirmed summary judgment on a conspiracy claim where the plaintiffs:

> simply assume[d] the existence of concerted action because panel ophthalmologists [here, Centura] complained to [defendant] IHC [here, United] about paneling optometrists [here, Kissing Camels], because IHC responded to those complaints by not paneling optometrists, and because panel ophthalmologists refer some of their discretionary patients to IHC facilities in accordance with IHC's provider agreement.

461 F.3d at 1261.  Relying on *Monsanto*, the Tenth Circuit held that a conspiracy could not be inferred from the fact that IHC refused to do business with optometrists after the ophthalmologists "lobbied" IHC and even though IHC responded to that lobbying.  *Id.* at 1259. The Court said that "[n]otably absent is evidence of a link between the second and third circumstances."  *Id.* at 1261.  Importantly, the optometrists "failed to provide evidence to show that on the whole, IHC's decision is against their economic interests."  *Id*.  Rather, just like the payors here, IHC had its own, unilateral reason to decline to do business with optometrists:

> [L]imiting the number of providers performing a given service increases the volume of patients each provider sees, which, in turn, enables IHC to negotiate lower reimbursement rates to the panel providers.

*Id.* at 1263. Here, too, the insurers had their own reasons to direct patients to in-network providers and away from plaintiffs' higher cost, out-of-network facilities. (SOF ¶¶ 15-20.) *See also Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1582 (11th Cir. 1988) ("Mere complaints are not sufficient proof [of a conspiracy] where the complaints are equally consistent with both an independent and a collusive interpretation."); *All Weather Exteriors Distributing, Inc. v. Cal. Wholesale Mat'l Supply Co.*, No. 2:06-CV-346-TS, 2007 U.S. Dist. LEXIS 8902, at *11 (D. Utah Feb. 6, 2007) (dismissing complaint where plaintiff alleged only facts supporting conclusion that supplier "excluded [distributor] in response to" other distributor's request).

This is exactly the point this Court made in dismissing the payors from the First Amended Complaint. The Court pointed out that plaintiffs alleged that Centura and HCA asked the payors to take actions and that the payors took those actions in parallel. (2/13/14 Order at 18 n.4.) The Court held that those allegations did not plead a conspiracy involving the payors because the allegations were "insufficient to reasonably suggest that the parallel conduct was the result of an agreement and not the result of independent factors" and because the payors had "independent, non-conspiratorial reasons to take these actions." (*Id*. at 19.)

Here, as in *Monsanto* and *Abraham*, there is no "evidence that tends to exclude the possibility that [Centura] and [United] were acting independently." *Monsanto*, 465 U.S. at 764. Neither Mr. Carley nor Ms. Driscoll ever spoke to United or Anthem about plaintiffs. (SOF ¶¶ 40-47.) Nor do any of the four emails (the sole contacts between Centura and any payor regarding plaintiffs) show any agreement involving Centura and anyone. And the evidence confirms the existence of unilateral explanations for what plaintiffs contend were the decisions by United, Anthem and Aetna to take steps adverse to plaintiffs. Specifically, each payor had a unilateral interest in ensuring compliance with the in-network incentives in its provider contracts

and therefore in taking steps to prevent the plaintiff ASCs and their physician-investors from reducing patients' out-of-network responsibility to in-network levels.  (SOF ¶¶ 15-20.)

Plaintiffs, as out-of-network providers, could and did bill payors at rates equal to 800 percent of Medicare rates—well above the rates at which the payors reimbursed in-network providers.  (SOF ¶¶ 15, 29.)  Plaintiffs opened as out-of-network facilities, that is, they had no contracts with payors, meaning that their investors (physicians, who themselves did have contracts with payors) could and did refer their patients to plaintiffs' facilities.  (SOF ¶¶ 26-28.)  But that is not all they did.  As anyone who has ever purchased health care insurance knows, insurers provide financial incentives to plan members (patients) to use in-network facilities rather than out-of-network facilities by requiring members to pay higher copays, coinsurance and deductibles when they used out-of-network facilities.  To skirt those incentives, plaintiffs charged patients only the in-network patient responsibility, making patients indifferent on where they received treatment.  (SOF ¶¶ 20, 30.)  Plaintiffs then billed the payors for fees equal to 800 percent of Medicare rates, obtaining "monster reimbursements" on occasion that were "even greater than the annual median income for Americans."  (SOF ¶ 29.)  Little wonder, then, that the payors took the steps they did regarding plaintiffs.

