IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 12-cv-3012-WJM-NYW

KISSING CAMELS SURGERY CENTER, LLC,
CHERRY CREEK SURGERY CENTER, LLC,
ARAPAHOE SURGERY CENTER, LLC, and
HAMPDEN SURGERY CENTER, LLC,

    Plaintiffs,

v.

CENTURA HEALTH CORPORATION,
COLORADO AMBULATORY SURGERY CENTER ASSOCIATION, INC.,
ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE, INC., d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF COLORADO,
UNITEDHEALTHCARE OF COLORADO, INC., and
AETNA, INC.,

    Defendants.

---

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

---

Plaintiffs Kissing Camels Surgery Center, LLC ("Kissing Camels"), Cherry Creek Surgery Center, LLC ("Cherry Creek"), Arapahoe Surgery Center, LLC ("Arapahoe"), and Hampden Surgery Center, LLC ("Hampden") (collectively "Plaintiffs") bring this antitrust action alleging violations of the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, and the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-101 *et seq.* (Sec. Am. Compl. ("SAC") (ECF No. 213) at 56–62.) Before the Court are four Motions to Dismiss (collectively "Motions"), filed by Defendants Rocky Mountain Hospital and Medical Service, Inc., d/b/a Anthem Blue Cross and Blue Shield of Colorado ("Anthem"), UnitedHealthCare of Colorado, Inc. ("United"), Aetna, Inc. ("Aetna") (collectively the "Insurer Defendants" or "Insurers"), and

Colorado Ambulatory Surgery Center Association, Inc. ("CASCA").[1] (ECF Nos. 259, 260, 261, 264.) For the reasons set forth below, the Motions are denied.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." In evaluating such a motion, a court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. BACKGROUND

Plaintiffs are four ambulatory surgery centers ("ASCs") performing outpatient surgical procedures and treatments in a non-hospital environment. (SAC ¶¶ 1, 19.)

---

[1] A fifth pending Motion to Dismiss was filed by Audubon Ambulatory Surgery Center, LLC ("Audubon"). (ECF No. 266.) As Plaintiffs have since stipulated to dismiss Audubon as a Defendant (ECF No. 290), Audubon's Motion is denied as moot.

Plaintiff Kissing Camels provides services in the area of Colorado Springs, Colorado, and the other three Plaintiffs provide services in the Denver, Colorado metropolitan area. (*Id.* ¶¶ 6–9.)

Defendant Centura Health Corporation ("Centura") owns a system of hospitals and surgery centers in both Denver and Colorado Springs, which compete with Plaintiffs to provide ambulatory surgery services in both geographic areas. (*Id.* ¶¶ 10, 36–39.) Former defendant Audubon is an ASC which is a joint venture between Centura and several local physicians, and Centura holds more than 40% ownership of Audubon. (*Id.* ¶¶ 38, 123.) Audubon competes with Plaintiff Kissing Camels to provide ambulatory surgery services in the Colorado Springs area. (*Id.* ¶ 40.) Former defendant HCA, Inc. owns former defendant HCA-HealthONE LLC ("HCA"), which operates a system of hospitals and surgery centers in Metro Denver that compete with Plaintiffs Cherry Creek, Arapahoe, and Hampden to provide ambulatory surgery services. (*Id.* ¶¶ 27–28.)

Defendant CASCA is a trade association purporting to represent the interests of ASCs, to which Centura and HCA both provide substantial financial support. (*Id.* ¶¶ 45, 83.) At least two HCA employees sit on CASCA's Board of Directors, and six Board members are employed by companies with contractual relationships with Centura, including one, Brent Ashby, who is the Administrator of Audubon and another of Centura's joint venture ASCs. (*Id.* ¶¶ 46, 53.) Plaintiffs allege that CASCA worked directly with the Colorado Association of Health Plans ("CAHP"), an association of insurers whose Board of Directors includes executives from United and Anthem, to

assist in formulating the alleged conspiracy. (*Id.* ¶¶ 46, 53, 101.) Defendants Anthem, United, and Aetna are health insurance companies doing business in Colorado. (*Id.* ¶¶ 13–15.)

