**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 12-cv-3012-WJM-NYW

KISSING CAMELS SURGERY CENTER, LLC,
CHERRY CREEK SURGERY CENTER, LLC,
ARAPAHOE SURGERY CENTER, LLC, and
HAMPDEN SURGERY CENTER, LLC,

    Plaintiffs,

v.

CENTURA HEALTH CORPORATION,
COLORADO AMBULATORY SURGERY CENTER ASSOCIATION, INC.,
ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE, INC., d/b/a ANTHEM BLUE
CROSS AND BLUE SHIELD OF COLORADO,
UNITEDHEALTHCARE OF COLORADO, INC., and
AETNA, INC.,

    Defendants.

---

**ORDER DENYING CENTURA'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs Kissing Camels Surgery Center, LLC ("Kissing Camels"), Cherry Creek Surgery Center, LLC ("Cherry Creek"), Arapahoe Surgery Center, LLC ("Arapahoe"), and Hampden Surgery Center, LLC ("Hampden") (collectively "Plaintiffs") bring this antitrust action alleging violations of the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, and the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-101 *et seq.* (Sec. Am. Compl. ("SAC") (ECF No. 213) at 56–62.) Before the Court is Defendant Centura Health Corporation's ("Centura") Motion for Summary Judgment ("Motion"). (ECF No. 229.) For the reasons set forth below, the Motion is denied.

**I. LEGAL STANDARD**

Summary judgment is appropriate only if there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND

The following relevant facts are undisputed, unless otherwise noted. Plaintiffs are four ambulatory surgery centers ("ASCs") performing outpatient surgical procedures and treatments in a non-hospital environment. (Defendant's Statement of Material Facts ("SMF") (ECF No. 228 at 4–20) ¶ 1.) Plaintiff Kissing Camels is located in Colorado Springs, Colorado, and the other three Plaintiffs are located in the Denver, Colorado metropolitan area. (*Id.*)

Defendant Centura operates numerous hospitals and ASCs, the latter as joint ventures with private physicians, in both Denver and Colorado Springs. (*Id.* ¶¶ 4, 6–7.)

Former defendant Audubon is an ASC in Colorado Springs which is a joint venture between Centura and several local physicians, and Centura holds more than 40% ownership of Audubon.  (*Id.* ¶¶ 6, 8.)  Defendants Rocky Mountain Hospital and Medical Service, Inc., d/b/a Anthem Blue Cross and Blue Shield of Colorado ("Anthem"), UnitedHealthCare of Colorado, Inc. ("United"), and Aetna, Inc. ("Aetna") (collectively the "Insurers" or "Payors") are health insurance companies that reimburse medical providers for care provided to insured patients.  (*Id.* ¶¶ 11–16.)  The amounts of these reimbursements vary depending on whether the provider has an in-network agreement with the insurance company, or is instead out-of-network.  (*Id.*)

As pled in the Second Amended Complaint,[1] former defendant HCA, Inc. is the parent company of former defendant HCA-HealthONE LLC (collectively "HCA"), which operates a system of hospitals and surgery centers in Metro Denver that compete with Plaintiffs Cherry Creek, Arapahoe, and Hampden to provide ambulatory surgery services.  (SAC ¶¶ 27–28.)  Defendant Colorado Ambulatory Surgery Center Association, Inc. ("CASCA") is a trade association purporting to represent the interests of ASCs, to which Centura and HCA both provide substantial financial support.  (*Id.* ¶¶ 45, 83.)  At least two HCA employees sit on CASCA's Board of Directors, and six Board members are employed by companies with contractual relationships with Centura, including one, Brent Ashby, who is the Administrator of Audubon and another of Centura's joint venture ASCs.  (*Id.* ¶¶ 46, 53.)  Plaintiffs allege that CASCA worked

---

[1] The factual allegations concerning HCA and CASCA were not included in the parties' briefing on the instant Motion.  They are recited in this paragraph in order to provide pertinent background on the parties involved.

3

directly with the Colorado Association of Health Plans ("CAHP"), an association of insurers whose Board of Directors includes executives from United and Anthem, to assist in formulating the alleged conspiracy. (*Id.* ¶¶ 46, 53, 101.)

