# Exhibit 4

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-03012-WJM-NYW

---

VIDEOTAPE RULE 30(b)(6) DEPOSITION OF:
LISE STREIT - June 28, 2016
Kissing Camels Surgery Center, LLC

---

KISSING CAMELS SURGERY CENTER, LLC,
CHERRY CREEK SURGERY CENTER, LLC,
ARAPAHOE SURGERY CENTER, LLC, and
HAMPDEN SURGERY CENTER, LLC,

Plaintiffs-Counterdefendants,

v.

CENTURA HEALTH CORPORATION,
COLORADO AMBULATORY SURGERY CENTER ASSOCIATION, INC.,
ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE, INC.
d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF COLORADO,
UNITED HEALTHCARE OF COLORADO, INC., and
AETNA, INC.,

Defendants-Counterclaimants.

---

PURSUANT TO NOTICE, the videotape Rule 30(b)(6) deposition of LISE STREIT, Kissing Camels Surgery Center, was taken on behalf of the Defendant United Healthcare of Colorado, Inc., at 2 North Cascade Avenue, Suite 1300, Colorado Springs, Colorado 80903, on June 28, 2016, at 9:13 a.m., before Tina M. Stuhr, Registered Professional Reporter and Notary Public within Colorado.

H+G

Hunter+Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

Your Partner in Making the Record

www.huntergeist.com
scheduling@huntergeist.com

Court Reporting, Legal Videography, and Videoconferencing

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-03012-WJM-NYW

---

VIDEOTAPE RULE 30(b)(6) DEPOSITION OF:
LISE STREIT - June 28, 2016
Kissing Camels Surgery Center, LLC

---

KISSING CAMELS SURGERY CENTER, LLC,
CHERRY CREEK SURGERY CENTER, LLC,
ARAPAHOE SURGERY CENTER, LLC, and
HAMPDEN SURGERY CENTER, LLC,

Plaintiffs-Counterdefendants,

v.

CENTURA HEALTH CORPORATION,
COLORADO AMBULATORY SURGERY CENTER ASSOCIATION, INC.,
ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE, INC.
d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF COLORADO,
UNITED HEALTHCARE OF COLORADO, INC., and
AETNA, INC.,
Defendants-Counterclaimants.

---

PURSUANT TO NOTICE, the videotape Rule 30(b)(6) deposition of LISE STREIT, Kissing Camels Surgery Center, was taken on behalf of the Defendant United Healthcare of Colorado, Inc., at 2 North Cascade Avenue, Suite 1300, Colorado Springs, Colorado 80903, on June 28, 2016, at 9:13 a.m., before Tina M. Stuhr, Registered Professional Reporter and Notary Public within Colorado.

A P P E A R A N C E S

For the Plaintiffs:

ILZE C. THIELMANN, ESQ.
Whatley Kallas, LLP
1180 Avenue of the Americas
20th Floor
New York, New York 10036

For the Defendant Centura Health Corporation:
MELVIN B. SABEY, ESQ.
Hall, Render, Killian, Heath & Lyman
1512 Larimer Street
Writer Square, Suite 300
Denver, Colorado 80202

For the Defendant United Healthcare of Colorado, Inc.:

RICHARD B. BENENSON, ESQ.
Brownstein Hyatt Farber Schreck
410 Seventeenth Street
Suite 2200
Denver, Colorado 80202

For the Defendant Aetna, Inc.:
LAURA STURGES, ESQ.
Gibson, Dunn & Crutcher LLP
1801 California Street
Suite 4200
Denver, Colorado 80202

Also Present:

Rodney Hudson, Videographer

I N D E X

| EXAMINATION OF LISE STREIT: June 28, 2016 | PAGE |
|---|---|
| By Mr. Benenson | 11 |
| By Ms. Sturges | 277 |
| By Mr. Sabey | 377 |
| By Ms. Thielmann | 387 |

| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Counterclaimants' Updated Notice of Rule 30(b)(6) Deposition | 13 |
| Exhibit 2 | SurgCenter Development Coding, Billing and Collections Manual | 57 |
| Exhibit 3 | Acnwledgement [sic] | 64 |
| Exhibit 4 | E-mail to Chapman from Simmons, 10/24/2012, Subject: FW: KCSC need your help, with various e-mails attached | 96 |
| Exhibit 5 | E-mail to Snook and others from Auen, 12/27/2012, Subject: Updated Patient Responsibility Calc Worksheet | 107 |
| Exhibit 6 | E-mail to Streit from Serafin, 11/03/2013, Subject: FW: Questions, with e-mail attached | 116 |
| Exhibit 7 | E-mail to Serafin and others from Cox, 6/16/2014, Subject: Revised Fee Schedule/Coinsurance Calculation Process Documents | 122 |
| Exhibit 8 | Surgery Center Estimate of Patient Responsibility | 125 |
| Exhibit 9 | E-mail to Streit from Maddox, 4/30/2014, Subject: RE: Question, with e-mail attached | 126 |

