# Exhibit 4

# Exhibit A

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLORADO
 3                        - - -
 4
     KISSING CAMELS SURGERY CENTER,   )
 5   LLC, CHERRY CREEK SURGERY        )Civil Action No.
     CENTER, LLC, ARAPAHOE SURGERY    )12-cv-03012-WJM-
 6   CENTER, LLC and HAMPDEN SURGERY  )NYW
     CENTER, LLC,                     )
 7                                    )
                  Plaintiffs,         )
 8                                    )
         vs.                          )
 9                                    )
     CENTURA HEALTH CORPORATION,      )
10   COLORADO AMBULATORY SURGERY      )
     CENTER ASSOCIATION, INC., ROCKY  )
11   MOUNTAIN HOSPITAL AND MEDICAL    )
     SERVICE, INC., d/b/a ANTHEM      )
12   BLUE CROSS AND BLUE SHIELD OF    )
     COLORADO, UNITEDHEALTHCARE OF    )
13   COLORADO, INC., and AETNA,       )
     INC.,                            )
14                                    )
                  Defendants.         )
15
16                        - - -
17              Videotape Deposition of
            STEPHEN FOREMAN, PH.D., JD, MPA
18             Monday, October 10, 2016
19                        - - -
20       The deposition of STEPHEN FOREMAN, PH.D., JD,
     MPA, called as a witness by the Defendant Aetna,
21   pursuant to notice and the Federal Rules of Civil
     Procedure pertaining to the taking of depositions,
22   taken before me, the undersigned, Barbara Metz Leo,
     a Notary Public in and for the Commonwealth of
23   Pennsylvania, at the offices of Jones Day, 500
     Grant Street, Suite 4500, Pittsburgh, Pennsylvania
24   15219, commencing at 9:00 a.m., the day and date
     above set forth.
25
```

Page 1

```
 1                 MR. BROWN:  Object to form.
 2        A     No.
 3        Q     Are you offering an expert opinion that
 4   any conduct by any of the defendants caused any of
 5   the plaintiff ASCs to serve fewer patients?
 6                 MR. BROWN:  Object to form.
 7        A     No.
 8        Q     Are you offering an expert opinion that
 9   any conduct by any of the defendants caused any of
10   the plaintiff ASCs to earn any less money?
11                 MR. BROWN:  Object to form.
12        A     No.
13        Q     Are you offering an expert opinion that
14   any conduct by any of the defendants caused any of
15   the plaintiff ASCs to be at risk of going out of
16   business?
17                 MR. BROWN:  Object to form.
18        A     Would you read that question again,
19   please?
20        Q     Are you offering any -- are you offering
21   an expert opinion in this case that any conduct by
22   any of the defendants caused any of the plaintiff
23   ASCs to be at risk of going out of business?
24                 MR. BROWN:  Object to form.
25        A     No.
```

Page 37

```
 1              Do you see that sentence?
 2       A      I do.
 3       Q      What do you mean by "if the conspiracy
 4   had succeeded"?
 5       A      What I mean there is if the defendant --
 6   the alleged conspiracy had deprived plaintiffs of
 7   all of their private commercial insurance cases.
 8       Q      And how would that have happened?
 9       A      Excuse me?
10       Q      How would the defendants have deprived
11   the plaintiffs of all of their commercially insured
12   cases?
13       A      By driving the physicians who referred to
14   the facility -- by incentivizing -- driving is a
15   bad word.  By forcing, in a sense, the physicians
16   who referred to these facilities to send their
17   patients in-network.
18       Q      Were all commercial insurers part of the
19   alleged conspiracy?
20       A      Most of them were.  One or two of the
21   smaller ones may not have been, but it's the same
22   doctors.
23       Q      Did that actually happen, that the
24   alleged conspirators deprived the plaintiff ASC of
25   all of their commercial revenue?
```

Page 42

```
 1       A    No.
 2       Q    Have you seen any evidence to indicate
 3  that there was any material risk that the ASCs --
 4  that the plaintiff ASCs would be deprived of all of
 5  their commercial revenue?
 6       A    The charts starting on page 90 of my
 7  first report.
 8       Q    Okay.  Which charts?
 9       A    Figure 34 on page 90, figure 35 on page
10  91, figure 36, page 92.
11       Q    Let's go one by one.  How does figure 34
12  show you that there was a material risk that the
13  plaintiff ASCs would be deprived of all their
14  commercial revenue?
15       A    Well, you see the growth pattern between
16  July and March, July 2012?  ████████████████████
17  ████████████████████████████████████████████████
18       Q    You're talking about Kissing Camels?
19       A    Kissing Camels cases per month.
20       Q    You've actually done an update to that
21  data though, haven't you, that shows you case flow
22  through September of 2014, Dr. Foreman?
23       A    That's correct.
24       Q    And what happens to Kissing Camels cases
25  per month between the fall of 2013 when your prior
```

Page 43

```
 1   Dry Creek's cases per month.
 2            You show us a chart on page 12; isn't
 3   that correct?
 4        A    Correct.
 5        Q    It says Dry Creek cases per month.
 6        A    Yes.
 7        Q    This chart on page 12 does not show an
 8   appreciable downward trend from, say, the beginning
 9   of 2013 through the end of 2014; is that correct?
10        A    Once again, I think it levels off
11   basically.  It may come up even a little.
12        Q    So -- I'm sorry?
13        A    It may even increase a little.
14        Q    So your updated data doesn't show any
15   appreciable risk that Dry Creek cases per month is
16   going to drop to the point where they have no
17   commercial revenue at all, does it?
18        A    They have commercial revenue here.  In
19   terms of risk, I just don't know.
20        Q    In fact --
21        A    That's not my testimony that they have
22   risk.
23        Q    It's not your testimony they have risk.
24   In fact, in the data that you've examined in your
25   updated report, you show that each of the four
```

Page 47