Plaintiffs, moreover, were not the only out-of-network providers against which the payors took those steps.  Far from it, the payors were taking similar actions long before plaintiffs even existed and against ASCs and providers all over the country that were similarly diverting patients to out-of-network facilities in violation of their contractual commitments.  (SOF ¶¶ 22-25.)  For example, SCD employees testified that payors for years had taken actions in many other states similar to the actions complained about here and that payors had done so as early as 2003.  (SOF ¶¶ 22-25.)  SCD even prepared a letter in August 2012 to be sent to the physician investors in

SCD's ASCs titled, "Surviving and Thriving with Managed Care Threats," describing the same conduct complained about here as "tactics" that had occurred "nationwide" and, critically, that SCD had experienced these tactics "over the years in numerous geographic markets." (SOF ¶ 21.) In addition, plaintiffs' counsel in this case filed a lawsuit on behalf of ASCs in Maryland in which SCD had invested complaining about the same actions elsewhere that plaintiffs complain about in this case. (SOF ¶ 22.) Given this evidence, plaintiffs cannot meet their *Monsanto* "burden of providing evidence which tends to exclude the possibility" that those payors acted independently. *Gibson*, 818 F.2d at 725.

Simply alleging (as plaintiffs did in the complaint and as they will be forced to do in response to this motion) that United or Anthem took action "in response to" what plaintiffs will describe as "complaints" in Centura's four isolated emails is inadequate as a matter of law. *See Abraham*, 461 F.3d at 1262 ("mere acquiescence to competitor's complaints" is insufficient); *Credit Bureau Services v. Experian Info. Solutions, Inc.*, No. 12-61360, 2012 U.S. Dist. LEXIS 174487, at *46 (S.D. Fla. Dec. 7, 2012) (granting motion to dismiss even though customer threatened supplier and supplier allegedly "responded in a way that it hoped would appease" its customer because "we are left with what appears to be, at best, only a unilateral attempt … to respond to dissension among its largest customers"); *All Weather*, 2007 U.S. Dist. LEXIS 8902, at *11 (dismissing complaint where plaintiff alleged facts showing only that supplier "excluded [distributor] in response to" other distributor's request).[8]

---

[8] Plaintiffs likely will assert that Centura pressured a few of Kissing Camels' physicians-owners in 2010-2011 not to refer patients to Kissing Camels, but there is no evidence that Centura acted pursuant to a discussion with HCA or any payor in pursuing its own interests. Rather, Centura learned that some of Kissing Camels' investors had been diverting patients from a Centura-developed program (CCOM) to Kissing Camels in violation of the terms for being included in that program and took steps to prevent that practice. (SAC ¶ 49; SOF ¶¶ 49-51.) That is not evidence of any conspiracy, but simply Centura's unilateral effort to manage its own program.

In short, plaintiffs cannot "exclude the possibility" that United and Anthem acted on their own in taking the complained-about steps adverse to plaintiffs. Thus, as in *Abraham*, plaintiffs have only their unsupported assumptions of concerted action between Centura and payors—and that is not enough to sustain a conspiracy claim. *Abraham*, 461 F.3d at 1361.

### 3. Even assuming any evidence of a conspiracy between HCA and any payor, Centura is still entitled to summary judgment.

Plaintiffs may try to prove a conspiracy between HCA and one or more payors, but even assuming such a conspiracy that would not be enough to defeat Centura's summary judgment motion. Plaintiffs must prove that *Centura* participated in a conspiracy and, as set forth above, there is no such evidence. As a result, and notwithstanding any conduct involving anyone else, the "conscious commitment" involving Centura that plaintiffs must show to link Centura to any claimed conspiracy is missing. *Abraham,* 461 F.3d at 1257 (citing *Monsanto*, 465 U.S. at 764 (to prove conspiracy, "the antitrust plaintiff must present evidence that the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'")). *See also Islami v. Covenant Medical Ctr. Inc.*, 822 F. Supp. 1361, 1385 (N.D. Iowa 1992) (must link the defendant to the alleged conspiracy); *Champagne Metals v. Ken-Mac Metals, Inc.*, No. 02-528-C, 2004 U.S. Dist. LEXIS 27313, at *57 (W.D. Okla. June 15, 2004) (same).