Plaintiffs Arapahoe and Kissing Camels began doing business in 2010. (*Id.* ¶ 28.) Plaintiffs allege that, beginning that year, Centura and HCA conspired to reduce competition for ambulatory surgery services by not doing business with Plaintiffs, and by using their market power to pressure physicians and insurers with whom HCA and Centura have relationships not to do business with Plaintiffs. (*Id.* ¶¶ 47–50.) CASCA allegedly joined the conspiracy at the behest of HCA and Centura, holding strategy meetings at which the conspiracy was formed and meeting separately with CAHP and various Insurers to coordinate action against Plaintiffs. (*Id.* ¶¶ 59, 75, 90–93, 99–102, 125.) Despite the fact that Plaintiffs were CASCA members, CASCA acted in secret and excluded Plaintiffs from meetings at which the conspiratorial objectives were discussed. (*Id.* ¶¶ 95, 133.)

A non-hospital ASC is required to have transfer agreements with hospitals to ensure that a patient requiring emergency hospitalization receives rapid and adequate care. (*Id.* ¶ 66.) HCA and Centura have both refused to sign transfer agreements between their hospitals and Plaintiffs' facilities, despite the predicted benefit to the hospital of increased patient flow. (*Id.* ¶¶ 66–67.) In December 2010, a Centura-owned hospital canceled a planned patient transfer agreement with Plaintiff Kissing Camels, and in February 2012, a HCA hospital refused to sign a transfer agreement with Cherry Creek. (*Id.*)

Plaintiffs' allegations make reference to specific pieces of evidence, principally e-mails and meeting notes, in which Defendants discussed strategies to lessen the competitive threat posed by Plaintiffs. (*See id.* ¶¶ 42, 51–55, 59–62, 70, 77–78, 80, 91–95, 99–102, 124.)

Spearheaded by CASCA and CAHP, a conference call meeting to discuss actions against Plaintiffs was held on May 18, 2012, which was attended by representatives from Aetna, Anthem, United, and other insurance companies, as well as CASCA Board members. (*Id.* ¶¶ 94–95.) A follow-up meeting, which was scheduled in order for the "right" Insurer personnel to attend, was held on August 29, 2012, and was attended by CASCA Board members, including Mr. Ashby of Audubon, and executives from Anthem, United, and Aetna (by phone), as well as other insurance companies. (*Id.* ¶¶ 95–97.) Based on notes taken by a CAHP representative, Plaintiffs allege that the meeting participants agreed to follow a strategy of "stop[ping] the flow of dollars" from the Insurers to Plaintiffs. (*Id.* ¶¶ 98–99.) Subsequent e-mails between CASCA and CAHP indicate that both parties would work to take indirect action against Plaintiffs through governmental agencies, CASCA, and insurer actions against physicians referring patients to Plaintiffs. (*Id.* ¶ 100.)

At the request of Centura and HCA, and pursuant to the agreement among the alleged co-conspirators, CASCA's Executive Director sent a letter to the Colorado Department of Regulatory Agencies ("DORA") alleging that Plaintiffs violated state law prohibiting them from waiving or discounting insurance copayments and deductibles and asking DORA to take legal action against Plaintiffs. (*Id.* ¶ 103.) DORA took no

action against Plaintiffs based on this letter, and noted that no complaints had been received by the Colorado Medical Board for unlawful billing practices. (*Id.*) Plaintiffs allege that their billing practices did not violate state law, and that these claims were mere pretext for Defendants' conspiratorial actions. (*Id.* ¶ 128.)

Plaintiffs allege that, starting in 2010, Centura and Audubon asked the Insurers to penalize physicians referring business to Plaintiffs. (*Id.* ¶¶ 118, 124.) The Insurers were compelled to comply because they needed Centura's and HCA's hospitals in their provider networks. (*Id.*) The Insurers renewed their efforts to take action against Plaintiffs as a result of the agreements reached at the May 18, 2012 conference call and August 29, 2012 meeting. (*Id.* ¶ 104.)

Mr. Ashby of Audubon notified United in 2010 of Kissing Camels' opening and raised concerns regarding its billing practices. (*Id.* ¶ 123.) United conducted an investigation which concluded that such concerns were unfounded and that its network contracts with physicians permitted out-of-network referrals to Kissing Camels, but nevertheless agreed to take action against physicians referring patients to Plaintiffs. (*Id.*) In 2011, United threatened Dr. Steven Topper of Colorado Hand Center with termination for breach of his network contract based on his referral of patients to Kissing Camels, and terminated his contract by letter on December 16, 2011. (*Id.* ¶ 72.) On August 31, 2012, two days after the CASCA/CAHP meeting, United terminated another facility, Metro Denver Pain Management, purportedly "for cause" due to its regular use of Plaintiff Arapahoe's facility. (*Id.* ¶ 106.) United also threatened primary care physicians with termination from its network because they referred

patients to specialists that used Plaintiffs' facilities. (*Id.* ¶¶ 72–23.) Plaintiffs assert, based on e-mail evidence, that United's threatening letters were strategically targeted at physicians referring patients to Kissing Camels. (*Id.* ¶¶ 57, 70.)