The Insurers typically require members to bear some financial responsibility in the form of a copay, coinsurance, or deductible (collectively referred to here as a "copay" for simplicity) when they receive covered medical services, but the patients' financial responsibility is reduced when the patient is served by an in-network provider in order to incentivize patients to stay in-network. (SMF ¶¶ 18–19.) At the time Plaintiffs' facilities opened in 2010, they were out-of-network providers with respect to the Insurers, but Plaintiffs' physician investors had in-network relationships with one or more Insurers in their own medical practices. (*Id.* ¶¶ 26–27.) Plaintiffs sought to reduce the patients' disincentive to use their out-of-network facilities by maintaining a practice of reducing patients' copays to the equivalent of what they would pay for an in-network provider. (*Id.* ¶ 30.)

Beginning in 2010 when Plaintiffs' facilities opened, Centura, Audubon, and HCA viewed Plaintiffs as a competitive threat. (Plaintiffs' Statement of Additional Disputed Facts ("SADF") (ECF No. 243 at 17–21) ¶¶ 1–2.) Plaintiffs allege (and Defendants dispute) that Centura and HCA conspired to reduce competition for ambulatory surgery services by not doing business with Plaintiffs, and by using their market power to pressure physicians and the Insurers with whom HCA and Centura have relationships not to do business with Plaintiffs. (SAC ¶¶ 47–50.) According to Plaintiffs, the Insurers were compelled to comply because they needed Centura's and HCA's hospitals in their provider networks. (*Id.* ¶¶ 118, 124.) CASCA allegedly joined the conspiracy at the

4

behest of HCA and Centura, holding strategy meetings at which the conspiracy was formed and meeting separately with CAHP and various Insurers to coordinate action against Plaintiffs. (*Id.* ¶¶ 59, 75, 90–93, 99–102, 125.) Despite the fact that Plaintiffs were CASCA members, CASCA allegedly acted in secret and excluded Plaintiffs from meetings at which the conspiratorial objectives were discussed. (*Id.* ¶¶ 95, 133.)

A non-hospital ASC is required to have transfer agreements with hospitals to ensure that a patient requiring emergency hospitalization receives rapid and adequate care. (*Id.* ¶ 66.) In December 2010, a Centura-owned hospital canceled a planned patient transfer agreement with Plaintiff Kissing Camels. (ECF No. 245-1 at 6.) The hospital did so because Kissing Camels was viewed as a competitive threat to Audubon and the hospital. (*Id.*)

On May 18, 2012, a conference call meeting spearheaded by CASCA and CAHP was held to discuss actions that could be taken against Plaintiffs' billing practices. (ECF No. 244-9 at 7.) The meeting was attended by representatives from Aetna, Anthem, United, and other insurance companies, as well as CASCA Board members, including Mr. Ashby of Audubon. (*Id.*) A follow-up meeting, which was scheduled in order for the "right" Insurer personnel to attend, was held on August 29, 2012, and was attended by CASCA Board members, including Mr. Ashby, and executives from Anthem, United, and Aetna (by phone), as well as other insurance companies. (*Id.* at 8.) Handwritten notes taken by a CAHP representative in attendance include the following statements: "Bad ASC's haven't shown where huge revenue is coming from . . . They feel the ball is in our court * * * strategy –> * * * can the flow of $ stop on our end." (*Id.*)

According to Plaintiffs, the Insurers renewed their efforts to take action against Plaintiffs as a result of the agreements reached at the May 18, 2012 conference call and August 29, 2012 meeting. (SAC ¶ 104.)

On November 15, 2012, Plaintiffs filed a Complaint against HCA, Centura, CASCA, and Kaiser Foundation Health Plan of Colorado, bringing claims under the Sherman Act and the Colorado Antitrust Act. (ECF No. 1.) Plaintiffs filed their First Amended Complaint on April 3, 2013, adding claims against Arapahoe, Anthem, United, and Aetna. (ECF No. 70.) Plaintiffs subsequently stipulated to dismiss their claims against Kaiser (ECF No. 140) and HCA (ECF No. 175).