| | | |
|---|---|---|
| Exhibit 10 | E-mail to Auen from Streit, 3/21/2014, Subject: RE: Kissing Camels MRN 10938, with various e-mails attached | 134 |
| Exhibit 11 | Letter to Physician from Reigel, 3/23/2012, Re: Notice of Material Change to Contract Revised to the Protocol for Providing Advance Notice to United Healthcare Members, with attachments | 142 |
| Exhibit 12 | E-mail to Cichon and others from Norris, 8/17/2011, Subject: RE: Non-Scheduled case log, with various e-mails attached | 153 |
| Exhibit 13 | E-mail to Norris from Simmons, 9/22/2011, Subject: RE: Surgery Payments, with e-mail attached | 156 |
| Exhibit 14 | E-mail to Ross and others from coloradosportsdoc@yahoo.com, 1/26/2012, Subject: Re: We did it! Daily, with various e-mails attached | 158 |
| Exhibit 15 | E-mail to Hammerstrom and others from Topper, 7/28/2012, Subject: Re: Dr. Conner OON Surgeries, with various e-mails attached | 169 |
| Exhibit 16 | E-mail to Chapman and Leventis from Auen, 9/28/2012, Subject: FW: United Healthcare, with various e-mails attached | 177 |
| Exhibit 17 | E-mail to Ogden from Mayuri, 7/17/2012, Subject: RE: Pt surgery on 7/23, with various e-mails attached | 185 |
| Exhibit 18 | E-mail to Ogden from Conner, 8/16/2012, Subject: Re: Pt Surgery w/implant 8/27, with various e-mails attached | 186 |
| Exhibit 19 | E-mail to Serafin from Conner, 1/26/2013, Subject: Re: Patient Scheduled? with e-mail attached | 188 |

85

A. Correct.

**Q. Okay. Thanks for working through that with me.**

**There's also this thing called coinsurance, right?**

A. Correct.

**Q. And typically you see coinsurance amounts that are different for in and out of network?**

A. Yes.

**Q. And typically the out-of-network coinsurance amount is more than the in-network coinsurance amount?**

A. Correct.

**Q. And as a policy matter, just like the out-of-network deductible, Kissing Camels doesn't collect the out-of-network coinsurance amount for its patients, true?**

MS. THIELMANN: Object to -- object to form.

A. Correct.

**Q. (BY MR. BENENSON) That's correct. And you've worked in this industry for a long time, do you have an understanding of why coinsurance may be more expensive for out of network versus in network?**

MS. THIELMANN: Object to form.

86

A. I have an understanding.

**Q. (BY MR. BENENSON) Would you share that with me?**

A. Because the insurer would like the patient to go to an in-network facility so that they can pay less.

**Q. So overall healthcare costs will be less because in network has contracts, which means it's certain, they know what the price is, right?**

A. Correct.

MS. THIELMANN: Object to form.

**Q. (BY MR. BENENSON) And so carriers are attempting to financially incentivize their patients to stay in network; isn't that fair?**

MS. THIELMANN: Object to form. Foundation.

**Q. (BY MR. BENENSON) As you understand it.**

A. I don't work for the carrier, but I would assume that that's what they want.

**Q. Okay. So when it comes to out-of-network financial responsibilities, as a matter of policy, your center does not collect from patients out-of-network deductibles or out-of-network coinsurance amounts, right?**

A. Correct.

87

MS. THIELMANN: Object to form.

**Q. (BY MR. BENENSON) Okay. Let's go in network. As a matter of policy, your center won't collect in-network deductible amounts where they don't cross-accumulate; isn't that true?**

A. Yes.

**Q. Does your center also have a policy that a patient has no other financial obligations for coinsurance if it has a co-pay obligation?**

A. Yes. If the policy is a co-pay only, we collect the co-pay.

**Q. But what if it's co-pay and coinsurance? Does your center have a policy that states that the center won't collect the coinsurance amounts from a patient if it has a co-pay obligation?**

A. No, that's not right.

**Q. You're not aware of that policy?**

A. No.

MS. THIELMANN: Object to form.

A. No.

**Q. (BY MR. BENENSON) So if a patient has both a co-pay obligation and a coinsurance obligation and an in-network remaining deductible and they come to your facility, if the in -- if the remaining in-network deductible doesn't cross-accumulate, you**

88

**don't collect that money, right?**

A. Correct.

**Q. But if the co-pay is there, you would still collect coinsurance?**

A. Yes, if that's their policy. It's pretty rare. I don't see co-pay and coinsurance together very often.

**Q. And you're pretty confident that there's no decision to not collect coinsurance when there's a co-pay?**

MS. THIELMANN: Object to form.

MR. BENENSON: That's a double negative. It wasn't good.

MS. THIELMANN: There's a lot going on there.

**Q. (BY MR. BENENSON) This is news to you that there might not be a coinsurance obligation if there's a copayment obligation?**

MS. THIELMANN: Object to form.

A. Whatever the patient's in-network benefits are, that's how we respond, so if there's a co-pay, they're charged the co-pay. If there would be coinsurance as well, we would collect that percentage.

**Q. (BY MR. BENENSON) Okay. And the statement you just said, let me -- you just said**

93

particular contract for in network and honoring those obligations --

**Q. So --**

A. -- the coinsurance, the co-pay, and the cross-accumulating deductibles.

**Q. Isn't it honoring most obligations? You don't honor the in-network deductible obligation if it doesn't cross-accumulate, right?**

A. Yes, that's just what I said. Yes.

**Q. Right. So when you say you honor in-network benefits, what you're really telling me is you honor most in-network benefits?**

MS. THIELMANN: Object to form.

A. Yes, to the best of our knowledge.

**Q. (BY MR. BENENSON) And, in fact, what you're telling me is that we ignore one in-network financial responsibility which is the financial responsibility to pay in-network deductibles where they don't cross-accumulate?**

A. Correct.

MS. THIELMANN: Object to form.

**Q. (BY MR. BENENSON) Right. And that's --**

MS. THIELMANN: I'm sorry, I didn't know you were done with your question.

THE DEPONENT: Oh, I thought -- okay.

94

**Q. (BY MR. BENENSON) And that's the policy today, is it not?**

A. Yes, it is.

**Q. And as far as you know that's been the policy since the beginning of time at Kissing Camels; isn't that true?**

A. As far as I know.

**Q. What is it about the phrase "honor in-network responsibilities" that should alert a carrier that Kissing Camels doesn't recognize or honor the financial obligation of patients to pay in-network deductibles when they don't cross-accumulate?**

MS. THIELMANN: Object to form.