```
 1   plaintiff ASCs has a substantial proportion of
 2   their caseload and substantial revenue from
 3   commercial insurers in all periods that you've
 4   studied; isn't that correct?
 5           MR. BROWN:  Object to form.
 6      A    That's correct.
 7      Q    If there were a risk that the plaintiff
 8   ASCs would lose all commercial revenue by virtue of
 9   their out-of-network status if the insurers were
10   cutting off all patients from going out-of-network,
11   could the plaintiff ASCs have mitigated that risk
12   by entering into a network contract?
13      A    Yes.
14           MR. BROWN:  Object to form.
15      Q    I'm sorry?
16      A    Yes.
17      Q    Are you aware that the plaintiff ASCs had
18   network contract offers on the table for most of
19   your alleged damage period from both Aetna and
20   United?
21      A    I believe I read that in an Aetna
22   deposition for Aetna.  United, I don't know.
23      Q    At least for Aetna, you're aware that
24   there was -- that Aetna had attempted to enter into
25   a network contract with the plaintiff ASCs?
```

Page 48

```
 1        A     I don't know.
 2        Q     Are you aware of any physician who left
 3   the plaintiff ASCs because of the alleged unlawful
 4   conduct of the defendants?
 5        A     I'm not aware of any.
 6        Q     In paragraph 27, the last sentence of
 7   that paragraph in your rebuttal report, you say,
 8   "Plaintiffs also filed this lawsuit which may have
 9   reduced patient losses."
10              Do you see that?
11        A     I do.
12        Q     What do you mean by that sentence?
13        A     I think that by virtue of bringing the
14   lawsuit, some physicians who might have been
15   deterred from putting patients in these centers
16   might have been given some incentives to continue
17   to refer, to refer more.
18        Q     Have you seen any evidence of that
19   effect?
20        A     No.  It's all mixed together.
21        Q     I'm trying to understand if that's a
22   conclusion you've reached based on analysis of
23   evidence or if that's more of a hypothesis.
24        A     It's more of a hypothesis.  You asked me
25   of any other factor.  I went there.
```

```
 1        Q    You're saying it was more of a
 2   theoretical discussion about the likelihood of
 3   impacting investors?
 4        A    I think you could call it theoretic.
 5        Q    In fact, during the period that you
 6   studied in this case, you've observed that Surge
 7   Center has consistently, throughout this period,
 8   expanded the number of its facilities in the -- in
 9   Colorado; isn't that correct?
10        A    That's correct.
11        Q    Surge Centers started with Kissing Camels
12   and Dry Creek in 2010; is that correct?
13        A    That's correct.
14        Q    And added Hampden and Cherry Creek in
15   2012; is that correct?
16        A    That's correct.
17        Q    And then added Castle Rock and Mile High
18   in late 2013, early 2014; is that correct?
19        A    That's correct.
20        Q    So when you talk about a potential
21   chilling effect on investors, the evidence that we
22   actually observe is that the investor who was
23   associated with these plaintiffs' facilities was
24   actually expanding its presence in Colorado
25   throughout this relevant period; isn't that
```

Page 143

```
 1   correct?
 2            MR. BROWN:  Object to form.
 3       A    That's correct.
 4       Q    So that would not suggest that there was
 5   a chilling effect on new investment in Colorado; is
 6   that correct?
 7       A    No.  I wasn't speaking about a chilling
 8   effect in fact, although I don't know what happened
 9   with those projects.
10            What I'm saying is if in fact the four
11   plaintiffs were driven out of business, that might
12   have had a chilling effect or probably should have
13   a chilling effect of some sort.
14       Q    Were any of the plaintiffs driven out of
15   business at any point?
16       A    No.
17       Q    All of the plaintiff facilities continued
18   to operate; is that correct?
19       A    That's correct.
20       Q    ████████████████████████████████████████
     ████████████████████████████████████████████████
     ██ ██ ██
23       Q    Throughout the entire six year period in
24   which the plaintiffs allege a conspiracy was at
25   work, from 2010 to today, has there been any
```

Page 144

```
 1   facilities out.  Actually, two different markets.
 2   There's the Colorado Springs and Denver.
 3        Q    Is an HHI analysis alone sufficient to
 4   show harm to competition?
 5        A    No.
 6        Q    I'm sorry?
 7        A    No.
 8        Q    Why not?
 9        A    Well, there are other things that ought
10   to be considered, like some of the things we've
11   just been talking about in terms of access, you
12   know, consumer welfare, things that you've talked
13   about.
14        Q    What else would you need to consider in
15   order to determine whether there's harm to
16   competition?
17        A    You could consider price, if you can get
18   the data.  I mean, the data weren't available here
19   for that.
20        Q    In terms of an HHI analysis, are there --
21   would you also have to consider things like ease of
22   entry, capability of other providers to expand or
23   enter the market, things of that nature?
24        A    Yeah.  Ease of entry would be a factor,
25   yes.
```

Page 161