### B. No Attempted Monopolization: Counts III and VI Fail.

The Court should grant summary judgment to Centura on Kissing Camels' attempted monopolization claims in Counts III and VI.[9] To establish such a claim, Kissing Camels must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."

---

[9] The deficiencies in this section also provide a separate basis for the dismissal of Kissing Camels' conspiracy to monopolize claims in Counts II and V.

*Christy Sports, LLC v. Deer Valley Resort Co., Inc.*, 555 F.3d 1188, 1192 (10th Cir. 2009);

*Spectrum Sports*, 506 U.S. at 456.   Kissing Camels cannot show either that Centura has a

dangerous probability of achieving a monopoly in the ambulatory surgery business in Colorado

Springs or that Centura engaged in the requisite exclusionary conduct.

>    1.   **Kissing Camels cannot prove that Centura has market power, much less a dangerous probability of acquiring monopoly power.**

"Monopoly power" is defined as "the power to control prices or exclude competition."

*Four Corners*, 582 F.3d at 1220 (quotation omitted).   The presence of monopoly power depends

on "various market characteristics, such as 'market trends, number and strength of other

competitors, and entry barriers,'" *Cohlmia*, 693 F.3d at 1282, and "is typically evaluated by

examining the defendant's share of the relevant market." *Colo. Interstate Gas Co. v. Natural

Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 (10th Cir. 1989).   There is no bright line for what

constitutes monopoly power, but "lower courts generally require a minimum market share of

between 70% and 80%." *Id.* at 694 n.18; *see also Blue Cross & Blue Shield United of Wis. v.

Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) (anything less than "[f]ifty percent is

below any accepted benchmark for inferring monopoly power from market share"); IIB P.

Areeda & H. Hovenkamp, *Antitrust Law* 250 ("We…presume that market shares below 50 or 60

percent do not constitute monopoly power.").   By contrast, "a market share of less than 20% is

woefully short under any metric from which to infer market power." *Cohlmia*, 693 F.3d at 1283.

Kissing Camels defines the relevant product market for its attempt to monopolize claims

as a market for ambulatory surgery in Colorado Springs.  (SAC ¶¶ 22, 145.)  Centura at most has

only ▇ of the ambulatory surgery patient visits in Colorado Springs and ▇ of the

operating rooms used for ambulatory surgery.  (Argue Rept., Ex. UU, ¶¶ 84, 85, 88 and Ex. 23.)

That is well below the level that could be viewed as evidence of monopoly power.

Plaintiffs' expert artificially tries to increase Centura's share by combining Centura's patient visits with Audubon's patient visits, but Centura and Audubon are different firms (SOF ¶¶ 4-8) and the effort is insufficient for two reasons.  First, there is no theory for a conspiracy to attempt to monopolize or even for joint monopolization.  *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1227 (D. Kan. 2013) (collecting cases and observing that a joint monopolization claim "contradict[s] the basic concept that a monopoly is the domination of a market by a single firm").  In *City of Moundridge, KS v. Exxon Mobile Corp.*, 471 F. Supp. 2d 20, 42 (D.D.C. 2007), the district court dismissed such a monopolization claim:  "to sustain a charge of monopolization … a plaintiff must allege the necessary market domination of a *particular* defendant") (quotations omitted) (emphasis in original).

Second, even if the Court were to combine Centura's and Audubon's ambulatory surgery businesses (which the Court should not do, as explained above), the two companies account for only ▓REDACTED▓ of the operating rooms used for, and ▓REDACTED▓ of the patient visits in, a business of ambulatory surgery services in Colorado Springs.  (Argue Rept., Ex. UU, ¶¶ 84, 88, and Exs. 23, 24.)[10]  That is still well below a level of market share that could be viewed as some evidence of monopoly power even assuming it could be coupled with any other evidence (which it cannot).