Beginning in at least October 2011, Anthem contacted physicians who were using Plaintiffs' facilities, and sent letters threatening network termination for purportedly inappropriate referrals. (*Id.* ¶ 75.) Anthem employees met with CASCA and HCA regarding strategies for such actions against Plaintiffs. (*Id.* ¶ 75.) Plaintiffs allege that, based on e-mails sent by senior Anthem employees, Anthem coordinated its actions with HCA, CASCA, and CAHP. (*Id.* ¶¶ 77–78.) On August 31, 2012, two days after the CASCA/CAHP meeting, Anthem sent a threatening letter to Colorado Orthopaedic Consultants regarding referrals to Plaintiffs, and a week later it sent similar letters to Colorado Hand Center and Interwest Rehabilitation. (*Id.* ¶¶ 109–10.)

Beginning in at least May 2012, Aetna threatened physicians with termination from its provider network based on their referrals to Plaintiffs, and threatened to post information on its provider website that those physicians were referring patients to out-of-network providers, which would increase costs for patients. (*Id.* ¶ 80.) Aetna also sent certified letters terminating physicians for out-of-network referrals to Plaintiffs' facilities within a few days of the August 29, 2012 CASCA/CAHP meeting. (*Id.* ¶ 112.)

Plaintiffs allege that the justifications the Insurers provided for their threatening letters to physicians—namely, breaches of network contracts and unlawful billing practices—were pretexts for the anti-competitive goal of driving Plaintiffs out of business. (*Id.* ¶ 128.) Indeed, Plaintiffs allege, Audubon and other ASCs had the same

billing practices as Plaintiffs. (*Id.* ¶ 131.)

On November 15, 2012, Plaintiffs filed a Complaint against HCA, Centura, CASCA, and Kaiser Foundation Health Plan of Colorado, bringing claims under the Sherman Act and the Colorado Antitrust Act. (ECF No. 1.) Plaintiffs filed their FAC on April 3, 2013, adding claims against Arapahoe, Anthem, United, and Aetna. (ECF No. 70.) Plaintiffs subsequently stipulated to dismiss their claims against Kaiser (ECF No. 140) and HCA (ECF No. 175).

On February 13, 2014, the Court granted Motions to Dismiss filed by CASCA, Aetna, Anthem, United, and Audubon ("Dismissal Order"), based largely on Plaintiffs' failure to plead sufficient facts establishing the predicate agreement for their conspiracy claims. (ECF No. 177.) Plaintiffs then moved to amend their complaint to restate their claims against the dismissed parties, and the Court permitted the amendment. (ECF Nos. 179, 212, 242.) The SAC was thus accepted as filed. (ECF No. 213.)

On September 30, 2014, Centura filed a Motion for Summary Judgment, which remains pending. (ECF No. 228.) The instant Motions to Dismiss, as well as a similar motion by Audubon, were filed on December 17, 2014. (ECF Nos. 259, 260, 261, 264, 266.) Plaintiffs filed an Omnibus Response (ECF No. 283), and Anthem, Aetna, CASCA, and United filed Replies (ECF Nos. 284, 285, 287, 288). Plaintiffs subsequently stipulated to dismiss Audubon from this action (ECF No. 290), rendering moot its Motion to Dismiss (ECF No. 266). The other four Motions are fully briefed and ripe for disposition.

## III.  ANALYSIS

CASCA and the Insurers each move for dismissal of Plaintiffs' claim under § 1 of the Sherman Act (Count I), and the analogous state claim pursuant to Colorado Revised Statutes § 6-4-104 (Count IV), the only claims asserted against them.  (ECF Nos. 259, 260, 261, 264; *see* SAC ¶¶ 134–38, 149–53.)  As federal antitrust law principles control both the federal and state antitrust claims, the Court will consider the two challenged claims together.  *See Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1220 n.1 (10th Cir. 2009).