On February 13, 2014, the Court granted Motions to Dismiss filed by CASCA, Aetna, Anthem, United, and Audubon ("Dismissal Order"), based largely on Plaintiffs' failure to plead sufficient facts establishing the predicate agreement for their conspiracy claims. (ECF No. 177.) Plaintiffs then moved to amend their complaint to restate their claims against the dismissed parties, and the Court permitted the amendment. (ECF Nos. 179, 212, 242.) The SAC was thus accepted as filed. (ECF No. 213.)

On September 30, 2014, Centura filed the instant Motion. (ECF No. 228.) Plaintiffs filed a Response (ECF No. 243), and Centura a Reply (ECF No. 252). After the Motion was fully briefed, on February 12, 2015, Plaintiffs stipulated to dismiss Audubon as a defendant. (ECF No. 290.) On June 16, 2015, the Court denied the other previously dismissed parties' Motions to Dismiss. (ECF No. 295.)

### III. ANALYSIS

Centura moves for summary judgment on each of Plaintiffs' claims against it: (1) contract, combination, or conspiracy in restraint of trade in violation of § 1 of the

Sherman Act (Claim 1), and the analogous state claim pursuant to Colorado Revised Statutes § 6-4-104 (Claim 4); (2) conspiracy to monopolize in violation of § 2 of the Sherman Act (Claim 2), and the analogous state claim (Claim 5); and (3) attempted monopolization in violation of § 2 of the Sherman Act (Claim 3) and the analogous state claim (Claim 6).  (ECF No. 228 pp. 56–62.)  As federal antitrust law principles control both the federal and state antitrust claims, the Court will consider the two challenged claims together.  *See Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1220 n.1 (10th Cir. 2009).

Centura raises three arguments in its Motion: (1) Plaintiffs' § 1 claim for conspiracy in restraint of trade and § 2 claim for conspiracy to monopolize both fail because there is no evidence that Centura entered into a conspiracy with either HCA or the Insurers; (2) Plaintiffs have presented no evidence supporting any of the elements of their § 2 attempted monopolization claim; and (3) all of Plaintiffs' claims must fail because Plaintiffs have suffered no antitrust injury.  (ECF No. 228 at 20–36.)  The Court will consider each argument in turn.

**A.  Conspiracy**

Plaintiffs allege that Defendants violated § 1 of the Sherman Act by conspiring to put Plaintiffs out of business, which unreasonably restrained trade in the Denver and Colorado Springs markets for ambulatory surgery services and injured Plaintiffs.  (SAC ¶¶ 134–38, 149–53.)  Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 1.  Notably, § 1 prohibits only

concerted, multilateral action. *See Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1232 (10th Cir. 2003). "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (internal citations and brackets omitted). Such an agreement is established by evidence that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

Plaintiffs' § 2 claims for conspiracy to monopolize allege that Defendants conspired to monopolize the Colorado Springs market for outpatient surgical procedures, which harmed competition in that market and injured Plaintiff Kissing Camels. (SAC ¶¶ 139–43, 154–58.) To succeed on a § 2 claim of conspiracy to monopolize, a plaintiff must establish: "(1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize." *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir. 1992) (internal citation omitted).

Thus, in order to prevail on either of these sets of claims, Plaintiffs must present evidence of a conspiracy. In the Motion, Centura argues that both claims fail for lack of evidence that Centura conspired with either HCA or the Insurers. (ECF No. 228 at 21–30.) Centura contends that Plaintiffs' evidence of the May 2012 conference call and August 2012 CASCA meeting do not establish that Centura joined a conspiracy,

because Centura itself was unaware of, and had no representatives at, either meeting, and because there is no evidence that an actual agreement was reached at those meetings.  (ECF No. 228 at 21–22.)  Centura further argues that a few e-mails by its employees to United and Anthem expressing concerns about Kissing Camels' billing practices are insufficient for a reasonable juror to infer a conspiracy.  (*Id.* at 23–24 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("To survive a motion for summary judgment . . . , a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.") (internal quotation marks omitted)).)