A. What is it about that statement, is that what you're asking me?

**Q. (BY MR. BENENSON) How should United know you -- your position is that you tell the carriers that we do this, right?**

A. On the claim forms, yes.

**Q. And what does the claim form say?**

A. It says -- basically it says that Kissing Camels honors -- or -- what's the verbiage? Anyway, the idea of it is that we honor their in-network benefits. We reduce the rate to the patient to match their in-network benefits.

95

**Q. Right, but not always, right? There's one piece of it that you don't do as a matter of policy which is the in-network deductible if it doesn't cross-accumulate?**

A. That is correct.

**Q. Okay. So that -- that phrase about -- oh, sorry.**

MR. BENENSON: Good?

THE VIDEOGRAPHER: Yeah.

MR. BENENSON: Okay.

**Q. (BY MR. BENENSON) What is it about the phrase "we honor in-network obligations" that should alert a company like United or a company like Aetna to the fact that honoring in-network benefits actually means you don't collect in-network deductibles when they don't cross-accumulate?**

MS. THIELMANN: Object to form.

A. For what you're looking at, what you're asking, it can't. You can't make a statement that is all encompassing.

**Q. (BY MR. BENENSON) So how would United know that Kissing Camels isn't collecting in-network benefits when they don't cross-accumulate?**

A. They wouldn't know.

**Q. Just couldn't, right?**

96

A. No.

**Q. Not unless they looked at the file and saw the patient responsibility calculations and then understood, ah-ha, it's just coinsurance, right?**

MS. THIELMANN: Object to form.

A. Correct.

**Q. (BY MR. BENENSON) Thank you. And when you say patient's in-network benefits, what you really mean is the patient's in-network financial responsibilities; isn't that true?**

MS. THIELMANN: Object to form.

A. Correct.

**Q. (BY MR. BENENSON) So we'll explore that in a minute and I'll make it easier for you with a document.**

**(Deposition Exhibit 4 was marked.)**

MS. THIELMANN: May I have a copy, please.

MR. BENENSON: I'm sorry.

MS. THIELMANN: That's okay.

MR. BENENSON: I'm waiting for the caffeine to kick in. I'm just not --

MS. THIELMANN: Thank you.

MR. BENENSON: -- getting my usual bounce.

                                                               105

A. Okay.

**Q. And so as you explained in your deposition, United's insureds, just like Aetna's and Anthem's, they may have certain financial obligations, like paying deductibles, right?**

A. Correct.

**Q. And as you explained in your deposition, paying those deductibles in full is often a -- a condition of an insurance carrier paying its share of its obligations; isn't that right?**

MS. THIELMANN: Object to form.

A. That's correct.

**Q. (BY MR. BENENSON) Right. So you understand that United might have a genuine interest in understanding whether its patients were actually meeting their deductible financial obligations when it's making decisions about whether and how much to pay for any particular procedure?**

MS. THIELMANN: Object to form.

A. Yes.

**Q. (BY MR. BENENSON) That's not in any way shocking or provocative, right? That's just part and parcel of the healthcare system, isn't it?**

MS. THIELMANN: Object to form.

A. Yes.

106

**Q. (BY MR. BENENSON) It's a fundamental piece of the healthcare system, right?**

MS. THIELMANN: Object to form.

A. Yes.

**Q. (BY MR. BENENSON) Yeah, there are these financial checks and balances all over the place that are put in place to help maintain healthcare costs, right?**

MS. THIELMANN: Object to form.

A. Yes.

**Q. (BY MR. BENENSON) Would you describe the phrase "extend in-network benefits" to the patient in a way that's any way different than Bree Simmons did in October of 2012?**

A. Okay. Repeat that, please.

THE DEPONENT: Your job.

(The last question was read back as follows: "Would you describe the phrase 'extend in-network benefits' to the patient in a way that's any way different than Bree Simmons did in October of 2012?")

MS. THIELMANN: Object to form.

A. I couldn't describe it differently.

MR. BENENSON: Let's look at another document.

107

(Deposition Exhibit 5 was marked.)

MR. BENENSON: Getting better?

MS. THIELMANN: Yes. Thank you.

**Q. (BY MR. BENENSON) Ms. Streit, you've been handed what's been marked as Exhibit 5 to your deposition. Again, I will readily concede that this document was generated before your tenure at Kissing Camels, but I do want to ask you about the subject, which is "Patient Responsibility Calculation Worksheet." Are you familiar with that term?**

A. Yes.

**Q. Does Kissing Camels Surgery Center utilize a patient responsibility calculation worksheet?**

A. We do.

**Q. And it may not be this version, but it is some version that was provided by SurgCenter Development?**

A. Correct.

**Q. And you use that in the regular course of business every day for every case?**

A. We do.

**Q. Okay. Have you been trained on that particular worksheet?**

A. I've not been trained. My staff.

108

**Q. Okay. Do you understand that there are certain form -- well, let me take a step back.**

**It's an Excel spreadsheet?**

A. It is.

**Q. And I'm not going to profess to be an Excel expert, I don't know if you are, but do you understand that Excel spreadsheets can have built-in formulas for certain of the cells?**

A. Yes.

**Q. Are there built-in formulas to the patient worksheet that you're aware of?**

A. Yes, there would be.

**Q. Where are there built-in form -- well, strike that.**

**Is there a built-in formula on the cross-accumulation issue such that if the answer to whether the in and out-of-network benefits don't cross-accumulate -- if the answer to whether the in and out-of-network benefits cross-accumulate is no, then there's automatically a zero entered into the patient responsibility worksheet for in-network deductibles?**

MS. THIELMANN: Object to form.