As plaintiffs' expert concedes, market share alone is insufficient evidence from which to infer monopoly power or the dangerous likelihood of achieving it.  (Foreman, Ex. I, 218:12-20; 290:6-18); *Colo. Interstate Gas*, 885 F.2d at 695-96; *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, No. 13-1307, 2014 U.S. App. LEXIS 15049, at *21 (10th Cir. Aug. 5, 2014)

---

[10] By combining the Centura and Audubon shares, plaintiffs' expert puts forth a combined market share estimate (▓REDACTED▓) that is flawed for still other reasons.  (Argue Rept., Ex. UU, ¶¶ 91-92.)  In addition, that estimate, even if accepted, still does not matter in the absence of other evidence of monopoly power.  (Foreman Rept., Ex. VV, ¶ 209, Table 9); *Colo. Interstate Gas*, 885 F.2d at 694 n.18 (monopoly power requires a minimum of 70% to 80% market share).

(high market shares and significant barriers to entry); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) (high market share and barriers to entry).  Courts typically look to other factors as entry barriers or high prices.  But plaintiffs' expert did not examine any factors other than market share (Foreman, Ex. I, 296:2-11), and his report does not reach an opinion on monopoly power.  (Foreman Rept., Ex. VV, ¶¶ 203-15.)  Nor does any such evidence exist: there is no evidence that Centura's negotiated prices with payors were above competitive levels and plaintiffs themselves concede that no barriers exist—a new ASC can enter the market in "▮

REDACTED ."  (McCarthy Ex. Q 173:3-19.)

### 2. Kissing Camels cannot show that Centura engaged in any exclusionary conduct.

Kissing Camels also cannot show that Centura engaged in the required "predatory or anticompetitive conduct." *Christy Sports*, 555 F.3d at 1192.  It complains about Centura's decision to end a patient transfer agreement and Centura's efforts to require some of Kissing Camels' physician-investors to treat CCOM patients at a Centura facility.  Neither is sufficient to constitute exclusionary conduct.

First, Kissing Camels cannot show that the cancellation of the transfer agreement caused any harm.  (SOF ¶ 54.)  Even if it could, the Tenth Circuit has held that "a business, even a putative monopolist, has 'no antitrust duty to deal with its rivals at all.'" *Four Corners*, 582 F.3d at 1221 (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009)); *Christy Sports*, 555 F.3d at 1194 ("The Supreme Court has recognized the economic value of allowing businesses to decide with whom they will deal.").  The Supreme Court has underscored that "the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 407 (quotation omitted).

The Tenth Circuit's decision in *Four Corners* controls. There, a hospital had invested in a nephrology practice in the Durango area, and enticed a physician practice to relocate by making the practice the exclusive provider of nephrology services at the defendant's area hospital. The hospital then refused to provide admitting privileges to a plaintiff outpatient clinic even though such privileges were "critical" to compete in the Durango area. *Four Corners*, 582 F.3d 1222-25. Rejecting a duty to deal claim, the Tenth Circuit held that the hospital was "entitled to recoup its investment without sharing its facilities with a competitor." *Id*. at 1223. The Tenth Circuit further stated that dealing with the plaintiff hospital might hurt the hospital's profitability. *Id*. at 1225. *See also Christy Sports*, 553 F.3d at 1191, 1194-95, 1197 (ski resort had had no duty to aid a ski rental company; "The Sherman Act does not force [defendant] to assist a competitor in eating away its own customer base"). *See also Trinko*, 540 U.S. at 410 ("insufficient assistance in the provision of service to rivals is not a recognized antitrust claim").

Second, plaintiffs complain about Centura's efforts to prevent Kissing Camels' physician-investors from diverting CCOM patients to Kissing Camels in violation of those physicians' agreements with Centura – but that too is not exclusionary conduct as a matter of law. Here, Centura had legitimate business justifications to prevent Kissing Camels' physicians from diverting CCOM patients since Centura voluntarily placed those physicians on its panel in the first place. (SOF ¶¶ 49-51.) Referral of business within a healthcare entity is ordinary and understandable behavior. *Christy Sports*, 555 F.3d at 1197; *accord Marshfield Clinic*, 65 F.3d at 1413 ("Physicians employed by the Clinic, which has its own HMO, are hardly to be expected to steer their patients to another HMO….").

## C.     No Antitrust Injury:  All the Claims Fail

As previously explained, the Supreme Court has defined antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes

defendants' acts unlawful." *Brunswick*, 429 U.S. at 489.  Antitrust injury is an essential element of every antitrust claim and the plaintiff bears the burden of proof on that requirement. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 335 (1990); *Abraham*, 461 F.3d at 1267.