Plaintiffs' claims under § 1 of the Sherman Act allege that Defendants conspired to put Plaintiffs out of business, which unreasonably restrained trade in the Denver and Colorado Springs markets for ambulatory surgery services and damaged Plaintiffs. (SAC ¶¶ 134–38, 149–53.)  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 1. Notably, § 1 prohibits only concerted, multilateral action.  *See Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1232 (10th Cir. 2003).  "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553 (internal citations and brackets omitted). Accordingly, at the pleading stage, stating a § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. . . [and]

to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. Such an agreement is established by evidence that the conspiring parties "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

If the complaint does not directly allege an agreement but instead makes only "allegations of parallel conduct . . . in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That is, the complaint must contain "allegations plausibly suggesting (not merely consistent with) agreement." *Id.*

1. CASCA

CASCA's Motion argues that Plaintiffs have failed to allege sufficient facts to establish that it was a member of a conspiracy to put Plaintiffs out of business. (ECF No. 262 at 8–14.) CASCA further argues that its letter petitioning DORA to take action against Plaintiffs is protected by the First Amendment and the *Noerr-Pennington* doctrine, and that its alleged coordination of negative statements to the press is protected commercial speech. (*Id.* at 7–8, 14–15.)

In the Dismissal Order, the Court found that Plaintiffs' allegations in the FAC that CASCA provided a venue at which the conspiracy was formed were insufficient to state a claim that CASCA itself was a co-conspirator. (ECF No. 177 at 13.) Ultimately, the Court found that "Plaintiffs' allegations suggest that CASCA provided passive facilitation

of the conspiracy, not that it agreed to participate, tacitly or expressly," and noted that "Plaintiffs apparently concede that CASCA was a tool of the conspiracy, rather than a co-conspirator . . . ." (*Id.* at 14.)

As to CASCA's actions in petitioning DORA to take action against Plaintiffs, the Court held in the Dismissal Order that "the Supreme Court's decisions in [*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)] and [*United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965)] establish that no Sherman Act liability arises from 'a concerted effort to influence public officials, regardless of [anticompetitive] intent or purpose.'" (ECF No. 177 at 13–14 (quoting *Pennington*, 381 U.S. at 670).) CASCA reasserts its argument in the instant Motion, but Plaintiffs fail to respond to CASCA's *Noerr-Pennington* or First Amendment arguments in their Response. (*See* ECF No. 283.) On the same basis as that asserted in the Dismissal Order, the Court concludes that the allegations of government petition and speech to the press cannot support a claim for a § 1 conspiracy.

However, Plaintiffs' SAC now includes direct allegations that CASCA was a co-conspirator, not a mere tool of the conspiracy. (*See* SAC ¶¶ 3, 59, 75, 90–93, 99–102, 125.) Through Centura's and HCA's joint venture partners' membership on CASCA's Board of Directors, Plaintiffs allege that Centura and HCA dominate CASCA and it thereby represents their interests to Plaintiffs' detriment. (*Id.* ¶¶ 39, 45–46.) Plaintiffs allege that CASCA worked with CAHP to develop a strategy among the Insurer Defendants and to execute that strategy against Plaintiffs. (*Id.* ¶¶ 46, 51.) In support of these allegations, Plaintiffs also assert that in July 2012, HCA's CEO sent an e-mail in

11

response to an HCA employee's e-mail confirmation that one of the Plaintiffs' facilities had recently opened, which stated, "TIME TO CALL IN THE DOGS!!!!!," and "can we discuss Round 2 with the payer [insurer] community—off-line not on email?" (*Id.* ¶ 61.) A follow-up e-mail between HCA executives included the statements, "Can we add more pressure to the payers to stop the proliferation of the out-of-network [Plaintiff] ASCs?  Their letters aren't working." (*Id.*)  This latter e-mail was copied to an HCA representative on CASCA's Board.  (*Id.*)  Plaintiffs allege meetings between Insurers and CASCA in furtherance of this strategy, culminating in the October 29, 2012 CASCA/CAHP meeting at which a plan was established for the Insurers to "stop the flow of dollars" to Plaintiffs.  (*Id.* ¶¶ 75, 78, 91.)