Plaintiffs first point to evidence regarding a meeting between the CEOs of Centura and HCA regarding Plaintiffs, arguing that this provides direct evidence of a conspiracy.  (ECF No. 243 at 23.)  The Court disagrees.  The content of the meeting, which took place on October 2, 2012, is evidenced by an e-mail from Centura's CEO, Gary Campbell, in which he relates a discussion with HCA's CEO, Sylvia Young, regarding concerns about new ASCs in Colorado.  (ECF No. 244-8 at 10.)  The e-mail, however, contains no indication that Centura and HCA have agreed to do anything about those new ASCs.  The closest such reference is as follows: "Sylvia said that she has spoken with Steven Summer about CHA getting involved with the State to look at how they might fight the expansion of these physician-owned commercial payer-only health care facilities."  (*Id.*)  Subsequent e-mails between Centura employees reveal that the new ASCs discussed included Plaintiffs.  (*Id.* at 11–14.)  However, there is no evidence, in either the initial e-mail or in the subsequent exchange between Mr. Campbell and other Centura employees, that Centura agreed with HCA to take action

9

against Plaintiffs. Accordingly, the Court concludes that this evidence alone is insufficient to directly establish a conspiracy.

However, Plaintiffs have presented other evidence that does support such a finding. As Centura predicted, Plaintiffs next rely on evidence of the August 29, 2012 meeting to prove the conspiracy. (ECF No. 243 at 23–24.) Plaintiffs have introduced handwritten notes, taken contemporaneously during that meeting by Marc Reece, a representative of CAHP in attendance, that reveal various concerns about "bad ASC's," and conclude, "they feel the ball is in our court * * * strategy –> * * * can the flow of $ stop on our end". (ECF No. 244-9 at 8.) In his deposition, Mr. Reece testified that the meeting attendees included representatives of CASCA, such as Mr. Ashby of Audubon, as well as representatives of Anthem, United, and other health insurers. Mr. Reece testified that "they" referred to CASCA, "our" referred to CAHP's member health insurers, and he understood that the insurers were being asked to investigate regulatory or statutory relief to stop ASCs from waiving co-pays so that they would not be monetarily "rewarded for that behavior" by insurers. (Dep. of Marc Reece (ECF No. 244-9) pp. 39–41.) This evidence supports an agreement, formulated or furthered at the August 29, 2012 meeting, under which Insurers would take action against Plaintiffs for what they perceived as unlawful billing practices.

Centura correctly points out the lack of evidence that any of its employees attended the August 2012 meeting. (ECF No. 252 at 11.) It also argues that, although Mr. Ashby was indeed in attendance, Centura is not liable for any conspiracy entered into by its joint venture Audubon, or by any other companies with which Centura had business relationships. (*Id.*) The Court agrees that Centura and Audubon are distinct

parties for antitrust conspiracy purposes, as Audubon is not a wholly-owned subsidiary. However, Plaintiffs have presented evidence that Centura had already chosen to act through Audubon with respect to its concerns about Plaintiffs. In a series of e-mails sent on December 30, 2010, the Chief Operating Officer ("COO") of Penrose–St. Francis Health Services ("Penrose," a Centura hospital) discussed the cancellation of a hospital transfer agreement with Kissing Camels, explaining that Penrose initially believed that Kissing Camels would be "a very small player in niche surgery, which wouldn't hurt Audubon or the hospital," but that it had recently grown: "Why would we aid and abet such a competitor?" (ECF No. 245-1 at 6.) In response, the Chief Executive Officer ("CEO") of Penrose stated, "I think we need to use Audubon as our 'front' on this. They (as in we, but a harder to criticize we) can carry the water on this. We cannot afford the moniker—however unfair—of 'unfriendly' to physicians." (*Id.*) The COO replied, "Agreed." (*Id.*)

These e-mails were sent nearly two years prior to the August 2012 meeting, and are far from definitive. Nevertheless, the Court finds that a jury could reasonably rely on this evidence to conclude that Centura's choice to use Audubon in taking action against their mutual competitor Kissing Camels persisted, as did its concerns that it not be seen as "unfriendly" to physicians by opposing Plaintiffs directly. The jury could infer that Mr. Ashby, representing both Audubon and CASCA at the August 2012 meeting, was also acting on behalf of Centura when an agreement was formed with the Insurers to stop the flow of money to Plaintiffs—"a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764. As a result, the Court finds that sufficient evidence of a conspiracy has been presented, and

11

summary judgment is inappropriate on that basis.