A. I can't answer that a hundred percent. I believe that's true, but I haven't done it myself.

**Q. (BY MR. BENENSON) You have no reason to disagree with me, do you?**
A. No.
**Q. And so as a matter of course, if the selection on cross-accumulating is no, the patient obligation for in-network deductible is going to be zero?**
A. I would think that would be true.
**Q. Okay. When's the last time you recall receiving a patient calculation responsibility worksheet from SurgCenter?**
A. You mean the blank template? Is that what you're asking? Yes.
**Q. Yes.**
A. It's usually about April, about the time Medicare releases their rates.
**Q. And just so we're clear, if it's a matter of formula, right, the patient obligation for in-network deductibles is always going to be zero --**
MS. THIELMANN: Object --
**Q. (BY MR. BENENSON) -- right?**
MS. THIELMANN: Object to form.
A. Say it again, please.
**Q. (BY MR. BENENSON) It was a garbled question.**

A. I'm sorry.
**Q. It was bad. Let me strike that and try something else. We talked about the in-network deductibles --**
A. Yes.
**Q. -- and the formula. Let me focus on out-of-network deductibles. That number is always zero, right?**
A. Correct.
MS. THIELMANN: Object to form.
**Q. (BY MR. BENENSON) So never collect anything for out-of-network deductibles?**
A. Correct.
**Q. And never collect anything for in-net -- in-network deductibles where they don't cross-accumulate?**
A. Correct.
**Q. Okay. Are there any kinds of cases that you don't want at the center?**
MS. THIELMANN: Object to form.
A. Procedures?
**Q. (BY MR. BENENSON) Yeah. Is that different than cases?**
A. Well, a case is -- yes.
**Q. Okay. Procedures then. Are there any --**

A. No. No.
**Q. You want them --**
A. Okay.
**Q. -- all?**
A. Sorry.
**Q. We're talking over each other. Let me try again. Are there any procedures that you don't want at the center?**
MS. THIELMANN: Object to form.
A. Yes.
**Q. (BY MR. BENENSON) What are those?**
A. Any procedures that we don't have equipment for or are not capable of performing.
**Q. Is that the only limitation?**
A. For the most part, yes.
**Q. What about procedures that might not be profitable?**
A. We do every procedure even if it's zero pay.
**Q. Really?**
A. Yes.
**Q. And that's pursuant to the Never Say No policy?**
A. Pretty much.
**Q. But even under the Never Say No policy**

**isn't the practice to notify docs that the procedure might lose money?**
A. We try. I have to admit, we're not very good at it.
**Q. But the goal is to weed out cases that would be a drag on profitability?**
MS. THIELMANN: Object to form.
A. No, not with us.
**Q. (BY MR. BENENSON) Why is that?**
A. Because we understand that the physician and our first concern is patient care, so even if it's going to be a zero pay, we take it.
**Q. What about HMO cases?**
A. Yes, we would take that.
**Q. What about high deductible cases?**
A. We would take that.
**Q. And as we sit here today, you can't think of any examples in the last couple months where someone from your staff notified a doctor that he or she might want to consider taking that somewhere else --**
A. Yes.
**Q. -- because --**
A. Yes.
**Q. So I understand the Never Say No policy**

201

13:52:36 **Q. And there are higher amounts, right, for the deductible?**
13:52:40 A. Yes.
13:52:40 **Q. And there are separate deductible amounts that are met for out of network; is that right?**
13:52:46 A. Yes.

202

13:53:38 A. Yes.

203

204



[redacted]

[redacted]

**Q. (BY MR. BENENSON) And this is an example of the policy that we talked about earlier where, as a matter of policy, in-network deductibles are not collected when they don't cross-accumulate?**

MS. THIELMANN: Object to form.

**Q. (BY MR. BENENSON) Is that correct?**

A. Correct.

**Q. And how can you tell in this particular**

**instance if the deductible does or does not cross-accumulate?**

A. If it did, they would put C/A in their explanation of benefits.

**Q. Okay. So this is really just a plain vanilla example of the policy that provides, Kissing Camels is not going to collect in-network deductible amounts when they don't cross-accumulate?**

MS. THIELMANN: Object to form.

A. Well, you can't deduce that by this here.

**Q. (BY MR. BENENSON) Well, that's why I have you.**

A. Yes, it is. And, again, that is correct.

**Q. Okay. And this policy was in effect as early as July 2010, according to these notes and the patient's date of service?**

MS. THIELMANN: Object to form.

A. Yes, I believe so.

**Q. (BY MR. BENENSON) And you believe that's been the -- the consistent policy throughout?**

A. I have no reason to believe otherwise.

**Q. Done with that one. Let's look at another example. My esteemed colleague.**

A. I see that.

MS. THIELMANN: So we're not done with

this one.

MR. BENENSON: I apologize. I misspoke.

MS. THIELMANN: Laura.

MR. BENENSON: We are -- we are not done with this one quite yet.

**Q. (BY MR. BENENSON) So if you look at the third page, it looks like there's -- there is a singular CPT code. You see where -- the big three letters that say CPT?**

A. Yes.

**Q. There's one code there, right?**

A. Yes.

**Q. Turn with me to the last page. That lists two CPT codes, does it not?**

A. It does.

**Q. Do you know why that is?**

A. Yes, I do.

**Q. Why is that?**

A. Because they used the C-arm in that procedure. Fluoroscopy is use of the imaging equipment.

**Q. Thank you.**

A. You're welcome.

**Q. Is anything done to adjust the coinsurance amount owed if there's an additional CPT**

209

**code that incurs additional charges?**
A. Not in this case, no.
**Q. Is there a policy about that?**
A. No.
**Q. Isn't it true that there is no efforts made to recalculate a coinsurance amount if additional -- if the estimated allowable total number actually increased after the procedure?**
MS. THIELMANN: Object to form.
A. That is correct.
[redacted]
**Q. Right. And there's no efforts made to collect additional coinsurance dollars from patients if the actual -- I'm sorry, if the estimated allowable goes up as a result of what actually happens in the procedure?**
A. That's true.
**Q. And that's true in July of 2010 and that's true today, right?**
A. Correct.
MS. THIELMANN: Object to form.
**Q. (BY MR. BENENSON) Now I have nothing**