To prove antitrust injury, plaintiffs must link their claimed injury to an adverse effect on competition in the market as a whole.  Plaintiffs cannot do so.  They may try to show injury to themselves, but any such showing would not avoid summary judgment.  The antitrust laws are intended to protect "competition, not competitors," which means, "[i]t is *not sufficient* for [plaintiffs] to claim economic injuries as a competitor." *CTUnify, Inc. v. Nortel Networks, Inc.*, 115 Fed. Appx. 831, 836 (6th Cir. 2004) (emphasis added) (internal quotation marks and citations omitted); *see also Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("[C]onduct that eliminates rivals reduces competition.  But reduction of competition does not invoke the Sherman Act until it harms consumer welfare."). *See also Four Corners*, 582 F.3d 1225 (to establish antitrust claim, plaintiff "must show not only that he was harmed by [defendant's] conduct, but that the injury he suffered involved harm to competition"); *Sanjuan v. Am. Bd. of Psych. & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) ("The claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws....").

An antitrust plaintiff usually shows the required adverse effect on competition through expert testimony, yet the issue was not even addressed here.  (Foreman, Ex. I, 297:5-11.)  The standard in this setting is clear:  "[E]ntry of summary judgment [is mandatory]… against a party who fails to [establish] an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at

322-23 (internal quotation marks and citations omitted). As a result, and unless and until plaintiffs can point to evidence sufficient to support a finding of antitrust injury, Centura has no duty to present any evidence to the contrary and certainly has no burden to prove the absence of antitrust injury at all. *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 982 (9th Cir. 1988) (affirming summary judgment in part because "[plaintiffs] have failed to present … evidence [of injury to competition]"); *accord, Expert Masonry, Inc. v. Boone Cnty. Ky.*, 440 F.3d 336, 346 (6th Cir. 2006).

## V.     CONCLUSION

Plaintiffs have no evidence of any conspiracy involving Centura and plaintiffs' monopolization claim fails on the merits. Nor have plaintiffs suffered any antitrust injury. Centura is therefore entitled to summary judgment.

Dated:  September 30, 2014

Respectfully Submitted,

*s/ Robert E. Haffke*

Thomas Demitrack
Robert E. Haffke
JONES DAY
901 Lakeside Avenue East
Cleveland, OH 44114
Tel:  216.586.7141
Email: tdemitrack@jonesday.com
Email: rhaffke@jonesday.com

Toby G. Singer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel:  202.879.4654
Email:  tgsinger@jonesday.com

Paula W. Render
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601
Tel: 312.782.3939
Email: prender@jonesday.com

Melvin B. Sabey
KUTAK ROCK LLP
1801 California Street, Suite 3100
Denver, CO 80202
Tel:  303.297.2400
Email:  mel.sabey@kutakrock.com

Attorneys for Defendant
CENTURA HEALTH CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2014, I electronically filed the foregoing Defendant Centura Health Corporation's Motion For Summary Judgment And Memorandum In Support with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Edith M. Kallas
WHATLEY KALLAS, LLC
380 Madison Avenue, 23rd Floor
New York, NY 10017
Tel:  212.447.7060

Joe R. Whatley, Jr.
WHATLEY KALLAS, LLC
201 North Mill Street
Aspen, CO 81611
Tel:  800.695.6750

W. Tucker Brown
WHATLEY KALLAS LLC
2001 Park Place Tower, Suite 1000
Birmingham, AL 35203
Tel:  205.488.1200

Deborah J. Winegard
WHATLEY KALLAS, LLC
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel:  404.607.8222

Patrick J. Sheehan
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Tel: 617. 573.5118
psheehan@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLC
1 New Hampshire Avenue, Suite 125
Portsmouth, NH 03801
Tel: 603.766.4902
hquillen@whatleykallas.com

*s/ Robert E. Haffke*
Robert E. Haffke
JONES DAY
901 Lakeside Avenue East
Cleveland, OH 44114
Tel:  216.586.7141
Email: rhaffke@jonesday.com

Attorney for Defendant
CENTURA HEALTH CORPORATION.