The Court finds these allegations sufficient to plausibly allege that CASCA was a participant in the alleged conspiracy.  While CASCA contends that one Board member's receipt of HCA's e-mail insufficiently implicates it in HCA's attempts to involve the Insurers in taking action against Plaintiffs (ECF No. 262 at 13), the Court finds that this allegation supports Plaintiffs' contention that CASCA coordinated meetings the following month on behalf of HCA in order to instigate action by the Insurers.  These allegations also support Plaintiffs' assertion in the SAC that CASCA joined the conspiracy as an active participant, and was not merely a venue at which the conspiracy was formed.  (*See* SAC ¶ 125.)  Plaintiffs further allege a motive for CASCA's conspiratorial participation, namely that its Board members—which operate competing ASCs—feared competition from Plaintiffs, and note that CASCA hid its actions from Plaintiffs and never attempted to get Plaintiffs to change their allegedly

unlawful conduct directly. (*Id.* ¶¶ 93, 125, 133.)

CASCA's Motion emphasizes certain of Plaintiffs' allegations, noting that each of them could just as easily have been innocent. However, on a motion to dismiss, the law requires only "a complaint with enough factual matter (taken as true) to suggest that an agreement was made. . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. The Court finds that Plaintiffs' SAC meets this standard. CASCA's Motion is therefore denied.

  2. <u>Insurer Defendants</u>

The Motions filed by Aetna, Anthem, and United each argue that Plaintiffs' allegations are insufficient to establish an agreement to conspire against Plaintiffs. (ECF Nos. 259, 260, 264.)

In the Dismissal Order, the Court held that Plaintiff's First Amended Complaint ("FAC") contained insufficient allegations of conspiracy against the Insurer Defendants. (ECF No. 177 at 16–20.) Specifically, the Court noted as follows:

> Plaintiffs' allegations of the specific actions each Insurer Defendant took against physicians and health care providers using Plaintiffs' facilities are numerous and detailed. However, with regard to an agreement to conspire, these allegations fall short. Although Plaintiffs allege that Centura and HCA requested that the Insurers perform these kinds of actions in furtherance of the conspiracy, Plaintiffs do not directly allege that the Insurers made such an agreement, nor do they allege facts directly evidencing the Insurers' agreement with Centura and HCA. Instead, Plaintiffs' allegations only indirectly support an inference of such an agreement, pleading parallel acts by each Insurer against physicians that were using Plaintiffs' facilities.

(*Id.* at 18.) While Plaintiffs had not explicitly alleged an agreement, the Court noted that Plaintiffs could still state a § 1 claim through allegations of "conscious parallel conduct"

13

that "raise[] a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557.

However, such allegations are insufficient if they establish "merely parallel conduct *that could just as well be independent action*." *Id.* (emphasis added). The Court concluded that Plaintiffs' allegations failed on this front as well, noting that Plaintiffs had alleged plausible legitimate, independent reasons for the Insurers' actions.

> Plaintiffs' allegations of the Insurers' parallel conduct, which targeted physicians using Plaintiffs' facilities and caused indirect injury to Plaintiffs, are insufficient to reasonably suggest that the parallel conduct was the result of an agreement and not the result of independent factors. . . . [T]he FAC sets forth no facts supporting the inference of pretext, nor does the FAC clearly assert pretext. Instead, Plaintiffs ask the Court to reasonably infer that the Insurers, under pressure from powerful hospitals and in the face of allegations that Plaintiffs were violating state law, did not terminate these physicians' network contracts because their out-of-network referrals breached those contracts, but instead terminated them because the Insurers had previously agreed with the hospitals to conspire to put Plaintiffs out of business. While such an inference is possible, Plaintiffs' FAC does not "raise[] a suggestion of a preceding agreement" or otherwise make it plausible. *Twombly*, 550 U.S. at 557. Plaintiffs' allegations with respect to the Insurers do not suggest that they made "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764. Instead, the Court finds that the Insurers' parallel conduct could just as well be independent action. *See Twombly*, 550 U.S. at 557.