Centura insists that such "ambiguous" evidence is insufficient as a matter of law, because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588. Where a defendant's conduct is "as consistent with permissible competition as with illegal conspiracy[, it] does not, standing alone, support an inference of antitrust conspiracy." *Id.* (citing *Monsanto*, 465 U.S. at 764). The Court is aware of the apparently heightened standard imposed by *Monsanto* and *Matsushita* for § 1 cases, but nonetheless concludes that Plaintiffs' evidence suffices to defeat summary judgment. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that the evidence of agreement between the Defendants "tends to exclude the possibility" of independent action, *see id.*, and thus a jury must be permitted to weigh the evidence. Summary judgment is therefore denied on this basis.

**B. Attempted Monopolization**

Section 2 of the Sherman Act prohibits monopolization or attempted monopolization of any part of interstate trade or commerce. 15 U.S.C. § 2. In this circuit, to prevail on a claim of attempted monopolization, a plaintiff must establish the following: (1) the defendant engaged in predatory or anti-competitive conduct; (2) with a specific intent to monopolize; and (3) a "dangerous probability" of achieving monopoly power in the relevant market. *Christy Sports LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1992 (10th Cir. 2009). "Monopoly power" is the power to control prices or exclude competition. *Four Corners*, 582 F.3d at 1220. As such, the third element

requires consideration of "the relevant market and the defendant's ability to lessen or destroy competition in that market." *Christy Sports*, 555 F.3d at 1992.

Centura argues that there is no evidence that it had a dangerous probability of achieving monopoly power, or that it engaged in any exclusionary conduct. (ECF No. 228 at 31–34.) As to monopoly power, Centura cites its expert's report concluding that its market share for ambulatory surgery patient visits in Colorado Springs is only 4.3%, and it has only 16.4% of the operating rooms used for such surgeries. (*Id.* at 31 (citing ECF No. 228-47 ¶¶ 84–88).) Centura argues that such a low market share does not give rise to an inference of potential monopoly power. *See Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 (10th Cir. 1989) ("The higher the firm's initial market share, the greater the likelihood that it will eventually gain monopolistic control over the market."). However, Plaintiffs respond that Centura and Audubon may be considered together for purposes of calculating market share and cite their expert's report that Centura's and Audubon's combined market share is 62%—sufficient to give rise to an inference of a dangerous probability of achieving monopoly power. (ECF No. 243 at 32–33 (citing *Colo. Interstate Gas*, 885 F.2d at 694 (noting that a 41% market share is sufficient to indicate economic capacity to monopolize the market)).)

Based on the evidence adduced by Plaintiffs, in which, *e.g.*, Centura's COO expresses concerns about Kissing Camels' potential to "hurt Audubon or the [Penrose] hospital," and refers to Kissing Camels as a "competitor," the Court finds that there is sufficient evidence for a reasonable jury to find that Centura and Audubon were not

13

operating as competitors whose market shares must be considered separately, but instead were affiliates whose market share may be combined. (*See* ECF No. 245-1 at 6.) The Court is therefore unpersuaded by Centura's argument that Centura's and Audubon's shares may not be combined because "no evidence supports a claim of control." (ECF No. 252 at 18.) Accordingly, the competing expert reports establish a disputed question of material fact as to the relevant market share at issue here, and summary judgment must be denied on that issue.

As for the exclusionary conduct prong of the claim, Centura argues that Plaintiffs' evidence is insufficient to meet its burden. Specifically, Centura contends that neither its decision to cancel the transfer agreement with Kissing Camels, nor its efforts to require physician-investors in Kissing Camels to refer certain patients to Audubon for treatment, constitute exclusionary conduct under § 2. (ECF No. 228 at 33–34.) In response, Plaintiffs argue that the exclusionary conduct they allege is the entirety of the conspiracy to penalize physicians who refer patients to Plaintiffs and to ultimately put Plaintiffs out of business, not merely the specific decisions Centura cites. (ECF No. 243 at 35.) Even so, Plaintiffs argue, the cancellation of the patient transfer agreement constitutes exclusionary conduct: even though the agreement would have provided Centura with business by shuttling Kissing Camels' patients to Centura's hospital, it canceled the agreement for purely anticompetitive reasons, to protect Audubon from competition. (ECF No. 243 at 35–36; *see also* ECF No. 245-1 (Penrose COO referring to Kissing Camels as a "competitor" of Audubon and the hospital which has been "stealing surgeons from Audubon").)