210

**further with that document.**
A. Good.
MS. THIELMANN: Mel?
MR. BENENSON: She's calling you out, I think.
MS. THIELMANN: I was asking whether you were going to make him ask more questions about that.
MR. SABEY: Oh, I see.
**Q. (BY MR. BENENSON) Let's look at another example.**
A. Okay.
(Deposition Exhibit 25 was marked.)
A. And then they think I've had time to read it.
**Q. Ms. Streit, does this document or set of documents comprised of Exhibit 25 look familiar?**
A. Yes.
**Q. This is another claim file. Is that a fair descriptor?**
A. Yes.
**Q. Okay. Let's do a similar exercise, and I think the place to focus, again, is on the first and the fourth page. So let's walk through this patient's benefits first so we're on the same page. This is, again, a United Healthcare patient?**

211

A. Yes.
**Q. This patient has both in and out-of-network benefits, correct?**
A. Correct.
[redacted]

212

[redacted]
**Q. Why don't you take a minute and see if you can help me understand that.**
A. Hmmm.
**Q. Any idea?**
A. Close.
**Q. Let's discuss. Tell me, what do you think?**
A. Okay. Looking at the worksheets, the CPT code that --



**Q. But -- but telephone and television, I assume, are not costs that are billed directly to a patient?**
A. No.
**Q. So in AdvantX I could see for a particular procedure, for a particular patient when and what they paid, correct?**
A. Correct.
**Q. When and what the insurance company paid?**
A. Correct.
**Q. When and what the insurance company was billed?**
A. Correct.
**Q. When and what the patient was billed?**
A. No.
**Q. And that's part of my confusion. I think we talked about this with Mr. Benenson.**
A. Yeah.
**Q. There's the calculation of patient responsibility, right, but you were saying that that might be different than what they ultimately get billed?**
MS. THIELMANN: Object to form.
A. Okay. So a patient gets a statement. What the patient sees on the statement you can't see

in AdvantX. You can see the patient payments, but I never know what their statement is month to month to month. It will give me a patient balance --
**Q. (BY MS. STURGES) Um-hum.**
A. -- and I can always see the balance.
**Q. But no itemized basis for that balance?**
A. That comes on a statement.
**Q. Why don't you see those statements?**
A. Because that's the billing company's responsibility.
**Q. Does the billing company have access to those?**
A. Yes.
**Q. So when the billing company pulls the claim file and we request the claim file, for example, in this particular litigation and the billing company has to access that information, they would be able to provide what the client -- what the patient saw --**
A. Yes.
**Q. -- what the patient's statement is?**
**So where would -- where would the provider -- where would an insurance company, a payer, ever see the 1.5 allowable rate to charge for a patient?**
MS. THIELMANN: Object to form.

A. Why would they be allowed to do that or want to do that?
**Q. (BY MS. STURGES) To know what their patient was being charged.**
A. Right. That's not a standard request.
**Q. If they made that request, where would they be able to see that?**
A. Well, the patient responsibility sheet reflects that.
**Q. And when does the payer see the patient responsibility sheet?**
A. Well, you requested it.
**Q. In this litigation?**
A. Yes.
**Q. So outside the scope of this litigation --**
A. Okay.
**Q. -- when would an insurance company see the calculation of patient responsibility?**
A. You wouldn't. That's not something standard to send.

**Q. I have seen those, but I have not seen something that shows what the insurance company was charged that went to the patient, but I have some examples. Maybe you can show me where that is because that would be very helpful to see.**
A. Okay.
**Q. But my understanding from what you're saying right now is that the patient gets -- when the patient gets a statement that you were saying you don't see but the billing company sees, that statement explains this is what was charged to your insurance**

341

16:44:27 A. I don't know.
16:44:29 **Q. (BY MS. STURGES) But it might have been?**
16:44:32 A. The sky might be blue today. It might not.
16:44:36 **Q. Excellent. Let's turn to -- the next exhibit is -- what am I missing here? It's hiding. There it is.**
16:45:16 **(Deposition Exhibit 57 was marked.)**
16:45:23 **Q. Okay. This is an e-mail from Susan Ogden at Kissing Camels to Dr. Yohanan. Do you see that?**
16:45:31 A. Yes.
16:45:33 **Q. And her second sentence there, I think, is exactly what you and Mr. Benenson went through this morning. "According to SurgCenter Development, when the patient does not have a crossover deductible, we DO NOT charge a deductible at all. We only charge the in-network copay or coinsurance if the patient has one." Did you read that?**
16:45:52 A. Yes.
16:45:52 **Q. Do you agree with that?**
16:45:54 A. Yes.
16:45:54 **Q. That's Kissing Camels' policy today as well?**
16:45:55 A. Yes.
16:45:55 **Q. And that's according to SurgCenter**

342

16:45:56 **Development?**
16:45:58 MS. THIELMANN: Object to form.
16:46:00 **Q. (BY MS. STURGES) At the time it was?**
16:46:01 A. That's according to this e-mail.
16:46:03 **Q. If you turn the page, and I'm happy to give you time if you'd like to -- to familiarize yourself with this e-mail chain, but I can represent to you, as you see, it's talking about out-of-network deductibles, and I'm interested in the e-mail that starts at the bottom of Page 2 from Susan to Dr. Yohanan again. If you just wouldn't mind reading that.**
16:46:58 A. Okay.
16:46:58 **Q. Why does Kissing Camels tell patients to ignore their EOB from their insurance company?**
16:47:03 MS. THIELMANN: Object to form.
16:47:11 A. Because the EOB states what their out-of-network calculation is, and because we honor in-network, their out-of-network numbers would be different.
16:47:28 **Q. (BY MS. STURGES) The EOB -- explanation of benefits, right?**
16:47:32 A. Correct.
16:47:33 **Q. -- is describing a contractual relationship between the patient and the insurance**