(*Id.* at 18–20.) Consequently, the Court dismissed Plaintiffs' claims against the Insurers. (*Id.*)

The Insurers' Motions now argue that Plaintiffs' SAC contains the same deficiencies as the FAC, and that Plaintiffs' new allegations fail to support a conspiracy. (ECF Nos. 259, 260, 261, 264.) These arguments ignore the simple basis for the

Court's decision in the Dismissal Order: Plaintiffs' FAC did not explicitly allege that the Insurer Defendants *agreed* with Centura and HCA to take action against Plaintiffs, nor did it explicitly assert that the Insurers' reasons for their actions were pretextual. (*See* ECF No. 177 at 18–20.) In contrast, Plaintiffs' SAC now contains explicit allegations of agreement, and goes further by alleging the existence of evidence supporting those allegations. (*See, e.g.*, SAC ¶¶ 42, 51–55, 59–62, 70, 77–78, 80, 91–95, 99–102, 124.)

In particular, the Court finds compelling Plaintiffs' allegations regarding the alleged October 29, 2012 meeting, including an attendee's notes evidencing the establishment of a strategy by the participating Insurers to prevent Plaintiffs from obtaining patients, and the actions taken by each of the Insurer Defendants within a matter of days after that meeting in accordance with the agreement. These allegations support the SAC's direct assertion that the Insurers entered into an agreement to take action against Plaintiffs, and thus suggest that the Insurers "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764. Furthermore, the temporal proximity of the October 29, 2012 meeting and subsesquent Insurers' actions against physicians for their referrals to Plaintiffs "tends to exclude the possibility that . . . [they] were acting independently." *Id.* The Court consequently rejects Aetna's argument that its participation in a trade association meeting is necessarily innocent, as Plaintiffs have alleged that the participants explicitly agreed on a strategy for the Insurers to take actions against Plaintiffs at that meeting, that such actions were taken within days afterward, and that CASCA organizers purposefully excluded Plaintiffs from those meetings. (*See* ECF No.

264 at 7–9; SAC ¶¶ 95–100, 112.)

The Court finds that Plaintiffs have directly alleged a conspiracy and supported it with plausible factual allegations. As a result, the Court need not consider the Insurers' arguments relating to allegations that merely establish "conscious parallel conduct," namely that Plaintiffs have failed to exclude other plausible explanations for their actions. *See Twombly*, 550 U.S. at 557. While these arguments might well be persuasive before a jury, they need not be preemptively defeated by a plaintiff directly alleging an anticompetitive agreement in a well-pled complaint, as all such allegations are taken as true on a motion to dismiss.[2] *See id.* at 570. Accordingly, the Insurers' Motions are denied on this basis.

United's Motion raises a second argument, namely that an antitrust claim does not lie against a party alleged to have joined an unlawful boycott where the party had no rational motive to join the boycott. (ECF No. 260 at 13 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986)).) This argument is easily rejected. Plaintiff's SAC explicitly alleges that the Insurers entered the conspiracy at the behest of Centura and HCA because those hospitals possessed great market power and were essential to the Insurers' networks. (*See* SAC ¶¶ 123, 128.) As to United in particular, Plaintiffs allege that Centura threatened to terminate its contract,

---

[2] For example, Aetna's Motion argues that two e-mails on which Plaintiffs' SAC relies contain evidence that Aetna attempted to bring Plaintiffs into its provider network, which contradicts Plaintiffs' allegations that Aetna sought to put Plaintiffs out of business. (ECF No. 264 at 9–13.) While Aetna correctly notes that a document referred to in a complaint may be considered on a motion to dismiss, the Court finds that the evidence contained therein does not make Plaintiffs' claims implausible, and instead raises a dispute of fact more appropriate for resolution by a jury. Therefore, the Court will not dismiss Plaintiffs' claims on this basis.

and notes that despite United's independent investigation that Plaintiffs were not causing breaches of physician contracts, it nonetheless took action against Plaintiffs. (*Id.* ¶ 123.)  Faced with threats of losing valuable customers, the Court finds that the Insurers had a plausible, rational motive to join the alleged conspiracy.  Accordingly, the Court denies the Motions on that basis.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Motions to Dismiss filed by Defendants Rocky Mountain Hospital and Medical Service, Inc, d/b/a Anthem Blue Cross and Blue Shield of Colorado (ECF No. 259), UnitedHealthCare of Colorado, Inc. (ECF No. 260), Colorado Ambulatory Surgery Center Association, Inc. (ECF No. 261), and Aetna, Inc. (ECF No. 264) are DENIED; and

2. The Motion to Dismiss filed by Audubon Ambulatory Surgery Center, LLC (ECF No. 266) is DENIED AS MOOT.

Dated this 16th day of June, 2015.

BY THE COURT:

William J. Martinez
United States District Judge