The Court agrees with Plaintiffs and finds that they have presented sufficient evidence of exclusionary conduct for summary judgment purposes. While Centura correctly notes that the law does not require it to deal with a competitor (ECF No. 228 at 34 (citing *Four Corners*, 582 F.3d at 1223)), Plaintiffs' evidence of the alleged conspiracy discussed above can reasonably be interpreted to support a finding that Centura took actions intended to result in the exclusion of Plaintiffs from the market altogether. *See* Part III.A, *supra*. Therefore, the Court finds that Centura has failed to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law on Plaintiffs' attempted monopolization claim.

## C. Antitrust Injury

"An antitrust injury is defined as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997). "Antitrust injury" is not enumerated as an element of any of the Sherman Act claims discussed above, yet it is a necessary element of any antitrust claim. *See NYNEX Corp. v. Discon*, 525 U.S. 1278, 135 (1998) (a plaintiff in a § 1 claim must show harm to the competitive process); *Rural Tele. Serv. Co., Inc. v. Feist*, 957 F.2d 765, 768 (10th Cir. 1992) (holding that an antitrust injury is a necessary element of a § 2 claim); *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999) (claim under the Clayton Act requires that the plaintiff show an antitrust injury).

Centura argues that all of Plaintiffs' claims must fail for lack of antitrust injury because Plaintiffs have presented evidence only of injury to themselves as competitors,

not injury to competition itself. (ECF No. 228 at 35–36.) Centura cites numerous cases holding that because antitrust laws are intended to protect competition in the market as a whole, not individual competitors, a plaintiff's showing of injury to itself is insufficient. (*Id.* (citing cases from the 6th, 7th, and 9th Circuits).) *See also Four Corners*, 582 F.3d at 1225 (plaintiff "must show not only that he was harmed by [defendant]'s conduct, but that the injury he suffered involved harm to competition"); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 972 (10th Cir. 1994) ("[t]he Sherman Act ultimately must protect competition, not a competitor").

None of these cases, however, holds that a plaintiff's injury must be ignored in evaluating whether evidence of antitrust injury exists. Indeed, a plaintiff's injury alone can constitute antitrust injury under certain circumstances. *See Full Draw Prods.*, 182 F.3d at 254 ("We have no doubt that alleging the loss of one of two competitors in this case alleges injury to competition. . . . Because defendants' alleged boycott reduced a competitive market of two producers to a market of one monopolist, Full Draw quite clearly alleged substantial injury to competition from defendants' group boycott."). Thus, the Court may not, despite Centura's urging, grant summary judgment merely because Plaintiffs' principal showing of injury is to their own ability to compete; the Court must determine whether there is any evidence that competition has been harmed.

Here, as Centura accurately notes, Plaintiffs' expert did not analyze the performance of other competitors in Colorado Springs' ambulatory surgery market apart from Plaintiffs themselves. However, his report includes an analysis of that market and concludes that because it is highly concentrated, elimination of any of the Plaintiffs as

16

competitors would have a substantial negative impact on competition. (*See* ECF No. 243-3 at 7, 21–23.) While this is not as stark an impact as that in *Full Draw* and is not conclusive by any means, the Court finds that it is sufficient to defeat summary judgment, as evidence exists on which a jury could rely to find that competition as a whole has been harmed in the Colorado Springs market for ambulatory surgery services. Accordingly, the Motion must be denied as to antitrust injury.

## IV.  CONCLUSION

For the reasons set forth above, Defendant Centura Health Corporation's Motion for Summary Judgment (ECF No. 229) is DENIED.

Dated this 28th day of August, 2015.

BY THE COURT:

William J. Martinez
United States District Judge