343

16:47:36 **company?**
16:47:37 MS. THIELMANN: Object to form.
16:47:38 A. Yes.
16:47:39 **Q. (BY MS. STURGES) And Kissing Camels tells patients to ignore that --**
16:47:44 MS. THIELMANN: Object to form.
16:47:45 **Q. (BY MS. STURGES) -- correct?**
16:47:48 A. Not in that context.
16:47:50 **Q. In this context?**
16:47:54 A. She is saying don't worry about what it says on your EOB.
16:48:00 **Q. And she says, Kissing Camels tells patients the insurance is just letting you know what your -- that your out-of-network benefits have been accessed -- accessed?**
16:48:11 A. Correct.
16:48:11 **Q. So explaining to the patient what its contract with its payer is?**
16:48:17 MS. THIELMANN: Object to form.
16:48:20 **Q. (BY MS. STURGES) Excuse me.**
16:48:21 A. Are you asking me if the EOB is explaining to the patient what their contract -- how their contract --
16:48:28 **Q. I'm asking whether Kissing Camels tells patients what the EOB means.**

344

16:48:37 A. Today, in this e-mail, or ever?
16:48:39 **Q. All three.**
16:48:45 A. Okay. In this e-mail, she is saying not to worry about what you read on your EOB.
16:48:54 **Q. Okay. And today you still tell patients not to worry about that, yes?**
16:49:01 A. No. We don't usually have this kind of discussion.
16:49:04 **Q. Well, if you did, if a patient came with a concern about what their EOB says, what would you tell them?**
16:49:11 A. I would not tell them don't worry about your EOB.
16:49:14 **Q. Why not?**
16:49:15 A. Well, because that's part of their insurance. EOBs are important.
16:49:20 **Q. Right. It's between the patient and the payer?**
16:49:22 A. Yes.
16:49:23 MS. THIELMANN: Object to form.
16:49:24 **Q. (BY MS. STURGES) And she's -- she's interpreting that for the patient?**
16:49:27 MS. THIELMANN: Object to form.
16:49:28 A. I don't know what she's doing.
16:49:29 **Q. (BY MS. STURGES) But that's what she's**

349

16:54:18 A. Yes.
16:54:20 **Q. And the out-of-network co-pay has also**
16:54:23 **been met and deductible it says, right?**
16:54:27 A. Correct.
16:54:28 **Q. I just have a question on this. It**
16:54:31 **says -- it shows the Medicare allowable charges all**
16:54:37 **are zeros. Why would that be?**
16:54:42 A. I don't know. Maybe Medicare doesn't
16:54:45 allow that procedure.
16:54:47 **Q. The CPT code --**
16:54:49 A. Correct.
16:54:50 **Q. -- that is listed?**
16:54:51 A. That might be one of their procedures
16:54:52 that they say, No, we're not paying for it.
16:54:55 **Q. What about at the bottom, do deductibles**
16:55:00 **cross-accumulate, it says no?**
16:55:03 A. It does say no.
16:55:06 **Q. Why would it say no?**
16:55:07 A. The only reason I can figure out why they
16:55:10 would put no in there is because they had been met.
16:55:15 **Q. Right. And so if you put in the**
16:55:17 **deductible of in network and what was paid and what's**
16:55:21 **remaining, you could see that, right?**
16:55:23 A. Correct.
16:55:24 **Q. And they didn't do that?**

350

16:55:26 A. They did not.
16:55:26 **Q. And you don't know why they don't do**
16:55:27 **that?**
16:55:28 A. I do -- no.
16:55:29 MS. THIELMANN: Object to form.
16:55:29 A. No.
16:55:30 **Q. (BY MS. STURGES) Does anyone audit**
16:55:32 **these?**
16:55:34 A. This is 2012. I -- I don't know.
16:55:36 **Q. Today does anyone audit calculation**
16:55:38 **patient responsibility sheets?**
16:55:42 A. On a daily basis, no.
16:55:44 **Q. On some basis?**
16:55:45 A. SurgCenter Development.
16:55:47 **Q. Some -- periodically? Do you know? I'm**
16:55:50 **asking if this is --**
16:55:51 A. I don't know for a hundred percent.
16:55:53 **Q. Whether they review it?**
16:55:54 A. Correct.
16:55:54 **Q. Is it compared to a patient's bill?**
16:55:57 MS. THIELMANN: Object to form.
16:55:59 A. Is this figure compared to a patient's
16:56:03 bill? Not that I'm aware.
16:56:06 **Q. (BY MS. STURGES) The patient receives**
16:56:07 **this on the date of service --**

351

16:56:09 A. Correct.
16:56:09 **Q. -- is that correct?**
16:56:09 A. Correct.
16:56:27 (Deposition Exhibit 60 was marked.)
[redacted]

352

[redacted]
16:58:14 **Q. And it looks like they have more service**
16:58:16 **codes than the one that was listed for the calculation**
16:58:18 **of patient responsibility?**
16:58:20 A. Yes.
16:58:21 **Q. And so your explanation for that would be**
16:58:23 **that the physician ended up performing more procedures**
16:58:27 **during the surgery than anticipated?**
16:58:29 A. Correct.
16:58:31 **Q. And do those other procedures get billed**
16:58:34 **back to the patient?**
16:58:37 A. We don't bill patients. We bill

353

16:58:39 insurance companies.
16:58:42 **Q. Does the patient pay its contractual**
16:58:46 **responsibilities on the additional procedures that**
16:58:48 **occur after the calculation of patient responsibility?**
16:58:52 A. Their --
16:58:52 MS. THIELMANN: Object to form.
16:58:52 A. -- coinsurance.
16:58:55 **Q. (BY MS. STURGES) Their coinsurance or**
16:58:57 **their deductible if it applies?**
16:58:58 A. No.
16:59:00 **Q. Let's go to --**
16:59:14 **(Deposition Exhibit 61 was marked.)**
16:59:21 **Q. We've got a couple on here. Let's go to**
16:59:25 **7040.**
16:59:37 A. Hold on. Okay.
16:59:40 **Q. And it says this is a MultiPlan contract.**
16:59:44 **Do you see that or indicates that this is an Aetna**
16:59:50 **patient --**
16:59:50 A. Yeah.
16:59:50 **Q. -- but coming through MultiPlan, correct?**
16:59:52 A. Through MultiPlan, um-hum.
[redacted]

354

[redacted]
17:00:03 **Q. And then it says a few lines down with a**
17:00:06 **couple stars, "deductibles cross-apply," right?**
17:00:09 A. Yes.
17:00:10 **Q. But look at her sheet at the bottom where**
17:00:13 **it says "in-network deductible" and zero is listed,**
17:00:17 **right?**
17:00:17 A. Yes.
17:00:18 **Q. And paid is listed as zero, correct?**
17:00:25 A. Are we seeing the same thing?
17:00:27 **Q. This box here (indicating). I'm looking**
17:00:30 **at the in-network deductible and paid and remaining.**
17:00:34 A. Oh, I see where you are. Okay. It says
17:00:36 zero, yeah.
17:00:37 **Q. It does say that the deductibles**
17:00:39 **cross-accumulate, which is accurate, right?**
17:00:42 A. It does.
17:00:43 **Q. And that -- but that leads to a zero in**
17:00:45 **the deductible owed because someone put zero in the**
17:00:48 **in-network and out-of-network boxes for that, correct?**
17:00:51 A. It looks as though, yes.
17:00:52 **Q. But that's not right?**
17:00:55 A. Not according to this.
17:00:56 **Q. So there was no deductible collected for**
17:00:58 **this patient?**

355

17:01:00 A. At time of service, that's correct.
17:01:02 **Q. Let's go to the last page of her exhibit,**
17:01:08 **his exhibit, the patient's exhibit. I will be careful**
17:01:11 **not to . . .**
17:01:13 **So the same patient, and you see the**
17:01:16 **notes up above, deductibles cross-apply? You see**
17:01:21 **that, right?**
17:01:21 A. Yes.
17:01:22 **Q. How about the deductible box? What does**
17:01:23 **it say --**
17:01:23 A. It is --
17:01:23 **Q. -- about them cross-accumulating?**
17:01:23 A. -- zero.
17:01:25 **Q. And what does it say for**
17:01:26 **cross-accumulation?**
17:01:28 A. It says no.
17:01:29 **Q. So was there any deductible collected for**
17:01:32 **this patient for this procedure?**
17:01:33 A. Not at time of service, no.
17:01:35 **Q. And deductibles cross-applied?**
17:01:39 A. Yes.
17:01:40 **Q. So in-network deductible was not**
17:01:42 **collected?**
17:01:43 A. Correct.
17:01:44 **Q. Neither was out-of-network?**

356

17:01:46 A. Correct.
17:01:49 **Q. Let's go to . . .**
17:02:02 **(Deposition Exhibit 62 was marked.)**
17:02:13 **Q. If you look at the page with the**
17:02:14 **handwritten notes at the bottom, it ends 7119. It**
17:02:23 **looks like these are the notes from, I assume, the**
17:02:26 **insurance verifier?**
17:02:27 A. Yes.
17:02:28 **Q. And you see what it says about an**
17:02:30 **in-network deductible?**
17:02:35 A. Yes.
17:02:36 **Q. What is that?**
17:02:40 A. That wouldn't make sense. $1,510.24.
17:02:44 **Q. Well --**
17:02:45 A. That doesn't make sense.
17:02:47 **Q. What I read, and you can tell me if I'm**
17:02:49 **wrong, I read this as a $2,500 family plan**
17:02:53 **cross-accumulating deductible and $1,510.24 has been**
17:02:59 **met.**
17:03:00 A. I agree with that.
17:03:01 **Q. Okay. So if we turn to the calculation**
17:03:05 **of patient responsibility, you look above, and it**
17:03:08 **basically lays that out again, $2,500**
17:03:09 **cross-accumulating deductible, right?**
17:03:13 A. Yes.

357

**Q. And then somebody writes, "Do deductibles cross-accumulate," and the answer is?**
A. No.
**Q. And so was any deductible collected?**
A. No.
**Q. But a deductible was owed?**
MS. THIELMANN: Object to form.
A. According to this calculation, yes.
**Q. And they were charged for two different procedures, whereas, there's only one CPT code listed here, correct?**
A. Correct.
**Q. This patient did not pay a deductible on this particular CPT code and was not then charged any benefit responsibilities for the second procedure either, correct?**
A. Correct.

358

MS. THIELMANN: Object to form.
(Deposition Exhibit 63 was marked.)
MS. THIELMANN: Do we have many more of these patient files to go through?
MS. STURGES: We have one, two, three, four. Four.
MS. THIELMANN: Okay. Well, I'm just going to object because I think it's becoming sort of cumulative testimony.
MS. STURGES: Well, I think there will be some new stuff. Maybe that will be exciting.
**Q. (BY MS. STURGES) Let's turn to the calculation of patient responsibility on this one, which is the last page. And you see in the benefits comments, it says, "cross-accumulating deductibles," correct?**
A. Yes.
**Q. And she's not met her in-network -- or he or she has not met their in-network deductible, correct?**
A. Correct.
**Q. And in the bottom portion of this chart, do duct -- do deductibles cross-accumulate, the answer is yes, correct?**
A. Yes, it is.

359

**Q. But zero deductible is owed. Why is that?**
A. It looks like the formula is not calculating.
**Q. It looks to me like somebody put in zero for an in-network and out-of-network deductible.**
A. Yes.
**Q. So I think that the formula might have calculated correctly, but it looks like somebody put in zero instead of putting in what the actual deductible would be, right?**
A. Yes.
MS. THIELMANN: Object to form.
**Q. (BY MS. STURGES) And so this patient also did not pay an in-network deductible for this procedure?**
A. That's correct.
**Q. And they did cross-accumulate?**
A. That's correct.
(Deposition Exhibit 64 was marked.)

360



361

**Q. But there is nothing listed under deductible owed.**
A. I agree with that.
**Q. So deduc -- Kissing Camels did not collect a deductible for this patient?**
A. It does not appear so.
**Q. In network or out of network?**
A. It does not appear so.

**Q. (BY MS. STURGES) You have a better sheet than I have. Mine is --**
MS. THIELMANN: And I have the same thing as the witness.
**Q. (BY MS. STURGES) Well, I will apologize on the EOB. You have the wrong -- this is not the one that matches this particular patient, because it's been redacted too, so that was probably just an error**

362

**in putting the claim files together. So we will not look at the EOB sheet for this one and just look at the failure to collect cross-accumulating deductibles for this particular patient. Thank you for being good at reading your document.**
**Okay. Almost done. What did I do? Did we do those ones already? We did. Okay.**
**(Deposition Exhibit 66 was marked.)**

**Q. And -- let's see. What was my question on this one? Excuse me. Well, my question to this was not based on the deductibles. Excuse me. It was just on the charges to Aetna on the EOB, which I'm not totally convinced we didn't screw up now, so let me take a look at what yours is. That's correct, which is great.**
**You see that there are four service codes listed for the charges to Aetna. There's one for him on his calculation of patient responsibility, correct?**

363

A. I see two charges to Aetna.
**Q. You see the -- the PL rather than service codes themselves?**
A. I see two charges to Aetna.
**Q. I'm looking at the -- do you see the number of services, one, two, three, four? Well, one, one, one, and one.**
A. There's two charges. Regardless --
**Q. I see you submitted --**
A. Regardless of how many revenue codes you're looking at --
**Q. Okay.**
A. -- there's two charges for two procedures.
**Q. And one procedure listed on his calculation of patient responsibility?**
A. Yes.

364

**Q. Next exhibit and our last billing example.**
**(Deposition Exhibit 67 was marked.)**
**Q. We're just going to go to the very last page -- well, I think -- is it the last page for you? Yeah, last page, calculation of patient responsibility. Medicare allowable rate there is $1,045.85. Do you see that?**
A. Yes.



**Q. You testified about your understanding that payers like United and Aetna were not interested in contracting with Kissing Camels, but Mr. Benenson showed you some documents that showed otherwise, correct?**

A. He --

MS. THIELMANN: Object to form.

A. He did.

**Q. (BY MS. STURGES) Do you have any reason to think that that is not true with Aetna as well?**

MS. THIELMANN: Object to form.

A. I don't know.

**Q. (BY MS. STURGES) Do you think Aetna has wanted to be in network with Kissing Camels?**

MS. THIELMANN: Object to form.

A. I don't know.

**Q. (BY MS. STURGES) No basis?**

A. No basis.

**Q. Let's look at . . .**

**(Deposition Exhibit 68 was marked.)**

**Q. If you go to the very earliest e-mail in the back from 2012, Dottie was the administrator at the time; is that right?**

A. Looks like, yes.

**Q. And she's writing to Jamison Pearlman. Do you know who he is?**

A. No.

**Q. If you look up there, the top of that page, his signature block, vice president of revenue cycle management at SurgCenter Development. I don't know what that -- something to do with money, I guess. And do you know who Christine Merryman is?**

A. Yes.

**Q. Who's she?**

A. She is with SurgCenter Development.

**Q. And so is Emily McCarthy. We already talked about her.**

A. Yes.

**Q. And are those people that you reach out to sometimes?**

A. Chris Merryman.

**Q. Chris Merryman. What about Emily?**

A. No.

**Q. Dottie says to Jamie, "Aetna is calling to discuss contracting with Kissing Camels," and gives the contact information. If you got a call like that, is that what you would do is forward it to SurgCenter Development?**

MS. THIELMANN: And I'm going to object again. This is outside the scope of the subjects on the 30(b)(6) for which this witness has been propounded.

A. Please repeat the question.

MS. STURGES: Tina, do you mind?

(The last question was read back as follows: "Dottie says to Jamie, 'Aetna is calling to discuss contracting with Kissing Camels,' and gives

the contact information. If you got a call like that, is that what you would do is forward it to SurgCenter Development?")

A. Considering the circumstances of today, I would have probably done that, today.

**Q. (BY MS. STURGES) But if it was a different payer who was not involved in litigation, you would handle it at the center?**

A. I have --

MS. THIELMANN: Object to form.

A. -- been.

**Q. (BY MS. STURGES) At the bottom e-mail, at the bottom of Page 1, Jamison Pearlman writes back to Dottie and including Chris -- Chris Merryman and Emily and says, "Thank you...I will make sure to reach out to Bonita." Do you have any reason to know whether anyone at SurgCenter Development has reached out to anyone at Aetna about contracting?**

A. I don't know.

MS. THIELMANN: Same objection. What is our time on the record, please?

THE VIDEOGRAPHER: 6 hours 33 minutes.

THE DEPONENT: Is there a time limit?

MS. THIELMANN: Yes, seven hours.

THE DEPONENT: Thank you.